UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

THE UNITED STATES OF AMERICA *ex rel*. THE TARBELL GROUP, LLC,

Plaintiff,

v.

BRISTOL TN-VA ASSOCIATION OF REALTORS, *et al.*,

Defendants.

Case No. 1:25-CV-111-TRM-MJD

CHIEF JUDGE MCDONOUGH
MAGISTRATE JUDGE DUMITRU

**JOINT APPENDIX**

In accordance with Section 5.H of the Court's judicial preferences and its Order, dated September 14, 2026 (Doc. 149), the parties submit the following joint appendix containing materials cited in Defendants' motion for summary judgment and accompanying memorandum of law.

| Document | Description | Joint Appendix # |
| --- | --- | --- |
| Stipulation | Stipulation by Relator | 1 |
| Declaration of J. Andrew Whitten ("Declaration") | Declaration related to public data about PPP loans that was released on the Small Business Administration's ("SBA") website and related topics | 3 |
| Exhibit 1 to Declaration | Screenshot of SBA webpage reflecting public disclosure of PPP loan borrowers' data on 3/3/2021 | 8 |
| Exhibit 2 to Declaration | Source code for SBA webpage | 11 |

| Document | Description | Joint Appendix # |
|---|---|---|
| Exhibit 3 to Declaration | Screenshot from web-archival tool (the "Wayback Machine") showing archived SBA webpage as of 3/24/2025 | 20 |
| Exhibit 4 to Declaration | Document compiling screenshots of each Defendant's pertinent loan information from spreadsheets downloaded from SBA webpage. | 22 |
| Exhibit 5 to Declaration | Article entitled *Judge Orders the Release of Data on Emergency Loans for Small Businesses*, published on ProPublica. | 23 |
| Exhibit 6 to Declaration | Opinion ordering SBA to release PPP loan information pursuant to Freedom of Information Act request. *WP Co. LLC v. U.S. Small Bus. Admin.*, Civ. A. No. 20-1240, D.D.C., Doc. 23 (11/5/20). | 29 |
| Exhibit 7 to Declaration | IRS press release, dated 5/7/18, introducing Tax Exempt Organization ("TEO") Search Tool. | 71 |
| Exhibit 8 to Declaration | Screenshot from web-archival tool (the "Wayback Machine") showing that TEO Search Tool was publicly available before 2025. | 73 |
| *Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020) | Copy of the first SBA interim final rule regarding PPP loan eligibility, which, *inter alia*, limited eligibility of § 501(c) organizations to only § 501(c)(3) and (c)(19) organizations (referred to in Defendant's memorandum as the "April 2020 Rule" and previously judicially noticed at DE 61-9).<br>Available at https://www.federalregister.gov/documents/2020/04/15/2020-07672/business-loan-program-temporary-changes-paycheck-protection-program (last visited Oct. 5, 2026). | 74 |

| Document | Description | Joint Appendix # |
| --- | --- | --- |
| *Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3692, 3692-3712 (January 14, 2021) | Copy of the SBA interim final rule that, inter alia, expanded PPP loan eligibility to § 501(c)(6) organizations on January 12, 2021 (referred to in Defendant's memorandum as the "January 2021 Rule").<br><br>Available at: https://www.federalregister.gov/documents/2021/01/14/2021-00451/business-loan-program-temporary-changes-paycheck-protection-program-as-amended-by-economic-aid-act (last visited Oct. 5, 2026). | 81 |
| *Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act*, 86 Fed. Reg. 15083, 15083-15089 (March 22, 2021) | Copy of the SBA interim final rule that, inter alia, expanded PPP loan eligibility to § 501(c)(7), (8), and (13) organizations on March 18, 2021 (referred to in Defendant's memorandum as the "March 2021 Rule") (previously judicially noticed at DE 61-10).<br><br>Available at: https://www.federalregister.gov/documents/2021/03/22/2021-05930/business-loan-program-temporary-changes-paycheck-protection-program-as-amended-by-american-rescue (last visited Oct. 5, 2026). | 102 |
| Blank PPP "Borrower Application Form" | Copy of a blank PPP Borrower Application Form, U.S. Dep't of the Treasury.<br><br>Available at: https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Application-3-30-2020-v3.pdf (last visited Oct. 5, 2026). | 109 |
| ProPublica.org*: Tracking PPP: Search Every Company Approved for Federal Loans* | Screenshot of the ProPublica.org webpage that allows users to search PPP loans, showing it was last updated October 27, 2024.<br><br>Available at: https://projects.propublica.org/coronavirus/bailouts/ (last visited Oct. 5, 2026). | 113 |
| Virginia State Corporation Clerk's Information System, Business Entity Search | Screenshot of a Virginia State Corporation Commission webpage showing The Tarbell Group, LLC's formation date using the Business Entity Search (previously judicially noticed at DE 61-5). | 114 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

THE UNITED STATES OF AMERICA *ex rel.* THE TARBELL GROUP, LLC,

Plaintiff,

v.

BRISTOL TN-VA ASSOCIATION OF REALTORS, *et al.*,

Defendants.

Case No. 1:25-CV-111-TRM-MJD

CHIEF JUDGE MCDONOUGH
MAGISTRATE JUDGE DUMITRU

**STIPULATION**

The relator, the Tarbell Group, LLC ("Relator") stipulates as follows:

1. As used in this Stipulation, "Defendants" collectively refers to: (1) Fort Loudoun Yacht Club Inc., (2) Lakewood Golf & Country Club Inc., (3) River Bend Country Club Inc., (4) Tullahoma Chamber of Commerce, (5) Knoxville Racquet Club Inc., (6) Home Builders Association of Greater Knoxville Inc., (7) Green Meadow Country Club Inc., (8) Knoxville Academy of Medicine, (9) Oak Grove Cemetery Association, (10) Tennessee Valley Public Power Association Inc., (11) Homebuilders Association of Greater Chattanooga, (12) Signal Mountain Golf and Country Club, (13) Shelbyville Lodge No. 2197 Loyal Order of Moose, (14) Greeneville Lodge No. 692 Loyal Order of Moose, and (15) Fraternal Order of Police-Volunteer Lodge No. 2; and (16) Rogersville-Hawkins County Chamber of Commerce.

2. Solely for purposes of this action, Relator does not contest that the tax-exempt status of each of the Defendants, at the time it applied for its PPP loan, was, before the Complaint was filed, publicly disclosed from a source enumerated in 31 U.S.C. § 3730(e)(4)(A).

3. Solely for purposes of this action, Relator does not claim to be an "original source" as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

4. Solely for purposes of this action, Relator does not contest that the following information about each of the Defendant's PPP loans was, before the Complaint was filed, publicly disclosed from a source enumerated in 31 U.S.C. § 3730(e)(4)(A): (a) loan number, (b) date of approval, (c) borrower name and address, (d) loan status, (e) loan term, (f) originating lender, (g) loan amount, (h) forgiveness amount, (i) forgiveness date, and (j) the entries appearing in the "BusinessType" and "NAICSCode" fields of the Small Business Administration's published loan-level data for that loan.

5. Relator does not stipulate, and nothing in this Stipulation may be read to concede, that: (a) any source enumerated in 31 U.S.C. § 3730(e)(4)(A) disclosed any Defendant's completed application for a PPP loan or for forgiveness of a PPP loan, any certification any defendant made in either, or any Defendant's knowledge or state of mind when it applied or certified; (b) the public availability of a blank SBA form is a disclosure of any Defendant's application or certification, and (c) that the information described in this Stipulation constitutes "allegations or transactions" within the meaning of § 3730(e)(4)(A).

So stipulated.

The Tarbell Group, LLC

By: Bruce Ellis Fein

Dated: Oct. 5, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT CHATTANOOGA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. THE TARBELL GROUP, LLC,<br><br>*Plaintiff-Relator*,<br><br>v.<br><br>BRISTOL TN-VA ASSOCIATION OF REALTORS, et al.,<br><br>*Defendants*. | No. 1:25-CV-111-TRM-MJD |

**DECLARATION OF J. ANDREW WHITTEN**

1. My name is James Andrew Whitten. I am over the age of 18, am competent to make this declaration, and make this declaration based on my personal knowledge.

2. I am an associate attorney with Miller & Martin PLLC, which represents Defendant Tennessee Valley Public Power Association, Inc. in the above-captioned lawsuit. I am making and submitting this declaration in support of certain Defendants' joint motion for summary judgment addressing their False Claims Act public-disclosure-bar defense.

3. As of the date of this declaration's execution (the "Execution Date"), the United States Small Business Administration's ("SBA") website included a webpage with links to downloadable .CSV files that contain data about borrowers that received loans through the Paycheck Protection Program ("PPP").

4. The webpage referenced in Paragraph 3 can be found at the following link: https://data.sba.gov/dataset/ppp-foia (the "Webpage").

5. As of the Execution Date, the Webpage reflected that the SBA publicly disclosed spreadsheets with borrowers' data on March 3, 2021, and that the spreadsheets were last modified

on October 21, 2024, as shown in the screenshot attached as Exhibit 1. Note the heading on Exhibit 1 confirming the Webpage is "[a]n official website of the United States government."

6. As of the Execution Date, the Webpage's source code also reflected that the SBA last updated the Webpage on October 21, 2024, as shown in the highlighted section on Page 6 of the document attached to this declaration as Exhibit 2.

7. Additionally, using a common web archive tool, the "Wayback Machine," I confirmed that, on March 24, 2025, the Webpage reflected a last updated date of October 21, 2024. *See* Exhibit 3.

8. I personally visited the Webpage, downloaded the .CSV files labeled public_150k_plus_240930.csv and public_up_to_150k_10_240930.csv, and searched those files for each of the following Defendants' PPP loan data:

a. Fourt Loudon Yacht Club, Inc.;

b. The Fraternal Order of Police—Volunteer Lodge No. 2;

c. Green Meadow Country Club, Inc.;

d. Greenville Lodge Number 692 Loyal Order of Moose;

e. Homebuilders Association of Greater Chattanooga;

f. Homebuilders Association of Greater Knoxville, Inc.;

g. The Knoxville Academy of Medicine;

h. The Knoxville Racquet Club, Inc.;

i. Lakewood Golf & Country Club, Inc.;

j. Oak Grove Cemetery Association;

k. River Bend Country Club, Inc.;

l. Rogersville-Hawkins County Chamber of Commerce, Inc.;

m. Shelbyville Lodge No. 2197 Loyal Order of the Moose;

n. Signal Mountain Golf & Country Club;

o. Tennessee Valley Public Power Association, Inc.; and

p. The Tullahoma Chamber of Commerce.

9. I took screenshots of pertinent information in the spreadsheets as it relates to this litigation, including each Defendant's name as listed in the SBA's spreadsheets, the dates on which each Defendant applied for a PPP loan, the PPP loan amounts each Defendant received, the dates on which each Defendant's PPP loan(s) were forgiven, and the type of business the SBA listed for each Defendant. Exhibit 4 to this declaration contains screenshots of each Defendant's pertinent information from the spreadsheets I downloaded from the Webpage.

10. The SBA listed many of the Defendants as nonprofit entities in the spreadsheets, as shown in Exhibit 4.

11. Exhibit 4 thus demonstrates that each Defendant's PPP loan amounts, the dates each Defendant accepted PPP loans, and some Defendants' status as nonprofit entities were publicly available through SBA publications before the Relator filed suit on April 2, 2025.

12. According to ProPublica, an investigative news organization, the SBA released the loan data on the Webpage in response to organizations like ProPublica initiating a lawsuit against the SBA in response to the SBA's refusal to provide borrowers' PPP loan data to entities that submitted a Freedom of Information Act ("FOIA") request to the SBA. *See* Exhibit 5.

13. Exhibit 6 includes a November 5, 2020 memorandum opinion and accompanying order from the United States District Court for the District of Columbia directing the SBA to release the SBA's PPP data to ProPublica and the other organizations that joined the FOIA lawsuit against the SBA to obtain PPP borrowers' information. That order was stayed temporarily, but as reflected in the November 24, 2020 order also included in Exhibit 6, the court subsequently lifted

the stay and ordered the SBA to disclose "the names, addresses, and precise loan amounts for all individuals and entities that obtained COVID-related loans pursuant to the Paycheck Protection Program" by December 1, 2020.

14. In addition to searching for each Defendants' PPP loan data, I used the "Tax Exempt Organization Search Tool" from the Internal Revenue Service ("IRS") located at https://apps.irs.gov/app/eos/details/ (the "TEO Search Tool") to search for each of the Defendants listed in Paragraph 8 above.

15. Using the TEO Search Tool, I personally located Form 990s that each Defendant filed with the IRS prior to the filing of the Complaint. These Form 990s list the specific 501(c) designation for each Defendant.

16. The IRS issued a press release on May 7, 2018, stating that it introduced the TEO Search Tool on that date and that the TEO Search Tool would provide users access to Forms 990 for tax exempt organizations. The press release is attached as Exhibit 7.

17. Through the Wayback Machine, I was able to confirm that the TEO Search Tool was publicly available online prior to 2025. *See* Exhibit 8.

18. Because the information about Defendants' PPP loans and 501(c) status described in this declaration constitutes or is derived from United States government records publicly disclosed through official United States government websites and thereafter publicly reported by news media organizations, the information—including the timing of the public disclosure—is not subject to reasonable dispute and, respectfully, should be judicially noticed as fact by the Court. *See* Fed. R. Evid. 201.

19. I declare under penalty of perjury that the foregoing is true and correct.

[SIGNATURE ON FOLLOWING PAGE]

Date: 10/05/2026
Chattanooga, Tennessee

*s/ J. Andrew Whitten*
J. ANDREW WHITTEN

An official website of the United States government Here's how you know

U.S. Small Business Administration

Home Open data Datasets Paycheck Protection Program (PPP) FOIA

# Paycheck Protection Program (PPP) FOIA

SBA open dataset providing loan-level data on all disbursed PPP loans.

## Data and resources

- PPP Data Dictionary.xlsx (xlsx)
- public_150k_plus_240930.csv (csv)
- public_up_to_150k_1_240930.csv (csv)
- public_up_to_150k_2_240930.csv (csv)
- public_up_to_150k_3_240930.csv (csv)
- public_up_to_150k_4_240930.csv (csv)
- public_up_to_150k_5_240930.csv (csv)
- public_up_to_150k_6_240930.csv (csv)
- public_up_to_150k_7_240930.csv (csv)
- public_up_to_150k_8_240930.csv (csv)
- public_up_to_150k_9_240930.csv (csv)
- public_up_to_150k_10_240930.csv (csv)
- public_up_to_150k_11_240930.csv (csv)
- public_up_to_150k_12_240930.csv (csv)

## Additional information

| | |
|---|---|
| **Publisher** | U.S. Small Business Administration |
| **Program** | Program Management and Administration |
| **Issue date** | March 3, 2021 |
| **Last modified** | October 21, 2024 |
| **Contact** | SBA Chief Data Officer |
| **License** | U.S. Government Works |
| **Frequency** | Irregular |
| **Landing Page** | View Landing Page |
| **Topic** | Capital Access Capital FOIA |
| **Tags** | COVID-19 coronavirus loan |
| **Identifier** | SBA-OCA-2022-07-001 |

Return to top

**Open data**

Datasets

Topics

About

**About the site**

Privacy policy

Linking policy

Plain language

Accessibility

Disclaimers

Provide Feedback

**Open government**

Freedom of Information Act

**Oversight**

Inspector General

No Fear Act

Open data sources

Policies and guidance

Budget and performance

Regulations.gov

Advocacy

Hearings and appeals

Ombudsman

Fraud and identity theft

WhiteHouse.gov

USA.gov

**U.S. Small Business Administration**
409 3rd St., SW
Washington, DC 20416
800-827-5722

Line wrap

```
<!DOCTYPE html>
<html lang="en" dir="ltr" prefix="og: https://ogp.me/ns#">
<head>
  <meta charset="utf-8" />
<meta name="description" content="SBA open dataset providing loan-level data on all disbursed PPP loans." />
<link rel="canonical" href="https://data.sba.gov/dataset/ppp-foia" />
<meta property="og:title" content="Paycheck Protection Program (PPP) FOIA | SBA open data" />
<meta property="og:description" content="SBA open dataset providing loan-level data on all disbursed PPP loans." />
<meta property="og:image" content="https://www.sba.gov/themes/custom/sba/dist/img/social/SBASEOImage.jpg" />
<meta property="og:image:alt" content="U.S. Small Business Association" />
<meta name="twitter:card" content="summary" />
<meta name="twitter:site" content="@SBAgov" />
<meta name="twitter:title" content="Paycheck Protection Program (PPP) FOIA | SBA open data" />
<meta name="twitter:description" content="SBA open dataset providing loan-level data on all disbursed PPP loans." />
<meta name="twitter:image:alt" content="U.S. Small Business Association" />
<meta name="twitter:image" content="https://www.sba.gov/themes/custom/sba/dist/img/social/SBASEOImage.jpg" />
<meta name="Generator" content="Drupal 11 (https://www.drupal.org)" />
<meta name="MobileOptimized" content="width" />
<meta name="HandheldFriendly" content="true" />
<meta name="viewport" content="width=device-width, initial-scale=1.0" />
<link rel="icon" href="/themes/custom/sba/favicon.ico" type="image/vnd.microsoft.icon" />

  <title>Paycheck Protection Program (PPP) FOIA | SBA open data</title>
  <link rel="stylesheet" media="all" href="/sites/default/files/css/css_SKs5UfBIrhRGgtGttdZy9qOcqnKU6qeYzm9F02wTgZ8.css?delta=0&amp;language=en&amp;the
<link rel="stylesheet" media="all" href="/sites/default/files/css/css_2kyni7xj6CYvhMxZA0KHolUcuqzMlvM-Qx9_EVcwajc.css?delta=1&amp;language=en&amp;theme

  <script type="application/json" data-drupal-selector="drupal-settings-json">{"path":{"baseUrl":"\/","pathPrefix":"","currentPath":"node\/216","curren
<script src="/sites/default/files/js/js_b62eu_pbVxsdDQn8ZKGDPoZo1cyBbSzGaNpr_NBNY44.js?scope=header&amp;delta=0&amp;language=en&amp;theme=sba&amp;inclu
<script src="/modules/contrib/google_tag/js/gtag.js?tls2iy"></script>
<script src="/modules/contrib/google_tag/js/gtm.js?tls2iy"></script>

  <link rel="preload" href="/themes/custom/sba/dist/uswds/fonts/source-sans-pro/sourcesanspro-regular-webfont.woff2" as="font" type="font/woff2" crosso
<link rel="preload" href="/themes/custom/sba/dist/uswds/fonts/source-sans-pro/sourcesanspro-semibold-webfont.woff2" as="font" type="font/woff2" crossor

  <noscript><link rel="stylesheet" href="/themes/custom/sba/dist/uswds/css/noscript.css?0" />
</noscript>
</head>
<body class="path-node page-node-type-data">
<a href="#main-content" class="usa-skipnav">
  Skip to main content
</a>
<noscript><iframe src="https://www.googletagmanager.com/ns.html?id=GTM-TCQ8CL42"
                  height="0" width="0" style="display:none;visibility:hidden"></iframe></noscript>

  <div class="dialog-off-canvas-main-canvas" data-off-canvas-main-canvas>

<section class="usa-banner" aria-label="Official website of the United States government">
  <div class="usa-accordion">
    <header class="usa-banner__header">
      <div class="usa-banner__inner">
        <div class="grid-col-auto">
          <img
            class="usa-banner__header-flag"
            src="/themes/custom/sba/dist/uswds/img/us_flag_small.png"
            alt=""
            width="16"
            height="11"
          />
        </div>
        <div class="grid-col-fill tablet:grid-col-auto" aria-hidden="true">
          <p class="usa-banner__header-text">
            An official website of the United States government
          </p>
          <p class="usa-banner__header-action">
            Here’s how you know
          </p>
        </div>
        <button
          class="usa-accordion__button usa-banner__button"
          aria-expanded="false"
          aria-controls="gov-banner-default"
        >
          <span class="usa-banner__button-text">Here’s how you know</span>
        </button>
      </div>
    </header>
    <div class="usa-banner__content usa-accordion__content" id="gov-banner-default">
      <div class="grid-row grid-gap-lg">
        <div class="usa-banner__guidance tablet:grid-col-6">
          <img
            class="usa-banner__icon usa-media-block__img"
            src="/themes/custom/sba/dist/uswds/img/icon-dot-gov.svg"
            role="img"
            alt=""
            aria-hidden="true"
```

```
          />
          <div class="usa-media-block__body">
            <p>
              <strong> Official websites use .gov </strong>
                <br />
                A <strong>.gov</strong> website belongs to an official government
                organization in the United States.            </p>
          </div>
        </div>
        <div class="usa-banner__guidance tablet:grid-col-6">
          <img
            class="usa-banner__icon usa-media-block__img"
            src="/themes/custom/sba/dist/uswds/img/icon-https.svg"
            role="img"
            alt=""
            aria-hidden="true"
          />
          <div class="usa-media-block__body">
            <p>
              <strong> Secure .gov websites use HTTPS </strong>
                <br />
                A <strong>lock</strong> (
                <span class="icon-lock"
                  ><svg
                    xmlns="http://www.w3.org/2000/svg"
                    width="52"
                    height="64"
                    viewBox="0 0 52 64"
                    class="usa-banner__lock-image"
                    role="img"
                    aria-labelledby="banner-lock-description-default"
                    focusable="false"
                  >
                    <title id="banner-lock-title-default">Lock</title>
                    <desc id="banner-lock-description-default">Locked padlock</desc>
                    <path
                      fill="#000000"
                      fill-rule="evenodd"
                      d="M26 0c10.493 0 19 8.507 19 19v9h3a4 4 0 0 1 4 4v28a4 4 0 0 1-4 4H4a4 4 0 0 1-4-4V32a4 4 0 0 1 4-4h3v-9C7 8.507 15.507 0 26 0zm
                    /></svg
                ></span>
                ) or <strong>https://</strong> means you've safely connected to
                the .gov website. Share sensitive information only on official,
                secure websites.           </p>
          </div>
        </div>
      </div>
    </div>
  </div>
</section>



<div class="usa-overlay"></div>

<header class="usa-header usa-header--extended usa-header--extended-megamenu" id="header">

      <div class="usa-banner-inner">
        <div>
    <div data-drupal-messages-fallback class="hidden"></div>

  </div>

    </div>
    <div class="usa-navbar" data-test="usaNavBar">
    <div class="usa-logo site-logo" id="logo">
      <a href="https://www.sba.gov/" target="_blank">
        <picture>
          <source srcset="/themes/custom/sba/dist/img/logo-icon.svg" width="73" height="56" media="(max-width: 400px)"/>
          <img src="/themes/custom/sba/dist/img/logo-horizontal.svg" alt="SBA Home" width="206" height="56">
        </picture>
      </a>
    </div>

    <button class="usa-menu-btn sba-menu-btn" data-test="menuButton">
      <span class="visually-hidden">
        Menu
      </span>
      <span class="sba-menu-btn__icon">
        <span></span>
        <span></span>
        <span></span>
      </span>
    </button>
  </div>
```

```
<nav aria-labelledby="primary-navigation-title" class="usa-nav">
  <h2 id="primary-navigation-title" class="visually-hidden">Primary Navigation</h2>
  <div class="usa-nav__inner">
    <button class="usa-nav__close" data-test="navCloseButton">
      <img src="/themes/custom/sba/dist/uswds/img/usa-icons/close.svg" alt="close"/>
    </button>

          <ul class="usa-nav__primary usa-accordion">
          <li data-test="primaryNavMenu" class="usa-nav__primary-item hard-coded-menu-item">
      <a href="/" class="usa-nav__link usa-nav__link--level-0 usa-nav__link--subsite"><span>Open data</span></a>
    </li>

                <li data-test="primaryNavMenu" class="usa-nav__primary-item">





      <a href="/dataset" class="usa-nav__link usa-nav__link--level-0" data-drupal-link-system-path="dataset">          <span>Datasets</span>
      </a>


            </li>

                <li data-test="primaryNavMenu" class="usa-nav__primary-item">





      <a href="/topics" class="usa-nav__link usa-nav__link--level-0" data-drupal-link-system-path="node/3">          <span>Topics</span>
      </a>


            </li>

                <li data-test="primaryNavMenu" class="usa-nav__primary-item">





      <a href="/about" class="usa-nav__link usa-nav__link--level-0" data-drupal-link-system-path="node/1">          <span>About</span>
      </a>


            </li>

                <li data-test="primaryNavMenu" class="usa-nav__primary-item">





      <a href="/oca-datasets" class="usa-nav__link usa-nav__link--level-0" data-drupal-link-system-path="node/350">          <span>Office of Capital
      </a>


            </li>


          </ul>










            <div  class="usa-nav__secondary">



  <section aria-label="Search component">
    <form class="usa-search usa-search--small" role="search" action="/dataset" method="get">
      <label class="usa-sr-only" for="search-field">Search</label>
      <input class="usa-input" id="search-field" type="search" name="search_api_fulltext"/>
      <button class="usa-button" type="submit">
        <img src="/themes/custom/sba/dist/uswds/img/usa-icons-bg/search--white.svg" class="usa-search__submit-icon" alt="Search"/>
      </button>
    </form>
  </section>
</div>

          </div>
```

```
  </nav>
</header>
<main class="main-content usa-layout-docs usa-section padding-top-0 " data-test="mainContent">
  <a id="main-content" tabindex="-1"></a>
  <div class="grid-container">
                <div class="grid-row">
        <div id="block-sba-breadcrumbs" class="block block-system block-system-breadcrumb-block">
      <nav class="usa-breadcrumb" aria-labelledby="system-breadcrumb">
    <h2 id="system-breadcrumb" class="usa-sr-only">Breadcrumb</h2>
    <ol class="usa-breadcrumb__list">
      <li class="usa-breadcrumb__list-item">
        <a href="https://www.sba.gov" class="usa-breadcrumb__link">
          <span>Home</span>        </a>
      </li>
                  <li class="usa-breadcrumb__list-item " >
                  <a href="/" class="usa-breadcrumb__link">
            <span>Open data</span>
          </a>
                </li>
                  <li class="usa-breadcrumb__list-item " >
                  <a href="/dataset" class="usa-breadcrumb__link">
            <span>Datasets</span>
          </a>
                </li>
                  <li class="usa-breadcrumb__list-item usa-current" aria-current="page">
                  <span>Paycheck Protection Program (PPP) FOIA</span>
                </li>
          </ol>
  </nav>
  </div>
      </div>
      <div class="">
      </div>
    <div class="sba-layout-docs ">
      <div class="usa-layout-docs__main">
  <h1 data-test="title" >
<span>Paycheck Protection Program (PPP) FOIA</span>
</h1>
<div id="block-sba-content" class="block block-system block-system-main-block">
<article class="node node--type-data node--promoted node--view-mode-full">
  <div class="text-content node__content">
                 <div class="description">
          SBA open dataset providing loan-level data on all disbursed PPP loans.
      </div>
                            <h2>Data and resources</h2>
        <ul>                                     <li>
                                                      <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                    </li>
                                                <li>
                                                      <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                    </li>
                                                <li>
```

```
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                                        <li>
                                                  <a href="https://data.sba.gov/sites/default/files/distribution/SBA-OCA-2022
                        </li>
                        </ul>

          <h2>Additional information</h2>
          <table class="dataset-metadata-table usa-table">
```

```
        <caption class="visually-hidden">Additional information</caption>
        <thead>
            <tr class="visually-hidden">
                <th>Key</th>
                <th>Value</th>
            </tr>
        </thead>
        <tbody>
                        <tr class="publisher">
                <th scope="row">Publisher</th>
                <td>U.S. Small Business Administration</td>
            </tr>

                        <tr class="program-code">
                <th scope="row">Program</th>
                <td>
                                      <span data-program-code="028:032">Program Management and Administration</span>                <
            </tr>

                        <tr class="issued">
                <th scope="row">Issue date</th>
                <td>March 3, 2021</td>
            </tr>

                        <tr class="modified">
                <th scope="row">Last modified</th>
                <td>October 21, 2024</td>
            </tr>

                        <tr class="contact-point">
                <th scope="row">Contact</th>
                <td>
                                      <a href="mailto:chiefdataofficerteam@sba.gov">SBA Chief Data Officer</a>
                                  </td>
            </tr>

                                                                <tr class="license">
                  <th scope="row">License</th>
                  <td>
                                          <a href="https://www.usa.gov/publicdomain/label/1.0/">U.S. Government Works</a>
                                      </td>
              </tr>

                        <tr class="accrual-periodicity" data-accrual-periodicity="irregular">
                <th scope="row">Frequency</th>
                <td>Irregular</td>
            </tr>


                        <tr class="dcat-landing-page">
                <th scope="row">Landing Page</th>
                <td><a href="https://prod.data.ussba.io/oca-datasets/edit">View Landing Page</a></td>
            </tr>


                        <tr class="themes">
                <th scope="row">Topic</th>
                <td>
                    <div class="item-tags">
                                                    <a href="/dataset?theme%5B0%5D=Capital%20Access" class="item-tag">Capital Access</a>
                                                    <a href="/dataset?theme%5B0%5D=Capital" class="item-tag">Capital</a>
                                                    <a href="/dataset?theme%5B0%5D=FOIA" class="item-tag">FOIA</a>
                                            </div>
                </td>
            </tr>

                        <tr class="keywords">
              <th scope="row">Tags</th>
              <td>
                <div class="item-tags">
                                      <a href="/dataset?keyword%5B0%5D=COVID-19" class="item-tag">COVID-19</a>
                                      <a href="/dataset?keyword%5B0%5D=coronavirus" class="item-tag">coronavirus</a>
                                      <a href="/dataset?keyword%5B0%5D=loan" class="item-tag">loan</a>
                                  </div>
              </td>
            </tr>

                        <tr class="identifier">
                <th scope="row">Identifier</th>
                <td>SBA-OCA-2022-07-001</td>
            </tr>

        </tbody>
      </table>
      </div>
</article>
```

```html

</div>



    </div>
  </div>
  </div>
</main>

<footer class="usa-footer usa-footer--big ">
  <div class="grid-container usa-footer__return-to-top">
    <a href="#">Return to top</a>
  </div>


    <div>




    <div class="usa-footer__primary-section">
    <div class="grid-container">
      <div class="grid-row grid-gap">
        <div class="tablet:grid-col-9">
          <nav class="usa-footer__nav" aria-labelledby="footer-menu-navigation">
            <h2 class="visually-hidden" id="footer-menu-navigation">Footer navigation</h2>
            <div class="grid-row grid-gap-4">
                      <div class="mobile-lg:grid-col-6 desktop:grid-col-3">
        <section class="usa-footer__primary-content usa-footer__primary-content--collapsible" data-test="footerCol">
          <h3 class="usa-footer__primary-link">Open data</h3>
                <ul class="usa-list usa-list--unstyled">
                      <li class="usa-footer__secondary-link">
        <a href="/dataset" data-drupal-link-system-path="dataset">Datasets</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="/topics" data-drupal-link-system-path="node/3">Topics</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="/about" data-drupal-link-system-path="node/1">About</a>
      </li>

            </ul>
               </section>
      </div>
                <div class="mobile-lg:grid-col-6 desktop:grid-col-3">
        <section class="usa-footer__primary-content usa-footer__primary-content--collapsible" data-test="footerCol">
          <h3 class="usa-footer__primary-link">About the site</h3>
                <ul class="usa-list usa-list--unstyled">
                      <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/about-sbagov-website/privacy-policy">Privacy policy</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/about-sbagov-website/linking-policy">Linking policy</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/information-quality/plain-language">Plain language</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/about-sbagov-website/accessibility">Accessibility</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/about-sbagov-website/disclaimer">Disclaimers</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="mailto:chiefdataofficerteam@sba.gov?subject=Open%20Data%20Site%20Feedback">Provide Feedback</a>
      </li>

            </ul>
               </section>
      </div>
                <div class="mobile-lg:grid-col-6 desktop:grid-col-3">
        <section class="usa-footer__primary-content usa-footer__primary-content--collapsible" data-test="footerCol">
          <h3 class="usa-footer__primary-link">Open government</h3>
                <ul class="usa-list usa-list--unstyled">
                      <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/foia">Freedom of Information Act</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/about-sbagov-website/no-fear-act">No Fear Act</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://data.sba.gov/">Open data sources</a>
      </li>
                <li class="usa-footer__secondary-link">
        <a href="https://www.sba.gov/about-sba/open-government/sba-guidance">Policies and guidance</a>
      </li>
```

```html
                        <li class="usa-footer__secondary-link">
      <a href="https://www.sba.gov/about-sba/organization/performance">Budget and performance</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.regulations.gov/">Regulations.gov</a>
    </li>

          </ul>
                </section>
    </div>
                        <div class="mobile-lg:grid-col-6 desktop:grid-col-3">
      <section class="usa-footer__primary-content usa-footer__primary-content--collapsible" data-test="footerCol">
        <h3 class="usa-footer__primary-link">Oversight</h3>
                        <ul class="usa-list usa-list--unstyled">
                                    <li class="usa-footer__secondary-link">
      <a href="https://www.sba.gov/about-sba/oversight-advocacy/office-inspector-general">Inspector General</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://advocacy.sba.gov/">Advocacy</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.sba.gov/about-sba/oversight-advocacy/office-hearings-appeals">Hearings and appeals</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.sba.gov/about-sba/oversight-advocacy/office-national-ombudsman">Ombudsman</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.sba.gov/funding-programs/loans/covid-19-relief-options/preventing-fraud-identity-theft">Fraud and identity theft</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.whitehouse.gov/">WhiteHouse.gov</a>
    </li>
                        <li class="usa-footer__secondary-link">
      <a href="https://www.usa.gov">USA.gov</a>
    </li>

          </ul>
                </section>
    </div>

          </div>
        </nav>
      </div>
    </div>
  </div>
</div>



</div>

<div class="usa-footer__secondary-section">
<div class="grid-container">
  <div class="sba-footer-grid grid-row grid-gap">
    <div class="usa-footer__logo grid-row mobile-lg:grid-col-6 mobile-lg:grid-gap-2">
      <div class="mobile-lg:grid-col-auto">
        <img class="usa-footer__logo-img" src="/themes/custom/sba/dist/img/sba-logo.svg" alt="" loading="lazy" width="80" height="80"/>
      </div>
      <address class="mobile-lg:grid-col-auto usa-footer__address">
        <div class="usa-footer__contact-info grid-row grid-gap">
          <div class="grid-col-auto">
            <div id="block-sba-sbafooteraddress" class="block block-sbagov-footer-address block-id-sbafooteraddress">


    <p><strong>U.S. Small Business Administration</strong><br />409 3rd St., SW<br />Washington, DC 20416<br /><a href="tel:800-827-5722">800-827-572
</div>

          </div>
        </div>
      </address>
    </div>

    <div class="usa-footer__contact-links mobile-lg:grid-col-6">
      <div class="usa-footer__social-links grid-row grid-gap-1">
        <div class="grid-col-auto">
          <a class="usa-social-link" href="https://facebook.com/SBAgov" data-test="footerSocialLink">
            <img class="usa-social-link__icon" src="/themes/custom/sba/dist/img/sba-icons/facebook.svg" alt="SBA-Facebook" loading="lazy" width="40"
          </a>
        </div>

        <div class="grid-col-auto">
          <a class="usa-social-link" href="https://twitter.com/sbagov" data-test="footerSocialLink">
            <img class="usa-social-link__icon" src="/themes/custom/sba/dist/img/sba-icons/xlogo.svg" alt="SBA-X" loading="lazy" width="40" height="40
          </a>
        </div>
```

```
          <div class="grid-col-auto">
            <a class="usa-social-link" href="https://www.youtube.com/sbagov" data-test="footerSocialLink">
              <img class="usa-social-link__icon" src="/themes/custom/sba/dist/img/sba-icons/youtube.svg" alt="SBA-YouTube" loading="lazy" width="40" he
            </a>
          </div>

          <div class="grid-col-auto">
            <a class="usa-social-link" href="https://linkedin.com/company/us-small-business-administration" data-test="footerSocialLink">
              <img class="usa-social-link__icon" src="/themes/custom/sba/dist/img/sba-icons/linkedin.svg" alt="SBA-Linkedin" loading="lazy" width="40"
            </a>
          </div>

          <div class="grid-col-auto">
            <a class="usa-social-link" href="https://instagram.com/sbagov" data-test="footerSocialLink">
              <img class="usa-social-link__icon" src="/themes/custom/sba/dist/img/sba-icons/instagram.svg" alt="SBA-Instagram" loading="lazy" width="40
            </a>
          </div>
        </div>
      </div>
    </div>
  </div>
</div>


</footer>

  </div>


<script src="/core/assets/vendor/jquery/jquery.min.js?v=4.0.0"></script>
<script src="/sites/default/files/js/js_4W8PPe4yzWHYEpU41_NPzWxiyrc8sFMYN31KhMf_-Ys.js?scope=footer&amp;delta=1&amp;language=en&amp;theme=sba&amp;inclu

</body>
</html>
```

INTERNET ARCHIVE WaybackMachine
https://data.sba.gov/dataset/ppp-foia Go
511 captures
4 Apr 2021 - 1 Sep 2026
FEB MAR MAY
24
2024 2025 2026
About this capture

Followers

0

Organization

U.S. Small Business Administration

**Office of Capital Access**

*There is no description for this organization*

Social

Twitter

Facebook

License

Other (Public Domain)

# PPP FOIA

## Data and Resources

- PPP Data Dictionary.xlsx — Explore
- public_150k_plus_240930.csv — Explore
- public_up_to_150k_1_240930.csv — Explore
- public_up_to_150k_2_240930.csv — Explore
- public_up_to_150k_3_240930.csv — Explore
- public_up_to_150k_4_240930.csv — Explore
- public_up_to_150k_5_240930.csv — Explore
- public_up_to_150k_6_240930.csv — Explore
- public_up_to_150k_7_240930.csv — Explore
- public_up_to_150k_8_240930.csv — Explore
- public_up_to_150k_9_240930.csv — Explore

INTERNET ARCHIVE WaybackMachine
https://data.sba.gov/dataset/ppp-foia Go
511 captures
4 Apr 2021 - 1 Sep 2026
FEB MAR MAY
24
2024 2025 2026
About this capture


Administration

### Office of Capital Access

*There is no description for this organization*

**Social**

Twitter

Facebook

**License**

Other (Public Domain) OPEN DATA

public_up_to_150k_5_240930.csv Explore

public_up_to_150k_6_240930.csv Explore

public_up_to_150k_7_240930.csv Explore

public_up_to_150k_8_240930.csv Explore

public_up_to_150k_9_240930.csv Explore

public_up_to_150k_10_240930.csv Explore

public_up_to_150k_11_240930.csv Explore

public_up_to_150k_12_240930.csv Explore

## Additional Info

| Field | Value |
|---|---|
| Last Updated | October 21, 2024, 10:34 AM (UTC+00:00) |
| Created | March 2, 2021, 6:30 PM (UTC+00:00) |

About U.S. Small Business Administration (SBA) | Open Data

Powered by ckan

web.archive.org/web/20250324002540/https://www.facebook.com/sharer.php...

| | B | E | H | J | N | O | AR | AT | AV | | | BA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | DateApproved | BorrowerName | BorrowerState | LoanStatusDate | InitialApprovalAmount | CurrentApprovalAmount | BusinessType | OriginatingLender | Origi | | | ForgivenessDate |
| 672764 | 4/29/2020 | FORT LOUDOUN YACHT CLUB | TN | 12/18/2020 | 32695 | 32695 | Non-Profit Organizatioı | Unanswer | Unan: | 32850.9 | | 10/22/202( |
| 652483 | 5/6/2020 | FRATERNAL ORDER OF POLICE | TN | 3/6/2021 | 62722 | 62722 | Non-Profit Organiz | Enrichmen | Oak Ridge | | | 2/19/2021 |
| 634052 | 4/6/2020 | GREEN MEADOW COUNTRY CLUB, INC. | TN | 5/15/2021 | 141000 | 141000 | Corporation | SmartBank | PIGEON F( | | | 4/5/2021 |
| 664561 | 4/10/2020 | GREENEVILLE MOOSE LODGE NO 692 | TN | 2/18/2022 | 41810 | 41810 | Corporatio | Andrew J | GREENEV | TN | Unanswer | 1/6/2021 |
| 661356 | 3/12/2021 | HOMEBUILDERS ASSOCIATION OF GREATER CHATTANOO | TN | 12/15/2021 | 46339.72 | 46339.7 | Non-Profit Organiz | SmartBank | PIGEON F( | | | 11/26/2021 |
| 661387 | 6/19/2020 | HOMEBUILDERS ASSOCIATION OF GREATER CHATTANOO | TN | 6/18/2021 | 46300 | 46300 | Non-Profit Organiz | SmartBank | PIGEON F( | | | 5/5/2021 |
| 683111 | 3/8/2021 | HOME BUILDERS ASSOCIATION OF GREATER KNOXVILLE | TN | 12/7/2021 | 24190 | 24190 | Non-Profit Organiz | Home Fed | KNOXVILLI | | | 11/2/2021 |
| 807200 | 4/14/2020 | KNOXVILLE ACADEMY OF MEDICINE | TN | 5/21/2021 | 190562 | 190562 | Corporation | First Horizon Bank | TN | | | 4/22/2021 |
| 636113 | 4/16/2020 | KNOXVILLE RACQUET CLUB | TN | 2/18/2021 | 126517.5 | 126518 | Non-Profit Organiz | Pinnacle B | NASHVILLI | | | 1/12/2021 |
| 638502 | 4/16/2020 | LAKEWOOD GOLF & COUNTRY | TN | 12/4/2020 | 112000 | 112000 | Non-Profit Organiz | First Visior | TULLAHON | | | 11/3/2020 |
| 749012 | 5/8/2020 | OAK GROVE CEMETERY ASSOCIATION | TN | 12/17/2021 | 15954 | 15954 | Non-Profit Organiz | First Horiz | MEMPHIS | | | 10/28/2021 |
| 636147 | 4/16/2020 | RIVERBEND COUNTRY CLUB | TN | 2/18/2022 | 126197 | 126197 | Non-Profit Organi: | Franklin S) | FRANKLIN | | | 8/5/2021 |
| 764802 | 4/28/2020 | RODGERSVILLE-HAWKINS COUNTY CHAMBER OF COMME | TN | 6/18/2021 | 12532 | 12532 | Non-Profit Organiz | First Horiz | MEMPHIS | | | 5/19/2021 |
| 821354 | 4/13/2020 | SHELBYVILLE MOOSE LODGE 2197 | TN | 12/17/2020 | 3920 | 3920 | Non-Profit Organiz | First Comr | SHELBYVII | | | 11/12/2020 |
| 804360 | 4/15/2020 | SIGNAL MOUNTAIN GOLF & COUNTRY CLUB | TN | 3/26/2022 | 242755 | 242755 | Corporation | FirstBank | TN | | | 11/3/2020 |
| 798744 | 1/30/2021 | TENNESSEE VALLEY PUBLIC POWER ASSOCIATION INC. | TN | 4/7/2022 | 521052.5 | 521052.5 | Corporation | First Horizon Bank | TN | | | 3/15/2022 |
| 798308 | 4/14/2020 | TENNESSEE VALLEY PUBLICATION POWER ASSOCIATIO | TN | 6/17/2021 | 570105 | 570105 | Corporation | First Horizon Bank | TN | | | 5/21/2021 |
| 684920 | 4/27/2020 | TULLAHOMA CHAMBER OF COMMI | TN | 3/19/2021 | 22800 | 22800 | Non-Profit Organiz | FirstBank | Nashville | | | 2/11/2021 |

**FALL MEMBER DRIVE**

Journalism for the people, not for profit.

**Donate Now**



**The Pandemic Economy**

# Judge Orders the Release of Data on Emergency Loans for Small Businesses




KAMELEON007/ISTOCK/GETTY IMAGES PLUS

A consortium of news organizations, including ProPublica, has won a legal fight against the Small Business Administration. It will now have to publicly release the names of borrowers who got government pandemic loans.



by **Lydia DePillis**

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

After a monthslong legal fight over the transparency of one of the federal government's largest coronavirus relief programs, a judge in Washington required the disclosure of data on thousands of smaller business loan recipients.

The Small Business Administration's Paycheck Protection Program, created by the Coronavirus Aid, Relief, and Economic Security Act in March, has so far dispensed more than $525 billion in loans that can be forgiven if the money is mostly spent to keep employees. The Treasury Department originally declined to release the names of borrowers, maintaining that doing so would expose "proprietary information."

In May, ProPublica, together with several of the nation's largest news organizations, filed a Freedom of Information Act lawsuit to obtain the information. Two months later, the SBA released information on 650,000 businesses that received loans in amounts between $150,000 and the maximum of $10 million, representing a fraction of the total number of borrowers.

But the SBA only disclosed the loan amounts in broad ranges, saying that to be more specific would reveal confidential information about the businesses' payrolls, and it declined altogether to release borrower-level data on 4.5 million loans worth less than $150,000. It also withheld information on sole proprietorships and independent contractors receiving Economic Injury Disaster Loans, a program that disbursed $192 billion in total, saying that to do so would violate the recipients' privacy rights.

On Thursday, District of Columbia Circuit Judge James Boasberg rejected that contention, noting that borrowers had been informed via the loan application that such data could be revealed as a result of a FOIA lawsuit. The program is at significant risk of fraud, he added — in September, the Justice Department charged 57 people with violating the rules — and would therefore benefit from additional scrutiny.

"The significant public interest in shedding light on SBA's administration of the PPP and EIDL program dramatically outweighs any limited private interest in nondisclosure," Boasberg wrote.

The order requires the SBA to release the names, addresses and precise loan amounts of all PPP and EIDL borrowers by Nov. 19.

The previously released data (which ProPublica has collected into a searchable database) illuminated widespread abuse of the program, from businesses that took out more loans than they should have using multiple subsidiaries, to temporary help agencies that got outsized loans because their contracted workers were technically on their payroll. The data also helped to expose deep inequities in how the program was administered, with minority-owned businesses disproportionately receiving assistance late or not at all.

*Have ideas for what to look for in that data? Email Lydia DePillis at lydia.depillis@propublica.org or get in touch via Signal at 202-913-3717.*



**Lydia DePillis**

Lydia DePillis covered federal agencies at ProPublica.

Need to Get in Touch?

Republish This Story

## Who owns ProPublica? No one.

The story you just read was made possible by our readers. We hope it inspires you to support ProPublica, so we can continue producing investigations that shine a light on power, uncover the truth and drive real change.

ProPublica is a nonprofit newsroom dedicated to nonpartisan, evidence-based journalism that holds power accountable. Founded in 2008 to address the decline in investigative reporting, we've spent over 15 years uncovering injustice, corruption and abuse of power — work that is slow, expensive and more critical than ever to our democracy. With nine Pulitzer Prizes and reforms sparked in state and local governments, businesses, institutions and more, our reporting ensures that the public interest comes first.

Today, the stakes are higher than ever. From ethics in our government offices, to reproductive health care, to the climate crisis and beyond, ProPublica remains on the front lines of the stories that matter most. Your gift helps us keep the powerful accountable and

**Join over 90,000 supporters nationwide** in standing up for investigative journalism that informs, inspires and creates lasting impact. Thank you for making this work possible.

DONATE TO PROPUBLICA

# Most Read

1 Fiasco in the Factory: Taxpayers Funded a $533 Million Artillery Plant That Made Nothing

2 I Deliberately Bet Like a Problem Gambler. DraftKings Made Me a VIP.

3 The FBI Anti-Corruption Squad Was Circling Susan Collins — Until Trump Got in the Way

4 Susan Collins Dismissed Our Reporting as Old News. Some of Her Claims Aren't True.

5 Donald Trump Jr.'s Bahamas Wedding Was Secretly Bankrolled by Russian Oligarch Close to Putin

6 Colorado Marijuana Company Voluntarily Recalls Dozens of Contaminated Products Amid State Regulatory Delays

7 The Militia and the Mole

8 "Biblical Justice, Equal Justice, for All": How North Carolina's Chief Justice Transformed His State and America

9 Photos of Nude Children in Billionaire's Email Prompted Investigation

10 Two Years After Hurricane Helene, People Are Still Allowed to Live in Harm's Way

# Support Independent Journalism:

As a nonprofit newsroom, we rely on donations from individuals like you to fuel our work. **Your support today will directly fund investigations that shine a light on urgent issues:** corporations prioritizing profits over public safety, health insurers denying coverage to patients, unintended consequences of new laws and more.

Donate

**More Ways to Give**

## Go behind the scenes of ProPublica's biggest investigations.

Your email address

**Get our weekly newsletter**

INFO

COVERAGE

LOCAL

CONTACT

PROPUBLICA

Donate

SUPPORT US

**INFO**

About
Impact
Leadership
Staff
Partners
Awards
Events
Jobs
Fellowships

**COVERAGE**

Abortion
Civil Rights
Courts
Criminal Justice
Debt
See All

**LOCAL**

Midwest
Northwest
South
Southwest
Texas
Local Reporting Network

**CONTACT**

General Inquiries
Send Us a Tip
Corrections
Freelance
Pitches
Media Inquiries

**SUPPORT US**

Donate
More Ways To Give

Investigative Journalism in the Public Interest

PROPUBLICA

Code of Ethics Republishing Privacy Policy Advertising Policy Gift Acceptance

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WP COMPANY LLC d/b/a THE WASHINGTON POST, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**U.S. SMALL BUSINESS ADMINISTRATION,**<br><br>**Defendant.** | **Civil Action No. 20-1240 (JEB)** |
| **CENTER FOR PUBLIC INTEGRITY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**U.S. SMALL BUSINESS ADMINISTRATION,**<br><br>**Defendant.** | **Civil Action No. 20-1614 (JEB)** |

**MEMORANDUM OPINION**

While the COVID-19 pandemic has upended daily life for all, its effects have proven particularly acute for the nation's small businesses, many of which found their continued operations suddenly threatened in the early weeks of a pandemic-induced recession. Attempting to keep those businesses afloat and provide other forms of much-needed economic assistance, the federal government on March 27, 2020, passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act. A critical component of that law was the Paycheck Protection Program, which enabled the Small Business Administration to approve millions of loans on an expedited basis for qualifying individuals and small businesses. The next several months witnessed SBA

process an unprecedented $717 billion in loans via the PPP and the separate Economic Injury Disaster Loans (EIDL) program.

Notwithstanding this colossal outlay of taxpayer funds, the government initially refrained from disclosing the identities of the millions of loan recipients under these programs, as well as the specific amounts they obtained and other loan-level details. Unhappy with this lack of transparency, a host of national-news organizations submitted Freedom of Information Act requests for such data, eventually filing the present action last May when their efforts proved fruitless. Prompted by this Court, SBA in July finally released select information regarding individual PPP and EIDL loans. Much to Plaintiffs' continued disappointment, however, the data contained glaring gaps: the agency did not provide <u>both</u> dollar figures <u>and</u> borrower names and addresses for any of the PPP loans, but rather withheld the precise amounts of all loans of $150,000 or more, as well as recipients' identities for loans under that figure. SBA likewise reserved the names and addresses of sole proprietorships and independent contractors receiving EIDL loans. In support of its withholding of these data, the agency invoked FOIA's exemptions for confidential and private information.

The parties now cross-move for summary judgment as to the propriety of SBA's withholdings. In addition, the parties in a largely identical case brought by the Center for Public Integrity move for judgment on the same issues. Finding that neither of the agency's claimed FOIA exemptions covers the requested information, the Court will grant Plaintiffs' Cross-Motions in both actions and require SBA to supplement its prior disclosure with the names, addresses, and precise loan amounts of all PPP and EIDL borrowers.

## I. Background

A. Factual Background

On January 31, 2020, the federal government declared a public-health emergency regarding the novel coronavirus, which causes the disease COVID-19. See U.S. Dep't of Heath & Hum. Servs., Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://bit.ly/3mP3551. The ensuing months saw the virus take its toll on nearly all walks of American life. To date, COVID-19 is believed to have killed over 233,000 people in the United States. See Johns Hopkins Univ. & Med., Coronavirus Resource Center, https://bit.ly/31Y81fB (last visited Nov. 5, 2020). The economy has likewise suffered, with unemployment reaching a high of 14.7% in April 2020 before steadily declining to 7.9% as of September. See U.S. Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, https://bit.ly/2Gd8eUB (last visited Oct. 28, 2020).

The CARES Act remains the federal government's primary legislative response to the economic crisis that the pandemic precipitated. See Pub. L. No. 116-136, 134 Stat. 281 (2020). As relevant here, that stimulus package created the PPP, which provided SBA funding and authority to operate — with support from the Treasury Department — a new loan program to assist small businesses adversely affected by the COVID-19 crisis. See id. § 1102; U.S. Dep't of Treasury, The CARES Act Provides Assistance to Small Businesses, https://bit.ly/3ecUxlm (last visited Oct. 28, 2020). Specifically, the CARES Act amended Section 7(a) of the Small Business Act, 15 U.S.C. § 631 *et seq.*, under which SBA possesses general authority to issue loans to qualifying small businesses and sole proprietorships, including by guaranteeing loans made by private lenders. See 15 U.S.C. § 636(a); 13 C.F.R. § 120.2(a). The PPP temporarily expanded the types of entities to which SBA could make covered loans to include non-profit

organizations, independent contractors, and self-employed individuals, and it permitted SBA to guarantee all such loans. See 15 U.S.C. § 636(a)(36)(D); No. 20-1240, ECF No. 14 (Def. MSJ), Exh. 1 (Declaration of William Manger), ¶¶ 7, 9.

In order to obtain PPP loans, potential borrowers applied to lending institutions and made good-faith self-certifications both that they were eligible and that current economic "uncertainty" rendered the loan request necessary "to support the [recipient's] ongoing operations." 15 U.S.C. § 636(a)(36)(G)(i); Business Loan Program Temporary Changes, Paycheck Protection Program, 85 Fed. Reg. 20,811, 20,814 (Apr. 15, 2020). Applicants also affirmed that loan funds would "be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments." 15 U.S.C. § 636(a)(36)(G)(i)(II). SBA has indicated that loans will be fully forgiven if they are in fact used for such costs and if at least 60 percent of the proceeds go toward payroll expenditures. See Business Loan Program Temporary Changes; Paycheck Protection Program — Revisions to First Interim Final Rule, 85 Fed. Reg. 36,308, 36,311 (June 16, 2020).

Potential borrowers specified the amount of their loan request on the PPP application form. See SBA, Paycheck Protection Program: Borrower Application Form, https://bit.ly/3jF7tkR at 1 (PPP Application Form). SBA regulations established a four-step process by which businesses calculated the maximum dollar figure they could borrow, up to $10 million:

> Step 1: "Aggregate payroll costs . . . from the last twelve months," including "compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of

> employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation."
>
> Step 2: "Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year."
>
> Step 3: "[D]ivide the amount from Step 2 by 12."
>
> Step 4: "Multiply the [amount] from Step 3 by 2.5."

85 Fed. Reg. at 20,812–13; see also 15 U.S.C. § 636(a)(36)(A)(viii)(I)(bb), (II)(aa), (E). The PPP application further advised that certain information would be "automatically released" upon a FOIA request, including "names of the borrowers" and "the amount of the loan." PPP Application Form at 4.

SBA also administers the Economic Injury Disaster Loans program, which offers long-term financial assistance to eligible entities — including small businesses, sole proprietorships, and independent contractors — affected by covered disasters such as COVID-19. See 15 U.S.C. § 636(b)(2); Manger Decl., ¶ 11; SBA, Economic Injury Disaster Loans, https://bit.ly/2TAl3eS (last visited Oct. 28, 2020). While EIDL borrowers may also obtain a PPP loan, they must use the proceeds from each for different purposes. See Manger Decl., ¶ 12. The Court has already described the PPP purposes; conversely, borrowers may deploy EIDL loans to working capital, notes payable, accounts payable, and other expenses resulting from COVID-19's impact. Id.

By August 8, 2020, SBA had approved a whopping $525 billion by way of more than 5.2 million individual loans. See SBA, Paycheck Protection Program (PPP) Report at 2, https://bit.ly/2HPJCla (8/8/20 PPP Report). The agency's most recent EIDL figures similarly

reflect an additional $192 billion in approved COVID-related loans. See SBA, Disaster Assistance Update: Nationwide EIDL Loans at 2 (Oct. 19, 2020), https://bit.ly/31Z6oON (10/19/20 EIDL Report). It is worth noting that this combined figure of $717 billion exceeds the government's Medicaid expenditures in Fiscal Year 2018, as well as the President's request for the Department of Defense's entire Fiscal Year 2021 budget. See Ctrs. For Medicare & Medicaid Servs., NHE Fact Sheet, https://go.cms.gov/35JBOd8 (last modified Mar. 24, 2020); Office of the Under Secretary of Def. (Comptroller), Defense Budget Overview at PDF p. 10 (May 13, 2020), https://bit.ly/31Zuzwz.

B. Procedural History

Throughout April and May 2020, Plaintiffs in Case No. 20-1240 — eleven national-news organizations — submitted FOIA requests seeking records concerning SBA's COVID-related loan programs, including the PPP and EIDL program. See No. 20-1240, ECF No. 5 (Am. Compl.), Exhs. 1, 2, 5, 9, 12, 13, 14, 18, 20, 24, 27, 29, 31, 33, 35. Although their requests contained variations, the organizations generally sought data regarding each approved PPP and EIDL loan, including the names and addresses of loan recipients, loan amounts, approval dates, lender identity, and other details. See, e.g., Am. Compl., Exh. 1 (Washington Post FOIA Request) at 1–2; id., Exh. 2 (Bloomberg FOIA Request) at 1.

SBA either declined to timely respond to these requests or issued letters stating that, sometime "[i]n the future," it would "turn [its] efforts to providing loan specific data to the public." E.g., Am. Compl., Exh. 3 (SBA Bloomberg Resp.) at ECF p. 2. Finding those results unsatisfactory, the news organizations brought suit in this Court on May 12, 2020. See No. 20-1240, ECF No. 1 (Compl.). Their Amended Complaint, which seeks an order requiring SBA to make available the aforementioned loan-level data, asserts claims for constructive denial of

requests for agency records and of administrative appeal, as well as actual and constructive denial of expedited processing, all in violation of FOIA. See Am. Compl., ¶¶ 146–205.

On June 29, 2020, this Court ordered SBA to issue a final response to the news-organization Plaintiffs' FOIA requests and to produce any responsive non-exempt records. See No. 20-1240, 6/29/20 Min. Order. One week later, SBA released loan-level data for each of the roughly 4.9 million PPP loans made to that point. See No. 20-1240, ECF No. 14 (Def. SMF), ¶ 2. SBA's production included the following fields: the borrower's city, state, ZIP code, North American Industry Classification System (NAICS) code, business type, race/ethnicity, gender, veteran status, non-profit status, jobs reported as retained, date approved, lender, and congressional district. Id. (citing Manger Decl., ¶ 88 & n.1). Much to Plaintiffs' displeasure, however, the data did not provide both the loan amount and the recipient's name and address for a single loan. Instead, SBA adopted an "either/or" approach: for loans of $150,000 or more, it released the recipient's name and address, but withheld the actual loan amount and instead provided "loan amount ranges" of $150,000 to $350,000; $350,000 to $1 million; $1 million to $2 million; $2 million to $5 million; and $5 million to $10 million. Id. For loans of less than $150,000, on the other hand, the agency released the precise dollar amounts, but withheld the borrower's name and street address. Id. On July 13, 2020, it informed the news-organization Plaintiffs that select "[p]ortions of the [PPP] data are being withheld pursuant to FOIA Exemptions 4 and 6." E.g., No. 20-1240, ECF No. 13-1 (7/13/20 SBA Letter to Wash. Post) at ECF p. 2; Manger Decl., ¶ 90. Those exemptions, respectively, protect confidential commercial information and information the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. See 5 U.S.C. § 552(b)(4), (6).

The agency soon settled on a similar partial-disclosure approach as to Plaintiffs' requests for EIDL data. On July 20, 2020, it announced the release of data for all EIDL loans, save the names and street addresses of sole proprietorships and independent contractors, which it withheld pursuant to Exemption 6. See Manger Decl., ¶¶ 91, 112.

Emphasizing the significant public interest in full transparency surrounding the massive disbursement of taxpayer funds pursuant to SBA's COVID-relating lending programs, the news-organization Plaintiffs informed the agency of their intent to challenge the asserted withholdings. See No. 20-1240, ECF No. 13 (7/17/20 Joint Status Report) at 3–4; see also id., ECF No. 18-1 (Pl. Cross-Mot. & Opp.) at 5–8, 25–28 (discussing allegations of ineffectiveness, inequitable treatment, fraud, and abuse regarding PPP and EIDL program); *infra* at 31–37. SBA countered with a Motion for Summary Judgment, contending that FOIA Exemptions 4 and 6 protect the withheld information from disclosure. The news-organization Plaintiffs opposed that Motion and filed their own Cross-Motion, arguing that FOIA does not permit the agency to withhold any of the PPP or EIDL loan data.

On a parallel track, Plaintiff in Case No. 20-1614 — Center for Public Integrity — filed a separate action in this Court seeking the same information as the news-organization Plaintiffs, as well as some additional material not relevant here. See ECF No. 1 (CPI Compl.), ¶ 10; id., Exh. 1 (CPI FOIA Request); ECF No. 15 (9/11/20 Joint Status Report) (status of request for communications involving SBA Administrator). CPI and SBA also exchanged Summary-Judgment Motions. See No. 20-1614, ECF Nos. 11 (Def. Mot. for Partial Summ. J.), 13 (CPI Cross-Mot. & Opp.). Finding that the briefing in both cases presents identical factual and legal issues, and having received no objection from any party to considering all Motions collectively,

see No. 20-1240, 10/8/20 Min. Order; No. 20-1614, 10/8/20 Min. Order, the Court now consolidates the Motions for disposition.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)

(citation omitted). Such affidavits or declarations "are accorded a presumption of good faith." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III. Analysis

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).

The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). Nine categories of information are exempt from FOIA's broad rules of disclosure. See id. § 552(b)(1)–(9). Where the agency withholds records, it bears the burden of showing that at least one of the exemptions applies. See Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975). In addition, the exemptions are to be "narrowly construed," Rose, 425 U.S. at 361, and the reviewing court must bear in mind "[a]t all times . . . that FOIA mandates a 'strong presumption in favor of disclosure.'" Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991)). This Court can compel the release of any

records that do not satisfy the requirements of at least one exemption. See Reporters Comm., 489 U.S. at 755.

Here, SBA relied on Exemptions 4 and 6 in support of its decision to withhold particular segments of the requested loan data. As Plaintiffs dispute the applicability of both of these exemptions, the Court will address arguments as to each in turn.

A. Exemption 4

SBA invoked Exemption 4 to withhold the precise amounts of all PPP loans of $150,000 or more, as well as the names and addresses of all borrowers of PPP loans of less than that figure. See Def. SMF, ¶ 3; Manger Decl., ¶¶ 100–02. The Court begins with the legal framework governing the exemption before applying it to the circumstances of this case.

1. *Legal Framework*

Exemption 4 shields from disclosure "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). To demonstrate that this exemption shelters the information withheld, SBA must show that it is "(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential." Pub. Citizen Health Res. Grp. v. FDA, 704 F.2d 1280, 1290 (D.C. Cir. 1983).

This case turns on the third prong, which the Supreme Court recently clarified in Food Marketing Institute v. Argus Leader Media, 139 S. Ct. 2356 (2019). That opinion began by discussing two potential conditions for information communicated to another to be deemed "confidential": 1) the information is "customarily kept private, or at least closely held, by the person imparting it"; and 2) the party receiving the information "provides some assurance that it will remain secret." Id. at 2363. While the first condition "has to be" met in order for information to be considered confidential under Exemption 4, the Court found "no need to

resolve" whether the second was likewise mandatory — that is, whether privately held information can "lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." Id. The Court concluded, accordingly, that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." Id. at 2366 (emphasis added).

After Food Marketing, therefore, it is an open question in this Circuit whether government assurance that information will remain private is necessary for such information to qualify as "confidential" under Exemption 4. See Ctr. for Investigative Reporting v. U.S. Customs & Border Protection, 436 F. Supp. 3d 90, 112 (D.D.C. 2019) (remarking that Food Marketing "stopped short . . . of deciding that Exemption 4 does in fact impose this second requirement"). Regardless of whether such additional condition is required in every case, it is clear that the government must show that the commercial or financial information is "both customarily and actually treated as private" in order to withhold it. Food Mktg., 139 S. Ct. at 2366; see also Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Commerce, No. 18-3022, 2020 WL 4732095, at *3 (D.D.C. Aug. 14, 2020).

2. *Application*

With that prelude in tow, the Court finds it helpful to briefly survey what is not in dispute here. No party contends that the withheld information is not "commercial or financial," as required by the first prong. See 5 U.S.C. § 552(b)(4); see also Pub. Citizen, 704 F.2d at 1290. Neither do the news-organization Plaintiffs gainsay that it was "obtained from a person," thereby satisfying Exemption 4's second condition. See 5 U.S.C. § 552(b)(4). To be sure, CPI briefly

argues otherwise, asserting that "the amount of each loan" is not "obtained from a person." CPI Cross-Mot. & Opp. at 4–5. The Court, however, need not resolve that issue. As will soon become evident, even assuming that SBA is correct on this point, it still may not withhold the loan data under the third prong, as disclosure would not reveal any information "that has 'customarily' and 'actually' been treated as private." Pl. Cross-Mot. & Opp. at 14. And because SBA flunks this requirement, the Court need not tackle the question left open after Food Marketing — namely, whether the government must also establish that it provided assurance that the information will remain private. See id. at 14 (arguing that Court need not reach this question); No. 20-1240, ECF No. 20 (Def. Reply & Opp.) at 1, 8 (same).

Turning now to that critical portion of the third prong, the Court begins by clarifying the parameters of the parties' disagreement. SBA does not argue that the requested loan data, or anything contained therein, is *per se* confidential business information. Rather, it contends that the loan data must be withheld because its release would necessarily reveal entirely different information that is confidential — specifically, a borrowing company's average payroll. That is, according to SBA, a business customarily and actually treats its payroll information as confidential. See Def. MSJ at 13–14; Def. Reply & Opp. at 6. And because of the nature of the formula by which PPP loan amounts are determined, "average payroll can be deduced with reasonable confidence from the precise value of a PPP loan," thus requiring SBA to withhold either a borrower's identity or precise loan amount. See Def. MSJ at 8, 12, 14–15; see also id. at 14–15 (citing Flightsafety Servs. Corp. v. Dep't of Labor, 326 F.3d 607, 612 (5th Cir. 2003), which recognized need to protect against "serious risk that sensitive business information could be attributed to a particular submitting business"); Manger Decl., ¶ 100 ("Because Exemption 4 protects a business's payroll information, which can be deduced from the business's PPP loan

amount with reasonable confidence, Exemption 4 also protects (a) the identity of the borrower of any PPP loan, where the precise amount of the loan is disclosed, and (b) the precise amount of any PPP loan, where the borrower's identity is disclosed.").

Although SBA spills much ink arguing that a business's payroll is "confidential" under Exemption 4, see Def. MSJ at 12–15; Def. Reply & Opp. at 4–6, the news-organization Plaintiffs largely concede the point. See No. 20-1240, ECF No. 21 (Pl. Reply) at 5 n.2 ("Plaintiffs do not contest that an individual for-profit business's payroll information can be confidential under Exemption 4 . . . ."). Instead, they take aim at the core assumption underlying SBA's argument, without which the agency's entire theory collapses — to wit, the idea that the requested loan data necessarily reveals a business's payroll information. In the absence of a direct link between a borrower's PPP loan and its payroll, of course, the loan data cannot be withheld pursuant to Exemption 4, as it would not reveal any information that is "customarily and actually treated as private." Food Mktg., 139 S. Ct. at 2366. SBA, notably, never makes any suggestion to the contrary.

In order to assess the validity of SBA's central assumption, the Court must return to the agency's formula for dispensing PPP loans. Attentive readers will recall that the maximum loan a qualifying borrower could obtain was a figure 2.5 times its average monthly payroll, where such payroll excludes compensation paid to employees in excess of $100,000 annually. See 85 Fed. Reg. at 20,812–13. In arguing that releasing a borrower's precise loan amount "effectively would disclose its payroll information," Def. MSJ at 12, therefore, SBA expressly "assumes" two factual predicates: 1) "that a [PPP] borrower took out a loan for the maximum amount allowed"; and 2) "that a PPP borrower would pay few if any of its employees more than $100,000." Def. Reply & Opp. at 7. If a borrower took out a maximum loan and pays no

employees six figures or more, the agency maintains, a third party could calculate the borrower's average monthly payroll simply by dividing its loan amount by 2.5. Neither of SBA's two premises, however, is necessarily true for any given borrower. Indeed, after largely skirting the issue in its opening brief, the agency now admits that entities receiving PPP loans defied both assumptions. See id., Exh. 1 (Def. Resp. to Pl. SMF), ¶¶ 18–19. A closer look only reinforces the fundamentally flawed nature of SBA's assumptions, thereby rendering the agency unable to establish — as is its burden — that onlookers could deduce a business's payroll from the loan data with any degree of confidence sufficient to justify nondisclosure.

First, although SBA "assumes that a borrower took out a loan for the maximum amount allowed," Def. Reply & Opp. at 7 (emphasis added), it admits that this is plainly not always the case. See Def. Resp. to Pl. SMF, ¶ 18 (conceding that, in fact, "PPP borrowers did not all receive the maximum loan amount available to them"). It is far from obvious — and SBA nowhere demonstrates — that even a significant majority of PPP applicants sought and obtained the maximum possible loan amount.

Some borrowers, for instance, might have pursued less than the maximum loan figure because they had doubts about their ability to make the financial decisions necessary to ensure loan forgiveness in a turbulent pandemic economy. Shortly after lenders began accepting PPP loan applications, SBA made clear that it would fully forgive loans only if funds were spent on designated budget items such as payroll, mortgage interest, rent, and utilities. See 85 Fed. Reg. at 20,813–14 (explaining that forgiveness turns on whether "borrower uses all of the loan proceeds for forgiveable [*sic*] purposes[,] . . . and employee and compensation levels are maintained," and mandating that "not more than 25 percent of the loan forgiveness amount may be attributable to non-payroll costs"). The agency later reiterated those general requirements,

clarified that a borrower must devote at least 60 percent of its PPP loan to payroll costs to receive full loan forgiveness, and warned that forgiveness will be reduced if full-time headcount declines, or if salaries and wages decrease. See 85 Fed. Reg. at 36,310–11; Business Loan Program Temporary Changes; Paycheck Protection Program — Requirements — Loan Forgiveness, 85 Fed. Reg. 33,004, 33,007–08 (June 1, 2020); see also 15 U.S.C. § 9005(b), (d). In other words, businesses knew during the application period that if they borrowed too much and either could not meet spending thresholds or were forced to curtail staffing or salaries, they risked losing out on loan forgiveness. SBA declines to address this issue at all, much less counter Plaintiffs' argument that the potential loss of loan forgiveness likely provided businesses a disincentive to automatically borrow the maximum dollar figure available. See Pl. Cross-Mot. & Opp. at 16; Pl. Reply at 5–6.

Instead, SBA points to the context in which borrowers applied for loans, asserting that "serious economic distress" arising from the pandemic provided businesses "an obvious reason to borrow as much as the PPP made available to them." Def. Reply & Opp. at 7; see also id., Exh. 2 (Second Declaration of William Manger), ¶¶ 6–7. As just described, however, many businesses likely had an equally "obvious" reason not to borrow the maximum amount available. The potential loss of loan forgiveness likewise answers SBA's argument that the fact that borrowers could receive only a single PPP loan encouraged them to maximize the amount of such loan while they could. See Def. Reply & Opp. at 7 (citing Manger 2d Decl., ¶ 10); 15 U.S.C. § 636(a)(36)(G)(i)(IV) (requiring "during" specified period "that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan"); 85 Fed. Reg. at 20,814 (similar). Finally, SBA highlights the PPP loan-application form itself, which contained a field for "Average Monthly

Payroll" and stated that such amount "x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request." Manger 2d Decl., ¶ 9. According to the agency, the application form thus "steered borrowers to the maximum loan amount for which they were eligible," essentially "invit[ing] [them] to request the maximum loan amount." Id. But SBA does not refute that borrowers could request less than the amount to which they were "steered." Nor does it indicate, or provide even a rough sense of, how many borrowers either sought or ultimately obtained such lesser loan figures — even as it admits that some in fact did. See Def. Resp. to Pl. SMF, ¶ 18.

In addition, although SBA "assum[es] . . . that a PPP borrower would pay few if any of its employees more than $100,000," Def. Reply & Opp. at 7 (emphasis added), the agency once again admits that such assumption is often unfounded. See Def. Resp. to Pl. SMF, ¶ 19 (conceding that "[b]usinesses that pay salaries of greater than $100,000 received PPP loans"). As mentioned earlier, compensation paid to employees in excess of $100,000 annually is excluded from payroll calculations under the PPP. The fact that loan recipients concededly defy SBA's assumption thus further undermines its asserted link between the loan data and payroll information. For instance, the agency does not resist Plaintiffs' assertion that PPP recipients included "at least 45 . . . of the nation's 200 highest-grossing law firms," many of which pay even their most junior associates over $100,000. See Pl. Cross-Mot. & Opp. at 17. (Indeed, as the Court is painfully aware, many mid-level associates earn more than federal judges.) SBA has done nothing to assure the Court that there are not many more such borrowers, even though it bears the burden of justifying nondisclosure under Exemption 4. See Pub. Citizen Health Res. Grp. v. FDA, 185 F.3d 898, 904 (D.C. Cir. 1999).

This is relevant because if a borrower pays an employee over $100,000, thereby excluding compensation above that threshold from payroll calculations, an onlooker could not

accurately determine payroll from the amount of the loan. This means that without knowing which borrowers had employees in that category, along with their precise salaries, no third party could confidently assess the payroll of any borrower. Indeed, SBA never even establishes the proportion of PPP borrowers that do not pay any employees more than $100,000, such that the Court could conceivably conclude that the agency's assumption, while imperfect, nonetheless justifies withholding the loan data.

The closest SBA comes to this latter point is its declarant's relating an apparent Department of Treasury estimate "[b]ased on available W-2 data" that "77% of all small businesses do not have any employees whose salary exceeds $100,000." Manger 2d Decl., ¶ 11. As an initial matter, the declaration provides no citation for that proposition, nor any support for its contention that "[n]ationwide, many businesses are unlikely to pay any salaries in excess of $100,000." Manger Decl., ¶ 98. More critically, neither does SBA offer any basis for its apparent assumption that the population of "all small businesses" — however the uncited Treasury estimate defines such term — is representative of the entities that were eligible for, sought, and received PPP loans. One might reasonably presume, for instance, that borrowers with existing ties to banks had easier access to a finite stock of PPP loans, and that these borrowers are more likely to pay higher salaries. Regardless of the merit of such proposition, the point is that SBA must do more to buttress its unsupported assertion that the "vast majority of PPP borrowers have no employees who earn more than $100,000 per year." Def. Reply & Opp. at 8. At present, such claim lacks any evidentiary or statistical backing as it relates to the pool of borrowers itself.

In sum, far from creating a "clear mathematical relationship" between PPP loan amount and average monthly payroll, see Def. MSJ at 15, the CARES Act and its implementing

regulations enable only bare speculation as to any connection between the two figures for a given borrower. Without knowledge of whether a borrower sought and received the maximum possible loan and pays any employees more than $100,000 annually (and, if so, how many and by how much), third parties are in the dark about payroll. Cf. McDonnell Douglas Corp. v. U.S. Dep't of Air Force, 375 F.3d 1182, 1191–92 (D.C. Cir. 2004) (affirming release of data where there was neither viable theory nor evidence supporting claim that release would enable third party to calculate information protected by Exemption 4); Acumenics Res. & Tech. v. U.S. Dep't of Justice, 843 F.2d 800, 807–08 (4th Cir. 1988) (holding that disclosure of withheld unit-price information would not reveal confidential "profit multiplier" because asserted "assumptions" underlying third party's ability to derive multiplier from unit-price information were "unsupported" and turned on "unascertainable variables").

The situation may well be different had SBA offered evidence that nearly all PPP borrowers obtained the maximum amount and paid no employees more than $100,000, such that disclosure of their identities along with loan figures would reveal a borrower's payroll information in all but the rarest of instances. The present case, however, is far afield from that hypothetical state of affairs. FOIA, as a reminder, mandates a "strong presumption in favor of disclosure." Nat'l Ass'n of Home Builders, 309 F.3d at 32 (quoting Ray, 502 U.S. at 173). The government "bears the burden of proving the applicability of any statutory exemption it asserts in denying a FOIA request," Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000), and it must furnish "detailed and specific information" to justify its withholding. Campbell v. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998). SBA has not met that obligation here. As a result, even assuming that a business's payroll qualifies as "confidential" under Exemption 4, the agency may not withhold borrowers' names, addresses, and loan amounts pursuant to such

provision, as disclosure would not reveal any commercial information that is "customarily and actually treated as private." Food Mktg., 139 S. Ct. at 2366.

As a final coda, even were SBA correct that releasing the loan data would enable calculation of salary and wage information for many borrowers, the agency likely still could not withhold such information under Exemption 4. This is so because the PPP loan application expressly notified potential borrowers — admittedly in a form disclaimer — that their names and loan amounts would be "automatically released" upon a FOIA request. See PPP Application Form at 4; *infra* at 23–27 (elaborating on PPP application disclaimer in context of Exemption 6). The Court need not resolve the open question in Food Marketing — whether the government must assure borrowers that the loan data would remain private in order for it to fall within the scope of Exemption 4 — to recognize, as courts in this district already have, that "whether the agency provided an 'assurance of privacy' is undoubtedly relevant to determining whether commercial information possessed by [the agency] is 'confidential.'" Shapiro v. Dep't of Justice, No. 12-313, 2020 WL 3615511, at *26 (D.D.C. July 2, 2020) (emphasis added) (quoting Food Mktg., 139 S. Ct. at 2363); see also Stotter v. U.S. Agency for Int'l Dev., No. 14-2156, 2020 WL 5878033, at *5 (D.D.C. Oct. 3, 2020) (similar). Here, SBA does not explain how the loan data could remain "confidential" for purposes of Exemption 4 when the Government not only provided no assurance of privacy, but also told borrowers explicitly that the information would be disclosed.

B. Exemption 6

As SBA need only invoke one valid exemption to successfully withhold records, it alternatively believes that Exemption 6 is its lucky ticket. That exemption covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552(b)(6). SBA relied on this exemption to withhold the names and addresses of borrowers of PPP loans of less than $150,000, as well as names and addresses of sole proprietorships and independent contractors that received EIDL loans of any amount. See Def. SMF, ¶¶ 3–4; Manger Decl., ¶¶ 102, 110, 112. This exemption would therefore overlap in part with the agency's Exemption 4 withholding.

Plaintiffs do not dispute that the information at issue qualifies as "personnel and medical files and similar files," and that Exemption 6 is "therefore relevant." Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989); see also Judicial Watch, Inc. v. FDA, 449 F.3d 141, 152 (D.C. Cir. 2006) (explaining that Exemption 6 covers "not just files, but also bits of personal information, such as names and addresses, the release of which would 'create[] a palpable threat to privacy'") (alteration in original) (quoting Carter v. U.S. Dep't of Commerce, 830 F.2d 388, 391 (D.C. Cir. 1987)). Indeed, the D.C. Circuit has held that "Exemption 6 applies to financial information in business records when the business is individually owned or closely held, and the 'records would necessarily reveal at least a portion of the owner's personal finances.'" Multi Ag Media LLC v. Dep't of Agriculture, 515 F.3d 1224, 1228–29 (D.C. Cir. 2008) (quoting Nat'l Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 685 (D.C. Cir. 1976)). As SBA explains — and as the news-organization Plaintiffs do not contest — a "significant portion" of businesses receiving loans under $150,000 are individually owned or closely held, such that disclosing their identities would reveal a component of their owners' personal finances — *e.g.*, the simple fact of a loan itself. See Def. MSJ at 22–24 (quoting Multi Ag Media, 515 F.3d at 1229, and citing Manger Decl., ¶ 111).

The parties' disagreement focuses instead on whether disclosure of the identities of borrowers of PPP loans of less than $150,000 and EIDL loans of any amount "would constitute a

clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). That inquiry, in turn, involves a "balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information." U.S. Dep't of Def. Dep't of Mil. Affs. v. FLRA, 964 F.2d 26, 29 (D.C. Cir. 1992) (quoting Rose, 425 U.S. at 372); see also Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (requiring courts to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information") (quoting Davis v. Dep't of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

The Court, accordingly, begins with the private interest in withholding borrower names and addresses, then turns to the public interest in disclosure, and concludes with a balancing of the two. Because the scales tip decidedly in favor of disclosure, the Court holds that SBA's invocation of Exemption 6 is no more successful than its assertion of Exemption 4.

1. *Private Interest*

The threshold question for Exemption 6 is "whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." Multi Ag Media, 515 F.3d at 1229 (cleaned up). "A substantial privacy interest is anything greater than a *de minimis* privacy interest." Id. at 1229–30. Even if a privacy interest is deemed substantial, however, the Circuit has implied that some interests may be less compelling than others. Id. (characterizing privacy interest as not "particularly strong," but nevertheless "greater than *de minimis*"). In any event, "[f]inding a substantial privacy interest does not conclude the inquiry; it only moves it along to the point where [the Court] can address the question whether the public interest in disclosure

outweighs the individual privacy concerns." Id. at 1230 (citation and internal quotation marks omitted).

Some PPP and EIDL borrowers are individuals, while others are businesses. See Manger Decl., ¶¶ 9, 113; Def. MSJ at 19. As to the former, SBA contends that "individuals have a privacy interest in the nondisclosure of their names and addresses in connection with financial information," Lepelletier v. FDIC, 164 F.3d 37, 47 (D.C. Cir. 1999), and that the loans various individuals received plainly qualify as such. See Def. MSJ at 19–22. As to the latter, since some are sole proprietorships and closely held corporations, the agency argues that the individual owners of such entities likewise "have substantial privacy interests in the fact that their businesses received EIDL or PPP loans." Id. at 22. SBA finds support for this position in D.C. Circuit caselaw, which recognizes that although "businesses themselves do not have protected privacy interests under Exemption 6," disclosing records that "reveal financial information easily traceable to an individual . . . jeopardizes a personal privacy interest that Exemption 6 protects." Multi Ag Media, 515 F.3d at 1228; see also Consumers' Checkbook v. U.S. Dep't of Health & Hum. Servs., 554 F.3d 1046, 1051 (D.C. Cir. 2009) ("We have . . . recognized substantial privacy interests in business-related financial information for individually owned or closely held businesses because the 'financial makeup of the businesses mirrors the financial situation of the individual family members.'") (quoting Multi Ag Media, 515 F.3d at 1229).

Plaintiffs do not dispute that, as a general matter, individual owners of sole proprietorships and closely held businesses have reasonable privacy interests in financial information readily traceable to them. Instead, they argue that in the "particular circumstances" of this case, any privacy interest in the loan data is "minimal at most" because SBA "expressly told borrowers that their names and loan amounts would be public" when they applied for loans.

See Pl. Reply at 10–11, 13; Pl. Cross-Mot. & Opp. at 20. For the following reasons, the Court agrees that — at the very least — SBA's own loan materials substantially diminish the privacy interest at stake here.

All individuals and businesses seeking PPP and EIDL loans completed application forms. The PPP application contained a series of notices, including a FOIA-related disclaimer that read, in relevant part:

> Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties.

PPP Application Form at 4 (emphasis added); Manger 2d Decl., ¶ 17. SBA thus expressly informed potential PPP borrowers that their "names" and "amount of the loan" received would be "automatically released" upon a FOIA request. Similarly, SBA told EIDL applicants that FOIA "generally" requires it to release "information such as names of borrowers," as well as "loan amounts at maturity." SBA, COVID-19 Economic Injury Disaster Loan Application at PDF p. 12, https://bit.ly/2HKKYOe (EIDL Application Form). All loan applicants were thus on notice that their names and approved loan amounts would be public record.

Courts in this district have recognized that privacy interests under Exemption 6 are diminished when individuals provide information to the government despite notice that the relevant agency will disclose it to the public. For instance, one court deemed it "remarkable" that an agency objected to disclosure of the names and addresses of individual commenters on a proposed rulemaking, where an agency document "made it abundantly clear . . . that the

individuals submitting comments to its rulemaking would not have their identities concealed." All. for Wild Rockies v. Dep't of Interior, 53 F. Supp. 2d 32, 37 (D.D.C. 1999). Another court determined that an agency could not withhold commenters' email addresses in part because the comment-submission form warned that "[a]ll information submitted, including names and addresses, will be publicly available via the web." Prechtel v. FCC, 330 F. Supp. 3d 320, 329 (D.D.C. 2018) (alteration omitted). That notice, which "could hardly have been more straightforward," provided commenters "ample indication that their email addresses could be made public, mitigating any expectation of privacy." Id.; see also id. at 330 (explaining that when someone is "told that her email address will become part of the public record, her privacy interest in that email address is not as strong as the [agency] now suggests"). The import of these cases for the present one is evident: where SBA explicitly and unambiguously told loan applicants that their names and approved loan amounts would not remain private, such notification substantially "mitigat[es]" any individual privacy interest in the withheld information. Id. at 329.

Attempting to resist this straightforward result, SBA advances a series of arguments that essentially all reduce to the unavailing contention that the agency did not mean what the loan-application forms actually said. SBA principally focuses on the PPP form, claiming first that it "did not purport to override the [agency's] Standard Operating Procedure," which "for many years has committed SBA to preserving the confidentiality of payroll information." Def. Reply & Opp. at 10; see No. 20-1240, ECF No. 15-2 (SBA Attachments), Exh. Q (SBA Standard Operating Procedure) at 54 (stating that information generally exempt from disclosure includes business's "payroll information"). But that is of no moment. The Court has already debunked SBA's assertion that disclosure of a given borrower's PPP loan necessarily reveals its payroll.

See *supra* at 14–20. In any event, SBA fails to mention that the very next page of the SOP lists "[n]ames and commercial street and email addresses of recipients of approved loans" and "[k]inds and amounts of loans" under the heading, "INFORMATION GENERALLY DISCLOSED." SBA SOP at 55; see also SBA, FOIA, https://bit.ly/34JI1GS (last visited Oct. 28, 2020) (SBA FOIA Website) (same). So even if a potential borrower unsure about the confidentiality of its information looked past the PPP application and to the SOP — a document mentioned nowhere on the application itself — that manual would only confirm the application's notification that names and loan amounts would be disclosed, thereby further diminishing any privacy interest an individual might reasonably claim.

SBA next argues that the Court should ignore the plain import of the PPP form's disclaimer because the document was created in "an extraordinarily short timeframe" and "was substantially derived" from the preexisting application form for the Section 7(a) business-loan program, which routinely releases loan-level data including names, addresses, and loan amounts. See Manger 2d Decl., ¶ 17; see also SBA FOIA Website (providing "SBA 7(a) & 504 loan data reports" from 1991 to present under "Frequently requested records"). In other words, because SBA hastily "transplanted" the notice from that preexisting form "in the midst of a global pandemic," it "cannot bear the weight that Plaintiffs would accord it." Def. Reply & Opp. at 10, 14. The Court, to be clear, does not find that the disclaimer itself resolves the Exemption 6 issue in favor of Plaintiffs. But any carelessness that the agency now cites cannot alter the fact that it explicitly told potential borrowers that their identities and loan amounts would be disclosed, thereby lessening their expectation of privacy.

Similarly, SBA emphasizes the form's indication that information "automatically released" includes the "collateral pledged to secure the loan." Id. at 10; see PPP Application

Form at 4. Because PPP loans do not require collateral — and because Section 7(a) loans do — SBA concludes that "the most natural reading" of the notice "is that it applies only to Section 7(a) loans, not PPP loans." Def. Reply & Opp. at 10; see also Manger 2d Decl., ¶ 18. This interpretation, however, demands a tangled traverse between the agency's various programs and applications: borrowers must recognize that the PPP form's reference to "collateral" is inapt, be aware of the separate 7(a) program, understand that such program requires collateral, cross-reference the PPP application with a 7(a) form they need not even complete, and then conclude that the PPP disclaimer does not in fact apply in the PPP context, notwithstanding its inclusion on the program form. See Pl. Reply at 9. The Court finds that the far more "natural" reading, see Def. Reply & Opp. at 10, is also the far simpler one: the application's promise of name and loan-amount disclosure means what it says.

Finally, SBA fixates on its pronouncement that "[p]roprietary data on a borrower would not routinely be made available to third parties." PPP Application Form at 4. According to the agency, because the loan data ostensibly reveals "proprietary" payroll information, the disclaimer "reinforces the conclusion that SBA promised confidentiality." Def. MSJ at 17. Yet even if the loan data necessarily revealed a borrower's payroll — and, as the Court has explained, it does not — the agency's argument still would go nowhere. It is well established, albeit in statutory construction, that when two provisions conflict, "[t]o eliminate the contradiction, the specific provision [must be] construed as an exception to the general one." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012). Even assuming, therefore, the existence of a conflict when the agency told potential borrowers generally that it would safeguard proprietary data, but instructed specifically that it would "automatically release[]" names and loan amounts, a reasonable reader could hardly expect the

former assurance to somehow override the latter. SBA's sole reference to the EIDL form — which, as a reminder, similarly instructs that borrower names and loan amounts will "generally" be released, see EIDL Application Form at PDF p. 12 — fares no better. While that application also noted that SBA does "not routinely make available to third parties . . . information that would . . . constitute a clearly unwarranted invasion of personal privacy," Def. Reply & Opp. at 14 (citing EIDL Application Form at PDF p. 12), such disclaimer simply reinforces the unquestioned reality that Exemption 6 applies as a general matter, and it has no bearing on the distinct, antecedent question of whether the form mitigates any privacy interest a borrower might reasonably claim.

Looking past its own damaging statements, SBA mounts several further efforts to heighten the privacy interest at stake. Specifically, it contends that disclosure of loan-recipient identities for EIDL and smaller PPP loans would: 1) inform the public that borrowers recently had "money in the bank," thereby exposing them to targeting or soliciting from competitors or creditors; 2) reveal the fact that PPP borrowers had certified that loans were "necessary . . . to support . . . ongoing operations" given "the uncertainty of current economic conditions"; and 3) expose "with reasonable confidence" the incomes of independent contractors and self-employed individuals, by way of the PPP loan formula discussed in the Exemption 4 context. See Def. MSJ at 20–22; Manger Decl., ¶ 108.

The Court harbors doubts about the force of these concerns. For instance, SBA does not explain with much particularity the asserted harm that would obtain were creditors and competitors to learn of a borrower's PPP loan, which the borrower may not even still have. In addition, a generic attestation from the smallest of small businesses in the middle of a pandemic-triggered economic collapse that money was necessary to support ongoing operations hardly

seems noteworthy. It is nonetheless unnecessary to explore these issues fully, for the Court has already determined that SBA has nudged the privacy interest at hand past the "*de minimis*" threshold — if only barely, in light of the agency's own loan-application disclaimers. See Prechtel, 330 F. Supp. 3d at 330 (finding that notwithstanding agency promise of disclosure, individuals retained "some privacy interest in non-disclosure" of personal information); Multi Ag Media, 515 F.3d at 1230 (finding privacy interest not "particularly strong," but nevertheless "greater than *de minimis*"). With a valid, albeit weak, privacy interest established for individual borrowers and individual owners of sole proprietorships and closely held corporations, the Court may now move along to the public interest.

2. *Public Interest*

Before the Court may balance the privacy interest against the public interest in disclosure, "there must be proper public interests to even put on the scales." Jurewicz v. U.S. Dep't of Agriculture, 891 F. Supp. 2d 147, 156 (D.D.C. 2012). The "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government." Dep't of Def. v. FLRA, 510 U.S. 487, 495 (1994) (cleaned up). Because that basic purpose "'focuses on the citizens' right to be informed about what their government is up to,' information that 'sheds light on an agency's performance of its statutory duties' is in the public interest." Multi Ag Media, 515 F.3d at 1231 (quoting Reporters Comm., 489 U.S. at 773).

Here, the Court has little doubt that disclosure of the withheld information would serve the public interest. In light of SBA's awesome statutory responsibility to administer the federal government's effort at keeping the nation's small businesses afloat amidst an economic and

health crisis of unprecedented proportions, the public interest in learning how well the agency fulfilled its charge is particularly pronounced. As of August 8, SBA had approved a whopping $525 billion in loans pursuant to the PPP, and it has tacked on an additional $192 billion in COVID-related EIDL loans through mid-October. See 8/8/20 PPP Report at 2; 10/19/20 EIDL Report at 2. Production of the records sought would reveal the complete list of borrowers that benefited from this substantial outlay of public funds, as well as the precise loans they obtained. This information, "valuable in itself to enhance 'public understanding of the operations or activities of the government,'" also enables meaningful evaluation of whether the PPP and EIDL program are being operated consistent with applicable legal constraints; whether funds have been distributed fairly, equitably, and devoid of fraud; and whether the programs are achieving their purpose. See Nat'l Public Radio, Inc. v. FEMA, No. 17-91, 2017 WL 5633090, at *8 (D.D.C. Nov. 21, 2017) (quoting FLRA, 510 U.S. at 495).

The D.C. Circuit has recognized a "significant" public interest in disclosure in a case similar to this one, emphasizing that "there is a special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits." Multi Ag Media, 515 F.3d at 1232. Other courts have likewise affirmed the "undeniable and powerful" public interest in shedding light on "whether [an agency] has been a proper steward of billions of taxpayer dollars." News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1191–96 (11th Cir. 2007) (emphasizing public interest in data surrounding agency's handling of disaster-relief claims); see also United States v. Suarez, 880 F.2d 626, 630 (2d Cir. 1989) ("[T]here is an obvious legitimate public interest in how taxpayers' money is being spent, particularly when the amount is large."); Wash Post. Co. v. U.S. Dep't of Agriculture, 943 F.

Supp. 31, 36 (D.D.C. 1996) (explaining that "[a] significant public interest lies in shedding light on" agency's "workings" and "administration of [its] massive subsidy program").

Plaintiffs identify an array of issues surrounding SBA's handling of its CARES Act duties on which disclosure of the withheld information would shed light. To start, they point to questions surrounding the PPP's effectiveness in achieving its goal of supporting small businesses and encouraging them "to keep their workers on the payroll." SBA, Paycheck Protection Program, https://bit.ly/2HRRzqz (last visited Oct. 28, 2020). For instance, Plaintiffs highlight reports that "many small firms didn't receive money in the initial [round of PPP] funding." Pl. Cross-Mot. & Opp., Exh. 3 (4/22/20 Wall St. J. Article) at ECF p. 3. Many of those loan requests remained unfulfilled even as public companies and other well-capitalized entities received substantial disbursements, some of which returned their loan proceeds amid public criticism. Id.; see also id., Exh. 5 (5/8/20 Bloomberg Article) at ECF p. 2 (citing examples of large restaurant operators Shake Shack, Ruth's Hospitality Group, and Potbelly).

Relatedly, Plaintiffs raise questions about alleged inequities in the dispensing of PPP loans. A May 2020 report from SBA's Office of Inspector General found that the agency had not yet issued congressionally encouraged guidance regarding the prioritization of small businesses in underserved and rural communities, such that "rural, minority and women-owned businesses may not have received the loans as intended." SBA Inspector General, Flash Report: Small Business Administration's Implementation of the Paycheck Protection Program Requirements at 4 (May 8, 2020), https://bit.ly/34HZVcU; see also 15 U.S.C. § 636(a)(36)(P)(iv); Pl. Cross-Mot. & Opp. at 6–7 (citing news articles questioning whether businesses unable to secure loans were hindered by race or geography). In both cases, given the "controversy" surrounding the loan-allocation process, disclosure of the identities of loan

recipients would facilitate public evaluation of "whether" and "how" SBA fulfilled its statutory mission to assist small businesses throughout the country. Prechtel, 330 F. Supp. 3d at 332 (emphasis removed).

Even more critical — and particularly relevant to the substantial public interest at hand — are the well-documented allegations of fraud related to the disbursement and receipt of CARES Act funds. "[T]he protection of the public fisc is a matter that is of interest to every citizen." Brock v. Pierce County, 476 U.S. 253, 262 (1986). Numerous cases, accordingly, have recognized a public interest in determining whether government programs dispensing taxpayer money involve fraud, waste, or abuse. For instance, in Washington Post, the court ordered the release of data pertaining to a Department of Agriculture subsidy program, emphasizing "allegations of fraud and conflict of interest, supported by government reports and investigations, as well newspaper articles and other information" that were "sufficient to raise nonspeculative questions" about the program's administration. See 943 F. Supp. at 36. Similarly, Multi Ag Media noted that releasing the withheld information would enable the public to "more easily determine whether USDA is catching cheaters and lawfully administering its subsidy and benefit programs." 515 F.3d at 1232; see also News-Press, 489 F.3d at 1191–92 (emphasizing "substantial" public interest in learning whether agency fulfilled statutory responsibility to appropriately handle disaster-relief claims amidst allegations of fraud and waste); Nat'l Public Radio, 2017 WL 5633090, at *8 (noting that Office of Inspector General's "repeated identification of [agency's] mismanagement of [grant program] confirms the value of further public scrutiny of" program administration).

Here, Plaintiffs have gone far beyond mere hypothetical concerns surrounding the integrity of CARES Act programs, pointing instead to actual instances in which individuals have

been criminally prosecuted for PPP-related fraud. As of mid-September 2020, the Department of Justice had publicly charged more than 50 people with fraudulently obtaining PPP loans. See Pandemic Oversight, Charged: PPP Scammers (Sept. 16, 2020), https://bit.ly/31XEoLn (Pandemic Oversight Release); see also, e.g., Dep't of Justice, Man Indicted for COVID-19 Related Loan Fraud (May 29, 2020), https://bit.ly/2JekQMi (announcing prosecution of individual for PPP and EIDL fraud). These prosecutions — which ranged from targeting individuals who lied about having legitimate businesses to coordinated criminal rings mounting systemic looting — detailed more than $70 million of actual loss. See Pandemic Oversight Release (alleging that individuals used PPP funds to buy "luxury cars, homes, renovations, jewelry — and even adult entertainment and gambling"). Indeed, SBA's own inspector general seemingly acknowledged that such fraud was rampant, characterizing the aforementioned prosecutions as "the smallest, tiniest piece of the tip of the iceberg." Stacy Cowley, Spotting $62 Million in Alleged P.P.P. Fraud Was the Easy Part, N.Y. Times (Aug. 28, 2020), https://nyti.ms/34IzHqQ.

As if that were insufficient to "confirm[] the value of further public scrutiny," Nat'l Public Radio, 2017 WL 5633090, at *8, several additional features of SBA's lending programs reinforce concerns surrounding their integrity. First, the substantial size of the PPP and EIDL program, along with the rapid speed at which scores of applications were approved, likely created an ideal environment for fraud. See Manger Decl., ¶ 13 (stating that in April 2020, SBA "processed more than 14 years' worth of PPP loans in less than 14 days"); U.S. Gov't Accountability Off., COVID-19: Opportunities to Improve Federal Response and Recovery Efforts at PDF p. 3 (June 25, 2020), https://bit.ly/3mwKWbM (6/25/20 GAO Rep.) (noting that rapid pace of PPP loan processing "raised program integrity concerns"); U.S. Gov't

Accountability Off., COVID-19: Federal Efforts Could Be Strengthened by Timely and Concerted Actions at 324 (Sept. 21, 2020), https://bit.ly/2TEGDii (9/21/20 GAO Rep.) (highlighting similar concerns for EIDL program). As the Acting Assistant Attorney General put it recently, "[A]ny time the federal government makes a large amount of money available to the public on an expedited basis, the opportunities for fraud are clear." Dep't of Justice, Acting Assistant Attorney General Brian Rabbitt Delivers Remarks at the PPP Criminal Fraud Enforcement Action Press Conference (Sept. 10, 2020), https://bit.ly/3kKnlUv. In addition, and similarly born of necessity, both programs relied heavily on borrower self-certifications of eligibility, which "can leave a program vulnerable to exploitation by those who wish to circumvent eligibility requirements or pursue criminal activities." 6/25/20 GAO Rep. at PDF p. 47; see also 9/21/20 GAO Rep. at 324 (reporting that acceptance of EIDL self-certification "increased fraud risk"). This heightened potential for abuse only augments the value of disclosing the full range of PPP and EIDL loan recipients, which will enable the public to take its own look at the programs and "more easily determine whether" the government "is catching cheaters." Multi Ag Media, 515 F.3d at 1232.

SBA, for its part, largely ignores the above. It even concedes that "there is a public interest in understanding how public funds are deployed through the PPP and EIDL programs." Def. Reply & Opp. at 15; see also Manger Decl., ¶ 113 (admitting that "the public has a general interest in knowing who has received public funds through the PPP loan program"). Instead, the agency attempts to minimize that interest, contending that much of it "has been satisfied by the information that is already publicly available" — namely, the identities of PPP borrowers with loans of above $150,000 and various non-identifying details about smaller loans — and that the

value of releasing the additional withheld information is relatively minimal. See Def. Reply & Opp. at 15–16; see also Def. MSJ at 25.

The Court is unpersuaded. No doubt, SBA's prior disclosures have proven useful in shining a light on programs that previously were entirely opaque. But many important aspects of their operation remain veiled. Disclosure of the identities of recipients of PPP loans of less than $150,000, as well as the sole proprietors and independent contractors receiving EIDL loans, will contribute substantially to public understanding of SBA's "performance of its statutory duties." Nat'l Ass'n of Home Builders, 309 F.3d at 35 (quoting Bibles v. Or. Nat. Desert Ass'n, 519 U.S. 355, 356 (1997)). The statistics themselves are striking: loans of less than $150,000 make up over 87% of all PPP loans. See Pl. Reply at 12 (citing 8/8/20 PPP Report at 6). In other words, the public has no official record as to the identities of the vast majority of PPP borrowers, as well as the many sole proprietorships and independent contractors receiving EIDL loans. SBA rejoins that PPP loans of above $150,000 — for which it has released borrower identities, even if not precise loan amounts — account for "almost 75%" of all PPP funds lent. See Def. Reply at 16 (citing Manger 2d Decl., ¶ 30). Yet even on the agency's terms, that leaves over $130 billion in public funds disbursed to unknown entities as of August 8 — a staggering sum by any measure. See 8/8/20 PPP Report at 2. Production of the withheld data would thus reveal a vast array of previously unknown information concerning a substantial component of a government aid program of massive proportions.

Indeed, within this expansive pool of public moneys allocated to currently unidentified beneficiaries, the potential for insight into "what the Government is up to" abounds. Reporters Comm., 489 U.S. at 773. To start, disclosure of loan recipients' identities would further the "important public interest" of "enabl[ing] identification of fraud against the government." Nat'l

Public Radio, 2017 WL 5633090, at *11. SBA's briefing is silent on the topic of fraud and abuse, save its brief reference to the agency's commitment to review all PPP loans greater than $2 million (and others "as appropriate"). See Def. Reply & Opp. at 16 (citing Manger 2d Decl., ¶ 31). Yet loans over $2 million merely scratch the surface of the agency's PPP activity, making up just 0.6% of all loans. See 8/8/20 PPP Report at 6. Even under SBA's promise, therefore, nearly the whole gamut of PPP loans would receive no government scrutiny — and the public would have nowhere to start for over 87% of them (*i.e.*, the loans of less than $150,000) as a direct result of the agency's withholding.

Release of the full range of borrower identities would also "enable the press and the public to monitor whether taxpayer funds have been distributed fairly and equitably." Pl. Reply at 12. Although SBA claims it has "already released demographic data for PPP loans," Def. Reply & Opp. at 16, the Government Accountability Office has explained that because loan applications did not request such data, "information was not reported for business owners' race for 90 percent of approved loans, gender for 79 percent of approved loans, and veteran status for 85 percent of approved loans." 9/21/20 GAO Rep. at 99–100. Especially in light of the popular attention surrounding whether minority-owned businesses were able to promptly and readily obtain PPP loans, see Pl. Cross-Mot. & Opp. at 6–7, 26 n.3 (citing news articles), there is great value in enabling the public to mine the loan data and cross-reference it with other publicly available information to gain a more complete picture of the range of government-approved borrowers. See Pl. Reply at 12–13; see also Pl. Cross-Mot. & Opp., Exh. 30 (7/9/20 Minneapolis/St. Paul Bus. J. Article) at 2 (noting inability to determine number of minority-owned Minnesota businesses that received PPP loans in part because those "that took out PPP loans of less than $150,000 . . . were not disclosed").

Various reports, furthermore, have documented a substantial number of "gaps, outliers, duplicates, and anomalies in PPP loan-level data." 9/21/20 GAO Rep. at 103; see also Letter from Mary Gay Scanlon, Member, House of Representatives, to Jovita Carranza, Administrator, SBA at 1 (Aug. 12, 2020), https://bit.ly/37YhZBI (referencing "litany of concerning discrepancies" in PPP data, and requesting that SBA investigate approved loan for restaurant that had been closed for seven years). As one member of Congress explained, "[T]horough oversight of the funds that have already been dispersed" will help ensure that "future funds can be fairly and effectively distributed." Scanlon Ltr. at 1. Here, the non-identifying details SBA previously released about smaller PPP loans, as well as EIDL loans to independent contractors or sole proprietors, leave much to be desired. So long as borrower identities are withheld, the public is effectively precluded from playing a meaningful role in this oversight process.

Contrary to SBA's apparent belief, the fact that the public already knows some information about the agency's CARES Act lending activity does not preclude the existence of a "great public interest" that would be served by releasing more information. See Def. Reply & Opp. at 16; see also News-Press, 489 F.3d at 1194–96 (rejecting agency argument that previously released disaster-relief disbursement data, broken down by zip code, was sufficient, and explaining that zip codes are not "an altogether accurate or complete way for the public to evaluate [agency's] distribution of aid"); Nat'l Ass'n of Home Builders, 309 F.3d at 36–37 (finding "strong" public interest in disclosure of data that would contribute to public understanding of government's activities, when public previously had only "partial understanding" of those activities). Without the information withheld pursuant to Exemption 6, "the public would have great difficulty" determining whether SBA has fairly and equitably apportioned a staggering sum of taxpayer money to the smallest of businesses, in a fashion that

minimizes the potential for fraud. See Multi Ag Media, 515 F.3d at 1231. That reality reflects a powerful public interest in disclosure.

3. *Balancing*

"Having found both a greater than *de minimis* privacy interest and a significant public interest in disclosure" of the loan data, the Court "must now balance the two to determine whether the agency has met its burden to show that 'the substantial interest in personal privacy is not outweighed by the public interest in disclosure.'" Id. at 1232 (quoting Sims v. CIA, 642 F.2d 562, 573 (D.C. Cir. 1980)). In balancing those interests, "unless the invasion of privacy is 'clearly unwarranted,' the public interest in disclosure must prevail," and the agency may not withhold the files under Exemption 6. Ray, 502 U.S. at 177. Indeed, "the purpose and plain language of the Act mandate a strong presumption in favor of disclosure," Multi Ag Media, 515 F.3d at 1232 (internal quotation marks and citation omitted), which "is at its zenith under Exemption 6." Nat'l Ass'n of Home Builders, 309 F.3d at 37; see also Stern v. FBI, 737 F.2d 84, 91 (D.C. Cir. 1984) (noting that Exemption 6 strikes "a balance tilted emphatically in favor of disclosure") (citation omitted). "That presumption is of special force" where an agency "distributes extensive amounts of public funds" in the administration of benefit programs. Multi Ag Media, 515 F.3d at 1232.

Here, the Court finds that the balancing is not particularly close. The significant public interest in shedding light on SBA's administration of the PPP and EIDL program dramatically outweighs any limited private interest in nondisclosure. See Nat'l Ass'n of Home Builders, 309 F.3d at 36–37 (determining that "strong public interest in knowing 'what the government is up to'" overcame "relatively weak" privacy interest, such that agency "failed to rebut the presumption favoring disclosure"); Prechtel, 330 F. Supp. 3d at 331–32 (concluding that

"minimal" privacy interest paled in comparison to "significant" public interest in disclosure, which could help root out "fraud and abuse" and "clarify the extent to which the [agency] succeeded" in managing allegedly corrupted process); AquAlliance v. U.S. Bureau of Reclamation, 139 F. Supp. 3d 203, 214 (D.D.C. 2015) (finding that public interest in "monitor[ing]" agency's administration of water-transfer programs outweighed "relatively weak privacy interests").

Multi Ag Media once again offers useful instruction. There, the D.C. Circuit found that disclosure of the withheld information would implicate a "substantial privacy interest," but nonetheless concluded that the "significant public interest in disclosure . . . outweigh[ed]" that privacy interest. See 515 F.3d at 1226, 1233. In so holding, the court relied upon: 1) the agency's "rather tepid showing" that release of the withheld information would intrude upon a substantial privacy interest; 2) the "special need for public scrutiny of agency action that distributes extensive amounts of public funds in the form of subsidies and other financial benefits"; 3) the fact that Congress "recognized the importance of ensuring the responsible use of these funds" by creating an Office of Inspector General within the agency to police fraud and abuse; and 4) FOIA's presumption in favor of disclosure. Id. at 1232–33.

Each of these elements is present here. First, SBA has made a relatively weak, albeit sufficient, showing that disclosure would implicate borrowers' reasonable privacy interests. Second, production would facilitate public monitoring and scrutiny of a government aid program vast in both size and sweep. Third, Congress affirmed the importance of ensuring responsible use of CARES Act funding by creating the Pandemic Response Accountability Committee to "promote transparency and conduct and support oversight of covered funds," as well as to "prevent and detect fraud, waste, abuse, and mismanagement." Pub. L. 166–136, § 15010(b).

Finally, FOIA's presumption in favor of disclosure is fully applicable. See Nat'l Public Radio, 2017 WL 5633090, at *10 (similarly analogizing to Multi Ag Media). In these circumstances, the weighty public interest in disclosure easily overcomes the far narrower privacy interest of borrowers who collectively received billions of taxpayer dollars in loans.

In sum, Exemption 6 does not protect the names and addresses of borrowers of PPP loans of less than $150,000, as well as those of sole proprietorships and independent contractors receiving EIDL loans.

## IV. Conclusion

For the foregoing reasons, the Court will grant the news-organization Plaintiffs' Cross-Motion for Summary Judgment and CPI's Cross-Motion for Partial Summary Judgment and order that Defendant release the names, addresses, and precise loan amounts of all individuals and entities that obtained PPP and EIDL COVID-related loans by November 19, 2020. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: November 5, 2020

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WP COMPANY LLC d/b/a THE WASHINGTON POST, *et al.*,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**U.S. SMALL BUSINESS ADMINISTRATION,**<br><br>**Defendant.** | **Civil Action No. 20-1240 (JEB)** |
| **CENTER FOR PUBLIC INTEGRITY,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**U.S. SMALL BUSINESS ADMINISTRATION,**<br><br>**Defendant.** | **Civil Action No. 20-1614 (JEB)** |

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the Court ORDERS that:

1. The temporary stay is LIFTED;
2. Defendant's Motion to Stay in Nos. 20-1240 and 20-1614 is DENIED; and
3. Defendant shall release the names, addresses, and precise loan amounts for all individuals and entities that obtained COVID-related loans pursuant to the Paycheck Protection Program and Economic Injury Disaster Loans program by December 1, 2020.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: November 24, 2020

IRS

# New IRS online tool offers expanded access to information on tax-exempt organizations; newly-filed data available to public for first time

**Notice: Historical Content**

This is an archival or historical document and may not reflect current law, policies or procedures.

IR-2018-116, May 7, 2018

WASHINGTON — The Internal Revenue Service today introduced a new online tool on IRS.gov designed to provide faster, easier access to publicly available information about exempt organizations.

"This new tool provides taxpayers an easy way to get information about charitable organizations," said Acting IRS Commissioner David Kautter. "Tax-exempt organizations play a critical role in our nation, and this will provide greater insight for people considering donations."

The new Tax Exempt Organization Search (TEOS) replaces EO Select Check, a more limited tool available since 2012 that focused primarily on providing information on an organization's tax-exempt status.

The new tool makes images of newly-filed 990 forms available for the first time. TEOS also features two major enhancements:

- Users can access more types of information than were previously available using EO Select Check.
- The search process has been simplified and allows users to look across multiple data files for information in one search.

- In addition, TEOS is mobile friendly, which provides access to the search tool using smartphones or tablets. With the new tool, users can view images of an organization's:
  - Forms 990, 990-EZ, 990-PF and 990-T (501(c)(3) organizations only) filed with the IRS. Initially, only 990 series forms filed in January and February 2018 will be available. New filings will be added monthly.
- Favorable determination letters issued by the IRS when an organization applied for and met the requirements for tax-exempt status. Initially, a limited number of determination letters will be available. Eventually, determination letters issued since January 2014 will also appear on the system.

TEOS also can be used to find all the information previously available on EO Select Check. This information includes whether an organization is eligible to receive tax-deductible contributions, has had its tax-exempt status revoked because it failed to file required forms or notices for three consecutive years and, for a small organization, whether it filed a Form 990-N (e-Postcard) annual electronic notice with the IRS.

Publicly-available data from electronically-filed 990 forms will continue to be available in a machine-readable format through Amazon Web Services. Visit IRS.gov for more information.

⚠ *News items may not be updated after their release. Please verify the date before relying on the language.*

https://apps.irs.gov/app/eos/details/ Go NOV DEC JAN
255 captures 23
19 Dec 2022 - 22 Sep 2026 2023 2024 2025

An official website of the United States government

IRS

Help | News | English | Charities & Nonprofits | Tax Pros

File Pay Refunds Credits & Deductions Forms & Instructions Search

Home / File / Charities and Nonprofits / Search for Charities / Search for Tax Exempt Organizations / Tax Exempt Organization Search

# Tax Exempt Organization Search

Select Database
Search All

Search By
Employer Identification Number (EIN)

Search Term XX-XXXXXXX or XXXXXXXXX
Enter EIN Number

City
Enter City

State
All States

Country
United States

RESET SEARCH Search Tips

| OUR AGENCY | KNOW YOUR RIGHTS | RESOLVE AN ISSUE | LANGUAGES | RELATED SITES |
|---|---|---|---|---|
| About IRS | Taxpayer Bill of Rights | IRS Notices and Letters | Español | U.S. Treasury |
| Careers | Taxpayer Advocate Service | Identity Theft | 中文 (简体) | Treasury Inspector General for Tax Administration |
| Operations and Budget | Independent Office of Appeals | Phishing | 中文 (繁體) | |

# Rules and Regulations

Federal Register
Vol. 85, No. 73
Wednesday, April 15, 2020

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 120**

**[Docket No. SBA–2020–0015]**

**RIN 3245–AH34**

## Business Loan Program Temporary Changes; Paycheck Protection Program

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** This interim final rule announces the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new product, titled the ''Paycheck Protection Program,'' to the U.S. Small Business Administration's (SBA's) 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted under the Coronavirus Disease 2019 (COVID–19) Emergency Declaration (COVID–19 Emergency Declaration) issued by President Trump on March 13, 2020. This interim final rule outlines the key provisions of SBA's implementation of sections 1102 and 1106 of the Act in formal guidance and requests public comment.

**DATES:**

*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

*Comment Date:* Comments must be received on or before May 15, 2020.

**ADDRESSES:** You may submit comments, identified by number SBA–2020–0015 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.* Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID–19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia. With the COVID–19 emergency, many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the virus. These measures, some of which are government-mandated, are being implemented nationwide and include the closures of restaurants, bars, and gyms. In addition, based on the advice of public health officials, other measures, such as keeping a safe distance from others or even stay-at-home orders, are being implemented, resulting in a dramatic decrease in economic activity as the public avoids malls, retail stores, and other businesses.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act or the Act) (Pub. L. 116–136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The Small Business Administration (SBA) received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID–19 emergency.

Section 1102 of the Act temporarily permits SBA to guarantee 100 percent of 7(a) loans under a new program titled the ''Paycheck Protection Program.'' Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. A more detailed discussion of sections 1102 and 1106 of the Act is found in section III below.

### II. Comments and Immediate Effective Date

The intent of the Act is that SBA provide relief to America's small businesses expeditiously. This intent, along with the dramatic decrease in economic activity nationwide, provides good cause for SBA to dispense with the 30-day delayed effective date provided in the Administrative Procedure Act. Specifically, small businesses need to be informed on how to apply for a loan and the terms of the loan under section 1102 of the Act as soon as possible because the last day to apply for and receive a loan is June 30, 2020. The immediate effective date of this interim final rule will benefit small businesses so that they can immediately apply for the loan with a full understanding of loan terms and conditions. This interim final rule is effective without advance notice and public comment because section 1114 of the Act authorizes SBA to issue regulations to implement Title 1 of the Act without regard to notice requirements. This rule is being issued to allow for immediate implementation of this program. Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule, including section III below. These comments must be submitted on or before May 15, 2020. The SBA will consider these comments and the need for making any revisions as a result of these comments.

### III. Temporary New Business Loan Program: Paycheck Protection Program

*Overview*

The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses

affected by the COVID–19 emergency. Among the provisions contained in the CARES Act are provisions authorizing SBA to temporarily guarantee loans under a new 7(a) loan program titled the ''Paycheck Protection Program.'' Loans guaranteed under the Paycheck Protection Program (PPP) will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness. The following outlines the key provisions of the PPP.

1. General

SBA is authorized to guarantee loans under the PPP through June 30, 2020. Congress authorized a program level of $349,000,000,000 to provide guaranteed loans under this new 7(a) program. The intent of the Act is that SBA provide relief to America's small businesses expeditiously, which is expressed in the Act by giving all lenders delegated authority and streamlining the requirements of the regular 7(a) loan program. For example, for loans made under the PPP, SBA will not require the lenders to comply with section 120.150 ''What are SBA's lending criteria?.'' SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness. Lenders must comply with the applicable lender obligations set forth in this interim final rule, but will be held harmless for borrowers' failure to comply with program criteria; remedies for borrower violations or fraud are separately addressed in this interim final rule. The program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10).

2. What do borrowers need to know and do?

a. Am I eligible?

You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA employee-based size standards for that industry, and:

i. You are:

A. A small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the Act; or

B. A tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, or any other business; and

ii. You were in operation on February 15, 2020 and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.

You are also eligible for a PPP loan if you are an individual who operates under a sole proprietorship or as an independent contractor or eligible self-employed individual, and you were in operation on February 15, 2020.

You must also submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

SBA intends to promptly issue additional guidance with regard to the applicability of affiliation rules at 13 CFR 121.103 and 121.301 to PPP loans.

b. Could I be ineligible even if I meet the eligibility requirements in (a) above?

You are ineligible for a PPP loan if, for example:

i. You are engaged in any activity that is illegal under Federal, state, or local law;

ii. You are a household employer (individuals who employ household employees such as nannies or housekeepers);

iii. An owner of 20 percent or more of the equity of the applicant is incarcerated, on probation, on parole; presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of a felony within the last five years; or

iv. You, or any business owned or controlled by you or any of your owners, has ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted within the last seven years and caused a loss to the government.

The Administrator, in consultation with the Secretary of the Treasury (the Secretary), determined that household employers are ineligible because they are not businesses. 13 CFR 120.100.

c. How do I determine if I am ineligible?

Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10, Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible. (SOP 50 10 can be found at *https://www.sba.gov/document/sop-50-10-5-lender-development-company-loan-programs.*)

d. I have determined that I am eligible. How much can I borrow?

Under the PPP, the maximum loan amount is the lesser of $10 million or an amount that you will calculate using a payroll-based formula specified in the Act, as explained below.

e. How do I calculate the maximum amount I can borrow?

The following methodology, which is one of the methodologies contained in the Act, will be most useful for many applicants.

i. Step 1: Aggregate payroll costs (defined in detail below in f.) from the last twelve months for employees whose principal place of residence is the United States.

ii. Step 2: Subtract any compensation paid to an employee in excess of an annual salary of $100,000 and/or any amounts paid to an independent contractor or sole proprietor in excess of $100,000 per year.

iii. Step 3: Calculate average monthly payroll costs (divide the amount from Step 2 by 12).

iv. Step 4: Multiply the average monthly payroll costs from Step 3 by 2.5.

v. Step 5: Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020, less the amount of any ''advance'' under an EIDL COVID–19 loan (because it does not have to be repaid).

The examples below illustrate this methodology.

i. Example 1—No employees make more than $100,000
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Maximum loan amount is $25,000

ii. Example 2—Some employees make more than $100,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Maximim loan amount is $250,000

iii. Example 3—No employees make more than $100,000, outstanding EIDL loan of $10,000.
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Add EIDL loan of $10,000 = $35,000
Maximum loan amount is $35,000

iv. Example 4—Some employees make more than $100,000, outstanding EIDL loan of $10,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Add EIDL loan of $10,000 = $260,000
Maximum loan amount is $260,000

f. What qualifies as ''payroll costs?''

Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation.

g. Is there anything that is expressly excluded from the definition of payroll costs?

Yes. The Act expressly excludes the following:

i. Any compensation of an employee whose principal place of residence is outside of the United States;

ii. The compensation of an individual employee in excess of an annual salary of $100,000, prorated as necessary;

iii. Federal employment taxes imposed or withheld between February 15, 2020 and June 30, 2020, including the employee's and employer's share of FICA (Federal Insurance Contributions Act) and Railroad Retirement Act taxes, and income taxes required to be withheld from employees; and

iv. Qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Pub. L. 116–127).

h. Do independent contractors count as employees for purposes of PPP loan calculations?

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation.

i. What is the interest rate on a PPP loan?

The interest rate will be 100 basis points or one percent.

The Administrator, in consultation with the Secretary, determined that a one percent interest rate is appropriate. First, it provides low cost funds to borrowers to meet eligible payroll costs and other eligible expenses during this temporary period of economic dislocation caused by the coronavirus. Second, for lenders, the 100 basis points offers an attractive interest rate relative to the cost of funding for comparable maturities. For example, the FDIC's weekly national average rate for a 24-month CD deposit product for the week of March 30, 2020 is 42 basis points for non-jumbo and 44 basis points for jumbo (*https://www.fdic.gov/regulations/resources/rates/*). Third, the interest rate is higher than the yield on Treasury securities of comparable maturity. For example, the yield on the Treasury two-year note is approximately 23 basis points. This higher yield combined with the fact that the loans are 100 percent guaranteed by the SBA and the fact that lenders will receive a substantial processing fee from the SBA provide ample inducement for lenders to participate in the PPP.

j. What will be the maturity date on a PPP loan?

The maturity is two years. While the Act provides that a loan will have a maximum maturity of up to ten years from the date the borrower applies for loan forgiveness (described below), the Administrator, in consultation with the Secretary, determined that a two year loan term is sufficient in light of the temporary economic dislocations caused by the coronavirus. Specifically, the considerable economic disruption caused by the coronavirus is expected to abate well before the two year maturity date such that borrowers will be able to re-commence business operations and pay off any outstanding balances on their PPP loans.

k. Can I apply for more than one PPP loan?

No. The Administrator, in consultation with the Secretary, determined that no eligible borrower may receive more than one PPP loan. This means that if you apply for a PPP loan you should consider applying for the maximum amount. While the Act does not expressly provide that each eligible borrower may only receive one PPP loan, the Administrator has determined, in consultation with the Secretary, that because all PPP loans must be made on or before June 30, 2020, a one loan per borrower limitation is necessary to help ensure that as many eligible borrowers as possible may obtain a PPP loan. This limitation will also help advance Congress' goal of keeping workers paid and employed across the United States.

l. Can I use e-signatures or e-consents if a borrower has multiple owners?

Yes, e-signature or e-consents can be used regardless of the number of owners.

m. Is the PPP ''first-come, first-served?''

Yes.

n. When will I have to begin paying principal and interest on my PPP loan?

You will not have to make any payments for six months following the date of disbursement of the loan. However, interest will continue to accrue on PPP loans during this six-month deferment. The Act authorizes the Administrator to defer loan payments for up to one year. The Administrator determined, in consultation with the Secretary, that a six-month deferment period is appropriate in light of the modest interest rate (one percent) on PPP loans and the loan forgiveness provisions contained in the Act.

o. Can my PPP loan be forgiven in whole or in part?

Yes. The amount of loan forgiveness can be up to the full principal amount of the loan and any accrued interest. That is, the borrower will not be responsible for any loan payment if the borrower uses all of the loan proceeds for forgiveable purposes described below and employee and compensation levels are maintained. The actual amount of loan forgiveness will depend, in part, on the total amount of payroll costs, payments of interest on mortgage obligations incurred before February 15, 2020, rent payments on leases dated before February 15, 2020, and utility payments under service agreements dated before February 15, 2020, over the eight-week period following the date of the loan. However, not more than 25 percent of the loan forgiveness amount may be attributable to non-payroll costs. While the Act provides that borrowers are eligible for forgiveness in an amount equal to the sum of payroll costs and

20814 **Federal Register** / Vol. 85, No. 73 / Wednesday, April 15, 2020 / Rules and Regulations

any payments of mortgage interest, rent, and utilities, the Administrator has determined that the non-payroll portion of the forgivable loan amount should be limited to effectuate the core purpose of the statute and ensure finite program resources are devoted primarily to payroll. The Administrator has determined in consultation with the Secretary that 75 percent is an appropriate percentage in light of the Act's overarching focus on keeping workers paid and employed. Further, the Administrator and the Secretary believe that applying this threshold to loan forgiveness is consistent with the structure of the Act, which provides a loan amount 75 percent of which is equivalent to eight weeks of payroll (8 weeks/2.5 months = 56 days/76 days = 74 percent rounded up to 75 percent). Limiting non-payroll costs to 25 percent of the forgiveness amount will align these elements of the program, and will also help to ensure that the finite appropriations available for PPP loan forgiveness are directed toward payroll protection. SBA will issue additional guidance on loan forgiveness.

p. Do independent contractors count as employees for purposes of PPP loan forgiveness?

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan forgiveness.

q. What forms do I need and how do I submit an application?

The applicant must submit SBA Form 2483 (Paycheck Protection Program Application Form) and payroll documentation, as described above. The lender must submit SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty) electronically in accordance with program requirements and maintain the forms and supporting documentation in its files.

r. How can PPP loans be used?

The proceeds of a PPP loan are to be used for:

i. payroll costs (as defined in the Act and in 2.f.);

ii. costs related to the continuation of group health care benefits during periods of paid sick, medical, or family leave, and insurance premiums;

iii. mortgage interest payments (but not mortgage prepayments or principal payments);

iv. rent payments;

v. utility payments;

vi. interest payments on any other debt obligations that were incurred before February 15, 2020; and/or

vii. refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. If you received an SBA EIDL loan from January 31, 2020 through April 3, 2020, you can apply for a PPP loan. If your EIDL loan was not used for payroll costs, it does not affect your eligibility for a PPP loan. If your EIDL loan was used for payroll costs, your PPP loan must be used to refinance your EIDL loan. Proceeds from any advance up to $10,000 on the EIDL loan will be deducted from the loan forgiveness amount on the PPP loan.

However, at least 75 percent of the PPP loan proceeds shall be used for payroll costs. For purposes of determining the percentage of use of proceeds for payroll costs, the amount of any EIDL refinanced will be included. For purposes of loan forgiveness, however, the borrower will have to document the proceeds used for payroll costs in order to determine the amount of forgiveness. While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a requirement that borrowers use a substantial portion of the loan proceeds for payroll costs, consistent with Congress' overarching goal of keeping workers paid and employed. As with the similar limitation on the forgiveness amount explained earlier, the Administrator, in consultation with the Secretary, has determined that 75 percent is an appropriate percentage that will align this element of the program with the loan amount, 75 percent of which is equivalent to eight weeks of payroll. This limitation on use of the loan funds will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

s. What happens if PPP loan funds are misused?

If you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts. If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud. If one of your shareholders, members, or partners uses PPP funds for unauthorized purposes, SBA will have recourse against the shareholder, member, or partner for the unauthorized use.

t. What certifications need to be made?

On the Paycheck Protection Program application, an authorized representative of the applicant must certify in good faith to all of the below: [1]

i. The applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.

ii. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.

iii. The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments; I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud. As explained above, not more than 25 percent of loan proceeds may be used for non-payroll costs.

iv. Documentation verifying the number of full-time equivalent employees on payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight week period following this loan will be provided to the lender.

v. Loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities. As explained above, not more than 25 percent of the forgiven amount may be for non-payroll costs.

vi. During the period beginning on February 15, 2020 and ending on December 31, 2020, the applicant has not and will not receive another loan under this program.

vii. I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

[1] A representative of the applicant can certify for the business as a whole if the representative is legally authorized to do so.

viii. I acknowledge that the lender will confirm the eligible loan amount using tax documents I have submitted. I affirm that these tax documents are identical to those submitted to the Internal Revenue Service. I also understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

3. What do lenders need to know and do?

a. Who is eligible to make PPP loans?

i. All SBA 7(a) lenders are automatically approved to make PPP loans on a delegated basis.

ii. The Act provides that the authority to make PPP loans can be extended to additional lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the SBA guarantee. Since SBA is authorized to make PPP loans up to $349 billion by June 30, 2020, the Adminstrator and the Secretary have jointly determined that authorizing additional lenders is necessary to achieve the purpose of allowing as many eligible borrowers as possible to receive loans by the June 30, 2020 deadline.

iii. The following types of lenders have been determined to meet the criteria and are eligible to make PPP loans unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action with their primary Federal regulator that addresses unsafe or unsound lending practices:

I. Any federally insured depository institution or any federally insured credit union;

II. Any Farm Credit System institution (other than the Federal Agricultural Mortgage Corporation) as defined in 12 U.S.C. 2002(a) that applies the requirements under the Bank Secrecy Act and its implementing regulations (collectively, BSA) as a federally regulated financial institution, or functionally equivalent requirements that are not altered by this rule; and

III. Any depository or non-depository financing provider that originates, maintains, and services business loans or other commercial financial receivables and participation interests; has a formalized compliance program; applies the requirements under the BSA as a federally regulated financial institution, or the BSA requirements of an equivalent federally regulated financial institution; has been operating since at least February 15, 2019, and has originated, maintained, and serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months, or is a service provider to any insured depository institution that has a contract to support such institution's lending activities in accordance with 12 U.S.C. 1867(c) and is in good standing with the appropriate Federal banking agency.

iv. Qualified institutions described in 3.a.iii.I. and II. will be automatically qualified under delegated authority by the SBA upon transmission of CARES Act Section 1102 Lender Agreement (SBA Form 3506) unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action by their primary Federal regulator that addresses unsafe or unsound lending practices.

b. What do lenders have to do in terms of loan underwriting?

Each lender shall:

i. Confirm receipt of borrower certifications contained in Paycheck Protection Program Application form issued by the Administration;

ii. Confirm receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

iii. Confirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application; and

iv. Follow applicable BSA requirements:

I. Federally insured depository institutions and federally insured credit unions should continue to follow their existing BSA protocols when making PPP loans to either new or existing customers who are eligible borrowers under the PPP. PPP loans for existing customers will not require re-verification under applicable BSA requirements, unless otherwise indicated by the institution's risk-based approach to BSA compliance.

II. Entities that are not presently subject to the requirements of the BSA, should, prior to engaging in PPP lending activities, including making PPP loans to either new or existing customers who are eligible borrowers under the PPP, establish an anti-money laundering (AML) compliance program equivalent to that of a comparable federally regulated institution. Depending upon the comparable federally regulated institution, such a program may include a customer identification program (CIP), which includes identifying and verifying their PPP borrowers' identities (including *e.g.,* date of birth, address, and taxpayer identification number), and, if that PPP borrower is a company, following any applicable beneficial ownership information collection requirements. Alternatively, if available, entities may rely on the CIP of a federally insured depository institution or federally insured credit union with an established CIP as part of its AML program. In either instance, entities should also understand the nature and purpose of their PPP customer relationships to develop customer risk profiles. Such entities will also generally have to identify and report certain suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). If such entities have questions with regard to meeting these requirements, they should contact the FinCEN Regulatory Support Section at *FRC@fincen.gov.* In addition, FinCEN has created a COVID–19-specific contact channel, via a specific drop-down category, for entities to communicate to FinCEN COVID–19-related concerns while adhering to their BSA obligations. Entities that wish to communicate such COVID–19-related concerns to FinCEN should go to *www.FinCEN.gov,* click on ''Need Assistance,'' and select ''COVID19'' in the subject drop-down list.

Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the ''Paycheck Protection Application Form.'' Borrowers must submit such documentation as is necessary to establish eligibility such as payroll processor records, payroll tax filings, or Form 1099–MISC, or income and expenses from a sole proprietorship. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

c. Can lenders rely on borrower documentation for loan forgiveness?

Yes. The lender does not need to conduct any verification if the borrower submits documentation supporting its request for loan forgiveness and attests that it has accurately verified the payments for eligible costs. The Administrator will hold harmless any lender that relies on such borrower documents and attestation from a borrower. The Administrator, in

consultation with the Secretary, has determined that lender reliance on a borrower's required documents and attestation is necessary and appropriate in light of section 1106(h) of the Act, which prohibits the Administrator from taking an enforcement action or imposing penalties if the lender has received a borrower attestation.

d. What fees will lenders be paid?

SBA will pay lenders fees for processing PPP loans in the following amounts:

i. Five (5) percent for loans of not more than $350,000;

ii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and

iii. One (1) percent for loans of at least $2,000,000.

e. Do lenders have to apply the ''credit elsewhere test''?

No. When evaluating an applicant's eligibility lenders will not be required to apply the ''credit elsewhere test'' (as set forth in section 7(a)(1)(A) of the Small Business Act (15 U.S.C. 636) and SBA regulations at 13 CFR 120.101)).

4. What do both borrowers and lenders need to know and do?

a. What are the loan terms and conditions?

Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:

i. The guarantee percentage is 100 percent.

ii. No collateral will be required.

iii. No personal guarantees will be required.

iv. The interest rate will be 100 basis points or one percent.

v. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds.

b. Are there any fee waivers?

i. There will be no up-front guarantee fee payable to SBA by the Borrower;

ii. There will be no lender's annual service fee (''on-going guaranty fee'') payable to SBA;

iii. There will be no subsidy recoupment fee; and

iv. There will be no fee payable to SBA for any guarantee sold into the secondary market.

c. Who pays the fee to an agent who assists a borrower?

Agent fees will be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

i. One (1) percent for loans of not more than $350,000;

ii. 0.50 percent for loans of more than $350,000 and less than $2 million; and

iii. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application req uirements and the fees that lenders receive for making PPP loans.

d. Can PPP loans be sold into the secondary market?

Yes. A PPP loan may be sold on the secondary market after the loan is fully disbursed. A PPP loan may be sold on the secondary market at a premium or a discount to par value. SBA will issue guidance regarding any advance purchase for loans sold in the secondary market.

e. Can SBA purchase some or all of the loan in advance?

Yes. A lender may request that the SBA purchase the expected forgiveness amount of a PPP loan or pool of PPP loans at the end of week seven of the covered period. The expected forgiveness amount is the amount of loan principal the lender reasonably expects the borrower to expend on payroll costs, covered mortgage interest, covered rent, and covered utility payments during the eight week period after loan disbursement. At least 75 percent of the expected forgiveness amount shall be for payroll costs, as provided in 2.o. To submit a PPP loan or pool of PPP loans for advance purchase, a lender shall submit a report requesting advance purchase with the expected forgiveness amount to the SBA. The report shall include: the Paycheck Protection Program Application Form (SBA Form 2483) and any supporting documentation submitted with such application; the Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty (SBA Form 2484) and any supporting documentation; a detailed narrative explaining the assumptions used in determining the expected forgiveness amount, the basis for those assumptions, alternative assumptions considered, and why alternative assumptions were not used; any information obtained from the borrower since the loan was disbursed that the lender used to determine the expected forgiveness amount, which should include the same documentation required to apply for loan forgiveness such as payroll tax filings, cancelled checks, and other payment documentation; and any additional information the Administrator may require to determine whether the expected forgiveness amount is reasonable. The Administrator, in consultation with the Secretary, determined that seven weeks is the minimum period of time necessary for a lender to reasonably determine the expected forgiveness amount for a PPP loan or pool of PPP loans, since the PPP is a new program and the likelihood that many borrowers will be new clients of the lender. The expected forgiveness amount may not exceed the total amount of principal on the PPP loan or pool of loans. The Administrator will purchase the expected forgiveness amount of the PPP loan(s) within 15 days of the date on which the Administrator receives a complete report that demonstrates that the expected forgiveness amount is indeed reasonable.

5. Additional Information

All loans guaranteed by the SBA pursuant to the CARES Act will be made consistent with constitutional, statutory, and regulatory protections for religious liberty, including the First Amendment to the Constitution, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 and bb–3, and SBA regulation at 13 CFR 113.3–1h, which provides that nothing in SBA nondiscrimination regulations shall apply to a religious corporation, association, educational institution or society with respect to the membership or the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its religious activities. SBA intends to promptly issue additional guidance with regard to religious liberty protections under this program.

SBA may provide further guidance, if needed, through SBA notices and a program guide which will be posted on SBA's website at *www.sba.gov.*

Questions on the Paycheck Protection Program 7(a) Loans may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**Compliance With Executive Orders 12866, 12988, 13132, and 13771, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612)**

*E.O. 12866 and E.O. 13563*

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563. SBA, however, is proceeding under the emergency provision at Executive Order 12866 Section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency. This rule's designation under Executive Order 13771 will be informed by public comment.

This rule is necessary to implement Sections 1102 and 1106 of the CARES Act in order to provide economic relief to small businesses nationwide adversely impacted under the COVID–19 Emergency Declaration. We anticipate that this rule will result in substantial benefits to small businesses, their employees, and the communities they serve. However, we lack data to estimate the effects of this rule.

*Executive Order 12988*

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive or retroactive effect.

*Executive Order 13132*

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

*Paperwork Reduction Act, 44 U.S.C. Chapter 35*

SBA has determined that this rule will impose recordkeeping or reporting requirements under the Paperwork Reduction Act (''PRA''). SBA has obtained emergency approval under OMB Control Number 3245–0407 for the information collection (IC) required to implement the program described above. This IC consists of Form 2483 (Paycheck Protection Program Application Form), SBA Form 2484 (Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty), and SBA Form 3506 (CARES Act Section 1102 Lender Agreement), and SBA Form 3507 (CARES Act Section 1102 Lender Agreement—Non-Bank and Non-Insured Depository Institution Lender). The collection is approved for use until September 30, 2020.

*Regulatory Flexibility Act (RFA)*

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a ''small entity'' as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for such small government jurisdictions, neither State nor local governments are ''small entities.'' Similarly, for purposes of the RFA, individual persons are not small entities.

The requirement to conduct a regulatory impact analysis does not apply if the head of the agency ''certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, ''along with a statement providing the factual basis for such certification.'' If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b).

Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. Small Business Administration's Office of Advocacy guide: *How to Comply with the Regulatory Flexibility Ac. Ch.1. p.9.* Accordingly, SBA is not required to conduct a regulatory flexibility analysis.

*Authority:* 15 U.S.C. 636(a)(36); Coronavirus Aid, Relief, and Economic Security Act, Public Law 116–136, Section 1114.

**Jovita Carranza,**
*Administrator.*

[FR Doc. 2020–07672 Filed 4–10–20; 4:15 pm]

**BILLING CODE P**

---

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Part 121**

**[Docket No. SBA–2020–0019]**

**RIN 3245–AH35**

## Business Loan Program Temporary Changes; Paycheck Protection Program

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** Elsewhere in this issue of the **Federal Register**, the U.S. Small Business Administration (SBA) is publishing an interim final rule (the Initial Rule) announcing the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). Section 1102 of the Act temporarily adds a new program, titled the ''Paycheck Protection Program,'' to the SBA's 7(a) Loan Program. Section 1106 of the Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. The Paycheck Protection Program and loan forgiveness are intended to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). This interim final rule supplements the Initial Rule with additional guidance regarding the application of certain affiliate rules applicable to SBA's implementation of sections 1102 and 1106 of the Act and requests public comment.

**DATES:**

*Effective date:* This interim final rule is effective April 15, 2020.

*Applicability date:* This interim final rule applies to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for this purpose are exhausted.

**SMALL BUSINESS ADMINISTRATION**

**13 CFR Parts 113, 120, and 121**

**[Docket No. SBA–2021–0001]**

**RIN 3245–AH62**

**DEPARTMENT OF THE TREASURY**

**RIN 1505–AC74**

## Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act

**AGENCY:** U.S. Small Business Administration; Department of the Treasury.

**ACTION:** Interim final rule.

**SUMMARY:** On April 2, 2020, the U.S. Small Business Administration (SBA) posted an interim final rule announcing the implementation of sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). Section 1102 of the CARES Act temporarily adds a new program, titled the ''Paycheck Protection Program,'' to the SBA's 7(a) Loan Program. Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program (PPP). The PPP is intended to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). Subsequently, SBA published twenty-three interim final rules providing additional guidance on the PPP (some of which were jointly issued with the Department of the Treasury) and Treasury published one interim final rule. On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Economic Aid Act) became law. The Economic Aid Act extends the authority to make PPP loans through March 31, 2021 and revises certain PPP requirements. This interim final rule incorporates the Economic Aid Act amendments required to be implemented by regulation within 10 days of enactment. For ease of borrower and lender reference, this interim final rule also consolidates the interim final rules (and important guidance) issued to date governing borrower eligibility, lender eligibility, and PPP application and origination requirements for new PPP loans, as well as provides general rules relating to loan increases and loan forgiveness. This rule is not intended to substantively alter or affect PPP rules that were not amended by the Economic Aid Act. Additional rules related to second draw PPP loans will be published separately, and SBA intends to issue a consolidated rule governing all aspects of loan forgiveness and the loan review process as well. This interim final rule is intended to govern new PPP loans made under the Economic Aid Act, as well as applications for loan forgiveness on existing PPP loans where the loan forgiveness payment has not been remitted, and should not be construed to alter or affect the requirements applicable to PPP loans closed prior to its enactment, unless the provisions apply retroactively consistent with specific applicability provisions of the Economic Aid Act as identified in this rule. In addition, in this interim final rule, Treasury exercises its authority under section 1109 of the CARES Act to allow borrowers of first draw PPP loans to use 2019 or 2020 to calculate their maximum loan amount.

**DATES:**

*Effective date:* Unless otherwise specified in this interim final rule, the provisions of this interim final rule are effective January 12, 2021.

*Applicability date:* This interim final rule applies to loan applications, including requests for increases, and applications for loan forgiveness submitted under the Paycheck Protection Program following enactment of the Economic Aid Act. This interim final rule also applies to loan forgiveness applications submitted under the Paycheck Protection Program before enactment of the Economic Aid Act where SBA has not remitted the forgiveness payment.

*Comment date:* Comments must be received on or before February 16, 2021.

**ADDRESSES:** You may submit comments, identified by number SBA–2021–0001 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.* All other comments must be submitted through the Federal eRulemaking Portal described above. Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

On March 13, 2020, President Trump declared the ongoing Coronavirus Disease 2019 (COVID–19) pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, territories, and the District of Columbia. With the COVID–19 emergency, many small businesses nationwide continue to experience economic hardship as a direct result of the Federal, State, and local public health measures that continue to be taken to minimize the public's exposure to the virus. In addition, based on the advice of public health officials, other voluntary measures continue to be observed, resulting in a decrease in economic activity as the public avoids malls, retail stores, and other businesses.

On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act or the Act) (Pub. L. 116–136) to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus pandemic. The Small Business Administration (SBA) received funding and authority through the Act to modify existing loan programs and establish a new loan program to assist small businesses nationwide adversely impacted by the COVID–19 emergency.

Section 1102 of the CARES Act temporarily permitted SBA to guarantee 100 percent of 7(a) loans under a new program titled the ''Paycheck Protection Program,'' pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)). Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program. A more detailed discussion of sections 1102 and 1106 of the Act is found in section III.

On April 24, 2020, the President signed the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116–139), which provided additional funding and authority for the PPP. On June 5, 2020, the President signed the Paycheck Protection Program Flexibility Act of 2020 (Flexibility Act) (Pub. L. 116–142), which changed key provisions of the Paycheck Protection Program, including provisions relating to the maturity of PPP loans, the deferral of PPP loan payments, and the forgiveness of PPP loans. Section 3(d) of the Flexibility Act provided that the amendments relating to PPP loan

forgiveness and extension of the deferral period for PPP loans were effective as if included in the CARES Act, which meant that they were retroactive to March 27, 2020. Section 2 of the Flexibility Act provided that the amendment relating to the extension of the maturity date for PPP loans became effective on the date of enactment (June 5, 2020). Under the Flexibility Act, the extension of the maturity date for PPP loans was applicable to PPP loans made on or after that date, and lenders and borrowers were able to mutually agree to modify PPP loans made before such date to reflect the longer maturity. On July 4, 2020, Public Law 116–147 extended the authority for SBA to guarantee PPP loans to August 8, 2020. On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Economic Aid Act) (Pub. L. 116–260) was enacted, which reauthorizes lending under the PPP through March 31, 2021, and among other things, modifies provisions related to making PPP loans and forgiveness of PPP loans, and authorizes second draw PPP loans under new section 7(a)(37) of the Small Business Act for PPP borrowers that previously received a PPP loan (rules for second draw loans will be published separately). The Economic Aid Act also redesignates section 1106 of the CARES Act as section 7A and transfers that section to the Small Business Act, to appear after section 7 of the Small Business Act.[1]

In addition to incorporating the changes to PPP requirements made by the Economic Aid Act, this interim final rule consolidates and restates the following interim final rules: 85 FR 20811 (posted on April 2, 2020 and published in the **Federal Register** on April 15, 2020); 85 FR 20817 (posted on April 3, 2020 and published on April 15, 2020); 85 FR 21747 (posted on April 14, 2020 and published on April 20, 2020); 85 FR 23450 (posted on April 24, 2020 and published on April 28, 2020); 85 FR 23917 (posted on April 27, 2020 and published on April 30, 2020); 85 FR 26321 (posted on April 28, 2020 and published on May 4, 2020); 85 FR 26324 (posted on April 30, 2020 and published on May 4, 2020); 85 FR 27827 (posted on May 5, 2020 and published on May 8, 2020); 85 FR 29845 (posted on May 8, 2020 and published on May 19, 2020); 85 FR 29842 (posted on May 13, 2020 and published on May 19, 2020); 85 FR 29847 (posted on May 14, 2020 and published on May 19, 2020); 85 FR 30835 (posted on May 18, 2020 and published on May 21, 2020); 85 FR 31357 (posted on May 20, 2020 and published on May 26, 2020); 85 FR 35550 (posted on June 5, 2020 and published on June 11, 2020); 85 FR 36308 (posted on June 11, 2020 and published on June 16, 2020); 85 FR 36717 (posted on June 12, 2020 and published on June 18, 2020); 85 FR 36997 (posted on June 17, 2020 and published on June 19, 2020); 85 FR 38301 (posted on June 24, 2020 and published on June 26, 2020); and 85 FR 39066 (posted on June 25, 2020 and published on June 30, 2020). This rule should be interpreted consistently with the sets of Frequently Asked Questions (FAQs) regarding the PPP that are posted on SBA's and Treasury's websites and the interim final rules posted separately providing guidance on second draw PPP loans and the consolidated guidance on loan forgiveness and the loan review process; however, the Economic Aid Act overrides any conflicting guidance in the FAQs, and SBA will be revising the FAQs to fully conform to the Economic Aid Act as quickly as feasible.

Most of this document restates existing regulatory provisions to provide lenders and new PPP borrowers a single regulation to consult on borrower eligibility, lender eligibility, and loan application and origination requirements, as well as general rules on increases and loan forgiveness for PPP loans. To enhance the readability of this document, SBA has not reproduced the policy and legal justifications for existing regulatory provisions restated here, except to the extent that those justifications may be helpful to the borrower or lender. However, those justifications from the original interim final rules are incorporated by reference here.

In addition, section 1109(b) of the CARES Act authorizes Treasury to establish criteria for certain other lenders to participate in the PPP. The SBA is required to administer the program that Treasury establishes under section 1109 of the Act, with guidance from Treasury. The CARES Act authorizes Treasury to issue regulations and guidance to implement section 1109, including regulations that establish ''terms and conditions'' for PPP loans. *See* section 1109(d)(2). The terms and conditions established by Treasury under section 1109 are not required to be identical to those provided elsewhere. Rather, the CARES Act allows Treasury to set terms and conditions pertaining to certain criteria—the maximum interest rate, maximum loan amount, and other specified terms—that are ''consistent,'' to ''the maximum extent practicable,'' with comparable terms in paragraph 36 of section 7(a) of the Small Business Act (15 U.S.C. 636(a)). *See* section 1109(d)(2).

In this rulemaking, Treasury is addressing the needs of new PPP borrowers by allowing all new borrowers to use 2019 or 2020 for purposes of calculating their maximum loan amount. Section 1102 of the CARES Act states that borrowers are to calculate their maximum loan amount by using ''payroll costs incurred during the 1-year period before the date on which the loan is made . . . .'' For PPP loans made in 2020, most borrowers used 2019. The Economic Aid Act did not change this language for borrowers that are not farmers and ranchers and would require most new PPP borrowers who obtain a loan in 2021 to use 2020 as their base period. Using authority granted by section 1109 of the CARES Act, this rulemaking allows new borrowers to choose 2019 or 2020 as the base period, thereby ensuring that they are able to obtain funding on terms commensurate with existing PPP borrowers. Separately, section 313 of the Economic Aid Act states that farmers and ranchers are to calculate their maximum loan amount using 2019 as their base period. This rulemaking allows farmers and ranchers to elect either 2019 or 2020 as their base period, in order to ensure that they can obtain funding on terms commensurate with those available to other new PPP borrowers.

As required by section 1109(d)(2)(B) of the CARES Act, Treasury has determined that providing new PPP borrowers with flexibility in choosing a base period is consistent, to the ''maximum extent practicable,'' with the terms applicable to existing PPP borrowers. This enhanced flexibility will help ensure that new PPP borrowers are treated even-handedly and do not see their permissible loan amounts reduced due to financial distress experienced in 2020. Other than these adjustments, the terms and requirements applicable to PPP loans under this rule are identical to the terms and requirements applicable to all other PPP loans. As a result, a PPP borrower that elects to use the flexibility in selecting a base period under this interim final rule may follow the same processes and procedures applicable to other PPP loans.

[1] Because section 1106 of the CARES Act is now codified as section 7A of the Small Business Act, any reference to section 1106 of the CARES Act in the rules that are being restated herein will refer to section 7A.

## II. Comments and Immediate Effective Date

This interim final rule is being issued without advance notice and public comment because section 303 of the Economic Aid Act authorizes SBA to issue regulations to implement the Economic Aid Act without regard to notice requirements. In addition, this rule is being issued to allow for immediate implementation of this program. The intent of both the CARES Act and the Economic Aid Act is that SBA provides relief to America's small businesses expeditiously. Congress reauthorized PPP because of the current economic conditions affecting small businesses and intended for the loans to be made quickly. The last day to apply for and receive a PPP loan is March 31, 2021. Given the short duration of this program, and the urgent need to issue loans quickly, the Administrator in consultation with the Secretary has determined that it is impractical and not in the public interest to provide a 30-day delayed effective date. An immediate effective date will give small businesses the maximum amount of time to apply for loans and lenders the maximum amount of time to process applications before the program ends. This good cause justification also supports waiver of the 60-day delayed effective date for major rules under the Congressional Review Act at 5 U.S.C. 808(2). Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule, including section III. These comments must be submitted on or before February 16, 2021. The SBA will consider these comments and the need for making any revisions as a result of these comments.

## III. Paycheck Protection Program as Amended by Economic Aid Act

*Overview*

The CARES Act was enacted to provide immediate assistance to individuals, families, and businesses affected by the COVID–19 emergency. Among the provisions contained in the CARES Act are provisions authorizing SBA to temporarily guarantee loans under a new 7(a) loan program titled the ''Paycheck Protection Program.'' Loans guaranteed under the Paycheck Protection Program (PPP) will be 100 percent guaranteed by SBA, and the full principal amount of the loans may qualify for loan forgiveness. The Economic Aid Act reauthorizes lending under the PPP through March 31, 2021, and revises certain PPP requirements. The following outlines the key provisions of the PPP related to eligibility of applicants for PPP loans, which lenders are authorized to make PPP loans, the process for making PPP loans, loan increases, and loan forgiveness, as revised by the Economic Aid Act. Additional rules related to second draw PPP loans will be published separately. While this interim final rule fully implements the Economic Aid Act's changes to loan forgiveness, SBA also intends to issue a consolidated rule governing all aspects of loan forgiveness and loan review as well to provide a single reference point for lenders and borrowers.

*Table of Contents*


A. General
B. What do borrowers need to know and do?
1. What businesses, organizations, and individuals are eligible?
2. What businesses, organizations, and individuals are ineligible?
3. Affiliation Rules Generally
4. I Have Determined That I Am Eligible. How much can I borrow?
5. What is the interest rate on a PPP loan?
6. What will be the maturity date on a PPP loan?
7. Can I apply for more than one First Draw PPP Loan?
8. Can I use e-signatures or e-consents if a borrower has multiple owners?
9. When will I have to begin paying principal and interest on my PPP loan?
10. What forms do I need and how do I submit an application for a PPP loan?
11. How can PPP loans be used?
12. What certifications need to be made?
13. Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan Request
14. Can my PPP loan be forgiven in whole or in part?
15. Do independent contractors count as employees for purposes of PPP loan forgiveness?
16. For loans made prior to December 27, 2020, what additional documentation must a borrower submit when the President of the United States, Vice President of the United States, the head of an Executive department, or a Member of Congress, or the spouse of any of the preceding, directly or indirectly holds a controlling interest in the borrower?
C. What do lenders need to know and do?
1. Who is eligible to make PPP loans?
2. Do lenders have to register in *SAM.gov* to make PPP loans?
3. What do lenders have to do in terms of loan underwriting?
4. Can lenders rely on borrower documentation for loan forgiveness?
5. What fees will lenders be paid?
6. Can PPP loans be sold into the secondary market?
7. Do the requirements for loan pledges under 13 CFR 120.434 apply to PPP loans pledged for borrowings from a Federal Reserve Bank (FRB) or advances by a Federal Home Loan Bank (FHLB)?
8. Are lenders required to use a promissory note provided by SBA or may they use their own?
9. Are lenders required to use a separate SBA Authorization document to issue PPP loans?
10. By when must a lender electronically submit an SBA Form 1502 indicating that PPP loan funds have been disbursed?
11. How do lenders report disbursements on PPP loans that are approved for loan increases due to the Economic Aid Act?
D. What do both borrowers and lenders need to know and do?
1. What are the loan terms and conditions?
2. Do lenders have to apply the ''credit elsewhere test''?
3. Are there any fee waivers?
4. Who pays the fee to an agent who provides assistance in connection with a PPP loan?
5. Can a borrower take multiple draws from a PPP loan and thereby delay the start of the covered period?
6. If a partnership received a PPP loan that did not include any compensation for its partners, can the loan amount be increased to include partner compensation?
7. If a seasonal employer received a PPP loan before December 27, 2020, can the loan amount be increased based on a revised calculation of the maximum loan amount?
8. Which other PPP borrowers can reapply or request an increase in their PPP loan amount?
9. If a borrower's PPP loan has already been fully disbursed, can the lender make an additional disbursement for the increased loan proceeds?
10. Are recipients of PPP loans entitled to exemptions on the grounds provided in Federal nondiscrimination laws for sex-specific admissions practices, sex-specific domestic violence shelters, coreligionist housing, or Indian tribal preferences in connection with adoption or foster care practices?


## A. General

SBA is authorized to guarantee loans under the PPP through March 31, 2021. Congress has authorized a total program level of $806,450,000,000 to provide guaranteed loans under this temporary 7(a) program under sections 7(a)(36) (PPP loans or First Draw PPP Loans) and 7(a)(37) (Second Draw PPP Loans) of the Small Business Act, a portion of which is available for new First Draw and Second Draw PPP Loans. Lenders have delegated authority to make PPP loans. SBA will allow lenders to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness. Lenders must comply with the applicable lender obligations set forth in this interim final rule, but will

be held harmless for borrowers' failure to comply with program criteria and will not be subject to any enforcement action or penalty relating to loan origination or forgiveness of the PPP loan if the lender acts in good faith relating to the origination or forgiveness of the PPP loan and satisfies all other applicable Federal, State, local, and other statutory or regulatory requirements (as provided in section 7A(h) of the Small Business Act, as amended). Remedies for violations of PPP requirements or fraud are separately addressed in this interim final rule. The program requirements of the PPP identified in this rule temporarily supersede any conflicting Loan Program Requirement (as defined in 13 CFR 120.10).

**B. What do borrowers need to know and do?**

*1. What businesses, organizations, and individuals are eligible?*

*a. Am I eligible?* [2] [3]

You are eligible for a PPP loan if:

i. You, together with any affiliates (if applicable),[4] are:

- A small business concern under the applicable revenue-based size standard established by SBA in 13 CFR 121.201 for your industry or under the SBA alternative size standard; [5]
- an independent contractor, eligible self-employed individual, or sole proprietor;
- a business concern, a tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, a Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, and you employ no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by SBA in 13 CFR 121.201;
- a housing cooperative, an eligible section 501(c)(6) organization, or an eligible destination marketing organization,[6] that employs no more than 300 employees;
- a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS 511110 or 5151, that employs no more than 500 employees (or, if applicable, the size standard in number of employees established by SBA in 13 CFR 121.201 for your industry) per location; or
- another type of entity specifically provided for by PPP rules (as described below); and

ii. you were in operation on February 15, 2020, and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC or you were an eligible self-employed individual, independent contractor, or sole proprietorship with no employees.

You must submit documentation sufficient to establish eligibility and to demonstrate the qualifying payroll amount, which may include, as applicable, payroll records, payroll tax filings, Form 1099–MISC, Schedule C or F, income and expenses from a sole proprietorship, or bank records.

*b. Are employees of foreign affiliates included for purposes of determining whether a PPP borrower has more than 500 employees (or 300 employees, if applicable)?* [7]

Yes. SBA's affiliation regulations provide that to determine a concern's size, employees of the concern ''and all of its domestic and foreign affiliates'' are included. 13 CFR 121.301(f). Therefore, to calculate the number of employees of an entity for purposes of determining eligibility for the PPP, an entity must include all employees of its domestic and foreign affiliates, except in those limited circumstances where the affiliation rules expressly do not apply to the entity.[8] Any entity that, together with its domestic and foreign affiliates, does not meet the 500-employee, 300-employee,[9] or other applicable PPP size standard is therefore ineligible for a PPP loan. Under no circumstances may PPP funds be used to support non-U.S. workers or operations.

*c. I have income from self-employment and file a Form 1040, Schedule C. Am I eligible for a PPP Loan?* [10]

You are eligible for a PPP loan if: (i) You were in operation on February 15, 2020; (ii) you are an individual with self-employment income (such as an independent contractor or a sole proprietor); (iii) your principal place of residence is in the United States; and (iv) you filed or will file a Form 1040 Schedule C for 2019 or meet the requirements below. However, if you are a partner in a partnership, you may not submit a separate PPP loan application for yourself as a self-employed individual. Instead, the self-employment income of general active partners may be reported as a payroll cost, up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred on a PPP loan application filed by or on behalf of the partnership. Partnerships are eligible for PPP loans under the CARES Act, as amended by the Economic Aid Act, and the Administrator has determined, in consultation with the Secretary of the

[2] *See* interim final rule on Second Draw PPP Loans for eligibility criteria for Second Draw PPP Loans, which is being published separately.

[3] This subsection was originally published at 85 FR 20811, subsection III.2.a. (April 15, 2020), as amended by 85 FR 36308 (June 16, 2020), 85 FR 36717 (June 18, 2020), and 85 FR 38301 (June 26, 2020), and has been modified to reflect subsequent rules or guidance and the Economic Aid Act.

[4] See section 3 regarding the applicability of affiliation rules at 13 CFR 121.103 and 121.301 to PPP loans.

[5] Under SBA's alternative size standard, a business concern may qualify as a small business concern if it, together with any affiliates: (1) Has a maximum tangible net worth of not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of application is not more than $5 million.

[6] *See* subsections 1.j., 1.k., and 1.m. for additional information on the eligibility of housing cooperatives, section 501(c)(6) organizations, and destination marketing organizations. The applicable size standard for these entities is not more than 300 employees.

[7] This subsection was originally published at 85 FR 30835, section III.1. (May 21, 2020) and has been modified for readability. Housing cooperatives, section 501(c)(6) organizations, and destination marketing organizations, added by the Economic Aid Act, must have no more than 300 employees to be eligible for PPP loans.

[8] Paragraph 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv)), as added by the CARES Act and amended by the Economic Aid Act, waives SBA's affiliation rules for (1) any business concern with not more than 500 employees that, as of the date on which the loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; (2) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; (3) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681); and (4)(a) any business concern (including any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 *et seq.*) without regard for whether such a station is a concern as defined in section 121.105 of title 13, Code of Federal Regulations, or any successor thereto) that employs not more than 500 employees, or the size standard established by the Administrator for the North American Industry Classification System code applicable to the business concern, per physical location of such business concern and is majority owned or controlled by a business concern that is assigned a North American Industry Classification System code beginning with 511110 or 5151; or (b) any nonprofit organization that is assigned a North American Industry Classification System code beginning with 5151. SBA also applies affiliation exceptions to certain categories of entities. 13 CFR 121.103(b).

[9] For housing cooperatives, section 501(c)(6) organizations, and destination marketing organizations, the applicable size standard is not more than 300 employees. *See* subsections 1.j. and 1.m. For the applicable size standard for entities eligible to apply for Second Draw PPP Loans, see the interim final rule on Second Draw PPP Loans that is being published separately.

[10] This subsection was originally published at 85 FR 21747, subsection III.1.a. (April 20, 2020) and has been modified to reflect subsequent interim final rules or guidance and the Economic Aid Act.

Treasury (Secretary), that limiting a partnership and its partners (and an LLC filing taxes as a partnership) to one PPP loan is necessary to help ensure that as many eligible borrowers as possible obtain PPP loans before the statutory deadline of March 31, 2021. This limitation will allow lenders to more quickly process applications and lower the burdens of applying for partnerships/partners. The Administrator has further determined that permitting partners to apply as self-employed individuals would create unnecessary confusion regarding which entity, the partner or the partnership, applies for partner and LLC member income, and would generate loan proceeds use coordination and allocation issues. Rent, mortgage interest, utilities, other debt service, operations expenditures, property damage costs, supplier costs, and worker protection expenditures are generally incurred at the partnership level, not partner level, so it is most natural to provide the funds for these expenses to the partnership, not individual partners. In addition, you should be aware that participation in the PPP may affect your eligibility for state-administered unemployment compensation or unemployment assistance programs, including the programs authorized by Title II, Subtitle A of the CARES Act, or CARES Act Employee Retention Credits. On June 26, 2020, SBA issued additional guidance for those individuals with self-employment income who: (i) Were not in operation in 2019 but who were in operation on February 15, 2020, and (ii) filed a Form 1040 Schedule C for 2020. See ''How To Calculate Maximum Loan Amounts—By Business Type,'' Question 10 posted on SBA's website.[11]

*d. Are eligible businesses owned by directors or shareholders of a PPP lender permitted to apply for a PPP loan through the lender with which they are associated?*[12]

SBA regulations (including 13 CFR 120.110 and 120.140) shall not apply to prohibit an otherwise eligible business owned (in whole or part) by an outside director or holder of a less than 30 percent equity interest in a PPP lender from obtaining a PPP loan from the PPP lender on whose board the director serves or in which the equity owner holds an interest, provided that the eligible business owned by the director or equity holder follows the same process as any similarly situated customer or account holder of the lender. Favoritism by the lender in processing time or prioritization of the director's or equity holder's PPP application is prohibited. Lenders should comply with all other applicable state and federal regulations concerning loans to associates of the lender. Lenders should also consult their own internal policies concerning lending to individuals or entities associated with the lender.

The foregoing paragraph does not apply to a director or owner who is also an officer or key employee of the PPP Lender. Officers and key employees of a PPP Lender may obtain a PPP Loan from a different lender, but not from the PPP Lender with which they are associated. SBA also reminds Lenders that the ''Authorized Lender Official'' for each PPP Loan is subject to the limitations described in the PPP Lender Application Form (SBA Form 2484), which states in relevant part: ''Neither the undersigned Authorized Lender Official, nor such individual's spouse or children, has a financial interest in the Applicant [Borrower].''

*e. If a seasonal business was dormant or not fully operating as of February 15, 2020, is it still eligible?*[13]

Yes, in evaluating eligibility, a seasonal business will be considered to have been in operation as of February 15, 2020, if the business was in operation for any 12-week period between February 15, 2019 and February 15, 2020. This approach aligns the eligibility criteria for seasonal businesses being in operation with the time period for calculation of a seasonal employer's maximum loan amount from section 336 of the Economic Aid Act and makes PPP loans available to seasonal businesses that operate outside of the original, more limited time frame.

*f. How does the 500 employee limit apply to news organizations with more than one physical location?*[14]

A business concern, or any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 *et seq.*), with more than one physical location that employs not more than 500 employees (or the size standard established by the Administrator for the NAICS code applicable to the business concern) per physical location, is eligible for a PPP loan if it: (1) Is majority owned or controlled by a business concern that is assigned a NAICS code beginning with 511110 or 5151 or, with respect to a public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11))), has a trade or business that falls under such a code; and (2) makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the organization that produces or distributes locally focused or emergency information. See section 3 for the applicability of SBA's affiliation rules to news organizations.

*g. Industry-Specific Eligibility Issues*

*i. Is a hospital owned by governmental entities eligible for a PPP loan?*[15]

Notwithstanding 13 CFR 120.110(j), a hospital that is otherwise eligible to receive a PPP loan as a business concern or nonprofit organization (described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from taxation under section 501(a) of such Code) shall not be rendered ineligible for a PPP loan due to ownership by a state or local government if the hospital receives less than 50% of its funding from state or local government sources, exclusive of Medicaid.

*ii. Are businesses that receive revenue from legal gaming eligible for a PPP Loan?*[16]

A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues, and 13 CFR 120.110(g) is inapplicable to PPP loans. Businesses that received illegal gaming revenue remain categorically ineligible.

*iii. Are electric cooperatives that are exempt from Federal income taxation under section 501(c)(12) of the Internal Revenue Code eligible for a PPP loan?*[17]

Yes. An electric cooperative that is exempt from Federal income taxation under section 501(c)(12) of the Internal Revenue Code will be considered to be ''a business entity organized for profit'' for purposes of 13 CFR 121.105(a)(1). As a result, such entities are eligible PPP borrowers, as long as other eligibility requirements are met. To be eligible, an electric cooperative must satisfy the employee-based size standard established in the CARES Act, SBA's employee-based size standard

[11] *https://www.sba.gov/sites/default/files/2020-12/How-to-Calculate-Loan-Amounts-508_6-26-20.pdf* (April 20, 2020).

[12] This subsection was originally published at 85 FR 21747, subsection III.2.a. (April 20, 2020) and has been modified for readability.

[13] This subsection was originally published at 85 FR 23917, subsection III.4. (April 30, 2020) and has been modified to reflect the Economic Aid Act.

[14] This subsection has been added to conform to section 317 of the Economic Aid Act.

[15] This subsection was originally published at 85 FR 23450, subsection III.2.c. (April 28, 2020) and has been modified for readability.

[16] This subsection was originally published at 85 FR 23450, subsection III.2.d. (April 28, 2020) and has been modified for readability.

[17] This subsection was originally published at 85 FR 29847, subsection III.1. (May 19, 2020) and has been modified for readability.

corresponding to its primary industry, if higher, or both tests in SBA's ''alternative size standard.'' [18]

*iv. Are telephone cooperatives that are exempt from federal income taxation under section 501(c)(12) of the Internal Revenue Code eligible for a PPP loan?* [19]

Yes. A telephone cooperative that is exempt from federal income taxation under section 501(c)(12) of the Internal Revenue Code will be considered to be ''a business entity organized for profit'' for purposes of 13 CFR 121.105(a)(1). As a result, such entities are eligible PPP borrowers, as long as other eligibility requirements are met. To be eligible, a telephone cooperative must satisfy the employee-based size standard established in the CARES Act, SBA's employee-based size standard corresponding to its primary industry, if higher, or both tests in SBA's ''alternative size standard.'' [20]

*v. Are housing cooperatives as defined in section 216(b) of the Internal Revenue Code eligible for PPP loans?* [21]

Yes. Housing cooperatives (as defined in section 216(b) of the Internal Revenue Code of 1986) that employ not more than 300 employees are eligible to apply for PPP loans as long as other eligibility requirements are met. In addition, the provisions applicable to affiliation, described in section 3, apply to housing cooperatives in the same manner as with respect to a small business concern.

*vi. Are nonprofit and tax-exempt news organizations eligible for PPP loans?* [22]

Yes. A public broadcasting entity (as defined in section 397(11) of the Communications Act of 1934 (47 U.S.C. 397(11)) that is a nonprofit organization or any organization otherwise subject to section 511(a)(2)(B) of the Internal Revenue Code of 1986, and employs no more than 500 employees (or, if applicable, the size standard in number of employees established by SBA in 13 CFR 121.201 for the entity's industry) per location is eligible for a PPP loan if the organization has a trade or business that is assigned a NAICS code beginning with 511110 or 5151, and makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the organization that produces or distributes locally focused or emergency information.[23] See subsection B.1.f. for information on how the 500 employee limit applies to news organizations with more than one physical location. See section 3 for the applicability of SBA's affiliation rules to news organizations.

*vii. Are destination marketing organizations eligible for PPP loans?* [24]

Yes. Under the Economic Aid Act, any destination marketing organization [25] is eligible to receive a PPP loan as long as other eligibility requirements are met and if: (1) The destination marketing organization does not receive more than 15 percent of its receipts from lobbying activities; (2) the lobbying activities of the destination marketing organization do not comprise more than 15 percent of the total activities of the organization; (3) the cost of the lobbying activities of the destination marketing organization did not exceed $1,000,000 during the most recent tax year of the destination marketing organization that ended prior to February 15, 2020; (4) the destination marketing organization employs not more than 300 employees; and (5) the destination marketing organization: (a) Is described in section 501(c) of the Internal Revenue Code and is exempt from taxation under section 501(a) of such Code; or (b) is a quasi-governmental entity or is a political subdivision of a State or local government, including any instrumentality of those entities.[26]

*viii. Are 501(c)(6) organizations eligible for PPP loans?* [27]

Yes. Any organization that is described in section 501(c)(6) of the Internal Revenue Code and that is exempt from taxation under section 501(a) of such Code (excluding professional sports leagues and organizations with the purpose of promoting or participating in a political campaign or other activity) shall be eligible to receive a PPP loan as long as other eligibility requirements are met and if: (1) The organization does not receive more than 15 percent of its receipts from lobbying activities; (2) the lobbying activities of the organization do not comprise more than 15 percent of the total activities of the organization; (3) the cost of the lobbying activities of the organization did not exceed $1,000,000 during the most recent tax year of the organization that ended prior to February 15, 2020; and (4) the organization employs not more than 300 employees.

*2. What businesses, organizations, and individuals are ineligible?*

*a. Could I be ineligible even if I meet the eligibility requirements in section 1?* [28]

---

[18] Under the alternative size standard, a business concern, including an electric cooperative, can qualify for the PPP as a small business concern if, as of March 27, 2020: (1) The maximum tangible net worth of the business was not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. For an electric cooperative that does not have net income, the cooperative's savings distributed to its owner-members will be considered its net income.

[19] This subsection was originally published at 85 FR 35550, subsection III.1. (June 11, 2020) and has been modified for readability.

[20] Under the alternative size standard, a business concern, including a telephone cooperative, can qualify for the PPP as a small business concern if, as of March 27, 2020: (1) The maximum tangible net worth of the business was not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million. For a telephone cooperative that does not have net income, the telephone cooperative's capital credits distributed to its owner-members will be considered its net income.

[21] This subsection has been added to conform to section 316 of the Economic Aid Act.

[22] This subsection has been added to conform to section 317 of the Economic Aid Act.

[23] This subsection provides that an eligible nonprofit news organization under section 317 of the Economic Aid Act must have no more than 500 employees. (For those nonprofit news organizations with more than one physical location, they must have no more than 500 employees per location.) This will make PPP loans available to nonprofit news organizations, regardless of whether the organization would be a business concern under SBA regulations, if the nonprofit news organization satisfies the same general size standard applicable under the PPP rules to other borrowers that are nonprofit or tax-exempt organizations. The Administrator, in consultation with the Secretary, has determined this requirement appropriately implements section 317 of the Economic Aid Act by making PPP loans available to nonprofit news organizations on the same terms as other nonprofit organizations that have been made eligible for PPP loans.

[24] This subsection has been added to conform to section 318 of the Economic Aid Act.

[25] Section 318 of the Economic Aid Act added the following definition to paragraph 7(a)(36)(A) of the Small Business Act (15 U.S.C. 636(a)(36)(A)): ''(xv) the term 'destination marketing organization' means a nonprofit entity that is—(I) an organization described in section 501(c) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code; or (II) a State, or a political subdivision of a State (including any instrumentality of such entities)—(aa) engaged in marketing and promoting communities and facilities to businesses and leisure travelers through a range of activities, including—(AA) assisting with the location of meeting and convention sites; (BB) providing travel information on area attractions, lodging accommodations, and restaurants; (CC) providing maps; and (DD) organizing group tours of local historical, recreational, and cultural attractions; or (bb) that is engaged in, and derives the majority of the operating budget of the entity from revenue attributable to, providing live events.

[26] A destination marketing organization that is a quasi-governmental entity or is a political subdivision of a State or local government, including any instrumentality of those entities, is eligible for a PPP loan notwithstanding the SBA regulation at 13 CFR 120.110(j), which states that government-owned entities (except for businesses owned or controlled by a Native American tribe) are not eligible for SBA financial assistance.

[27] This subsection has been added to conform to section 318 of the Economic Aid Act.

[28] This subsection was originally published at 85 FR 20811, subsection III.2.a. (April 15, 2020), as

Continued

You are ineligible for a PPP loan if, for example:

i. You are engaged in any activity that is illegal under Federal, state, or local law;

ii. You are a household employer (individuals who employ household employees such as nannies or housekeepers);

iii. An owner of 20 percent or more of the equity of the applicant is presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or has been convicted of, pleaded guilty or nolo contendere to, or commenced any form of parole or probation (including probation before judgment) for, a felony involving fraud, bribery, embezzlement, or a false statement in a loan application or an application for federal financial assistance within the last five years or any other felony within the last year;

iv. You, or any business owned or controlled by you or any of your owners, has ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted within the last seven years and caused a loss to the government;

v. Your business or organization was not in operation on February 15, 2020; [29]

vi. You or your business received or will receive a grant under the Shuttered Venue Operator Grant program under section 324 of the Economic Aid Act; [30]

vii. The President, the Vice President, the head of an Executive Department, or a Member of Congress, or the spouse of such person as determined under applicable common law, directly or indirectly holds a controlling interest in your business; [31]

viii. Your business is an issuer, the securities of which are listed on an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f) [32] (SBA will not consider whether a news organization that is eligible under the conditions described in subsection 1.f. and 1.g.vi. is affiliated with an entity, which includes any entity that owns or controls such news organization, that is an issuer [33]); or

ix. Your business has permanently closed.[34]

*b. Are businesses that are generally ineligible for 7(a) loans under 13 CFR 120.110 eligible for a PPP loan?* [35]

Paragraphs (a), (g), and (k), of 13 CFR 120.110 do not apply to PPP loans. For PPP loans, the ineligibility restriction in 13 CFR 120.110(n) is superseded by subsection B.2.a.iii. of this interim final rule. Otherwise, a business is not eligible for a PPP loan if it is a type of business concern (or would be, if the entity were a business concern) described in 13 CFR 120.110, except as permitted by subsections B.1.d and B.1.g of this rule or otherwise permitted by PPP rules. Businesses that are not generally eligible for a 7(a) loan under 13 CFR 120.110 are described further in SBA's Standard Operating Procedure (SOP) 50 10 6, Part 2, Section A, Chapter 3.[36]

*c. Will I be approved for a PPP loan if my business is in bankruptcy?* [37]

No. If the applicant or the owner of the applicant is the debtor in a bankruptcy proceeding, either at the time it submits the application or at any time before the loan is disbursed, the applicant is ineligible to receive a PPP loan. If the applicant or the owner of the applicant becomes the debtor in a bankruptcy proceeding after submitting a PPP application but before the loan is disbursed, it is the applicant's obligation to notify the lender and request cancellation of the application. Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes.

The Borrower Application Form for PPP loans (SBA Form 2483), which reflects this restriction in the form of a borrower certification, is a loan program requirement. Lenders may rely on an applicant's representation concerning the applicant's or an owner of the applicant's involvement in a bankruptcy proceeding.

*d. Is a hedge fund or private equity firm eligible for a PPP loan?* [38]

No. Hedge funds and private equity firms are primarily engaged in investment or speculation, and such businesses are therefore ineligible to receive a PPP loan.

*3. Affiliation Rules Generally*

*a. Are affiliates considered together for purposes of determining eligibility?* [39]

In most cases, a borrower will be considered together with its affiliates for purposes of determining eligibility for the PPP.[40] Under SBA rules, entities

amended by 85 FR 36308 (June 16, 2020), 85 FR 36717 (June 18, 2020), and 85 FR 38301 (June 26, 2020), and has been modified to conform to subsequent interim final rules or guidance and the Economic Aid Act and for readability.

[29] Added to conform to section 310 of the Economic Aid Act. This provision is effective as if included in the CARES Act and applies to any loan made pursuant to section 7(a)(36) of the Small Business Act before, on, or after December 27, 2020, including forgiveness of such a loan.

[30] Added to conform to section 310 of the Economic Aid Act. This provision applies to PPP loans made on or after December 27, 2020.

[31] Added to conform to section 322 of the Economic Aid Act. This provision applies to any loan made on or after December 27, 2020. For any loan made under section 7(a)(36) to a covered entity before December 27, 2020, *see* subsection B.16 of this interim final rule.

[32] Added to conform to section 342 of the Economic Aid Act, which also added the following definitions to paragraph 7(a)(36)(A) of the Small Business Act (15 U.S.C. 636(a)(36)(A)): ''(xvi) the terms 'exchange', 'issuer', and 'security' have the meanings given those terms in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).'' This provision applies to loans made on or after December 27, 2020.

[33] *See* section 317 of the Economic Aid Act.

[34] This provision prohibits an entity that has gone out of business and has no intention of reopening from receiving a PPP loan. The Administrator, in consultation with the Secretary, has determined this provision is necessary to maintain program integrity, prevent abuse, and prevent PPP loans being made to businesses that have permanently closed. Preserving funds for businesses in operation is necessary because only businesses that are still in operation will retain employees, which is a primary purposes of the PPP. PPP was not intended to support businesses that have permanently closed. A borrower that has temporarily closed or temporarily suspended its business but intends to reopen remains eligible for a PPP loan.

[35] This subsection replaces the subsection originally published at 85 FR 20811, subsection III.2.c. (''*How do I determine if I am ineligible*'') (April 15, 2020) and modified to conform to the Economic Aid Act.

[36] SOP 50 10 6 can be found at *https://www.sba.gov/document/sop-50-10-lender-development-company-loan-programs-0.* For PPP loans approved before December 27, 2020, see SOP 50 10 5(K), Subpart B, Chapter 2 for ineligible types of businesses. SOP 50 10 5(K) can be found at *https://www.sba.gov/document/sop-50-10-5-lender-development-company-loan-programs.*

[37] This subsection was originally published at 85 FR 23450, subsection III.4. (April 28, 2020) and has been modified for readability.

[38] This subsection was originally published at 85 FR 23450, subsection III.2.a. (April 28, 2020) and has been modified for readability.

[39] The text of this subsection was originally published at 85 FR 20817 (April 15, 2020).

[40] Paragraph 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv), as added by the CARES Act and amended by the Economic Aid Act, waives the affiliation rules contained in § 121.103 for (1) any business concern with not more than 500 employees that, as of the date on which the loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; (2) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; (3) any business concern that receives financial assistance from a company licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681); and (4)(a) any business concern (including any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 *et seq.*) without regard for whether such a station is a concern as defined in section 121.105 of title 13, Code of Federal Regulations, or any successor thereto) that employs not more than 500 employees, or the size standard established by the Administrator for the North American Industry Classification System code applicable to the business concern, per physical location of such business concern and is majority owned or controlled by a business concern that is assigned a

may be considered affiliates based on factors including but not limited to stock ownership, overlapping management,[41] and identity of interest. See 13 CFR 121.301(f).

*b. How do SBA's affiliation rules affect my eligibility and apply to me under the PPP?*[42]

An entity generally is eligible for the PPP if it, combined with its affiliates, (i) is a small business as defined in section 3 of the Small Business Act (15 U.S.C. 632), (ii)(1) has 500 or fewer employees[43] or is a business that operates in a certain industry and meets applicable SBA employee-based size standards for that industry, if higher, and (2) is a tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a housing cooperative, a tax-exempt veterans organization described in section 501(c)(19) of the IRC, a Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, a section 501(c)(6) organization, a destination marketing organization, or any other business concern, or (iii) has 500 or fewer employees per location (or an applicable SBA employee-based size standard for that industry, if higher) and is either majority owned or controlled by a NAICS code 511110 or 5151 business or is a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151. Prior to the CARES Act, the nonprofit organizations listed above were not eligible for SBA Business Loan Programs under section 7(a) of the Small Business Act; only for-profit small business concerns were eligible. The CARES Act made such nonprofit organizations not only eligible for the PPP, but also subjected them to SBA's affiliation rules. As amended, section 7(a) of the Small Business Act (15 U.S.C. 636(a)) now provides that the provisions applicable to affiliations under 13 CFR 121.103 apply with respect to nonprofit organizations, housing cooperatives, and veterans organizations in the same manner as with respect to small business concerns. However, the detailed affiliation standards contained in § 121.103 currently do not apply to PPP borrowers, because § 121.103(a)(8) provides that applicants in SBA's Business Loan Programs (which include the PPP) are subject to the affiliation rules contained in 13 CFR 121.301.

*c. Faith-Based Organizations*[44]

This rule exempts otherwise qualified faith-based organizations from the SBA's affiliation rules, including those set forth in 13 CFR part 121, where the application of the affiliation rules would substantially burden those organizations' religious exercise. For the reasons described in 85 FR 20817, the SBA's affiliation rules, including those set forth in 13 CFR part 121, do not apply to the relationship of any church, convention or association of churches, or other faith-based organization or entity to any other person, group, organization, or entity that is based on a sincere religious teaching or belief or otherwise constitutes a part of the exercise of religion. This includes any relationship to a parent or subsidiary and other applicable aspects of organizational structure or form. A faith-based organization seeking loans under this program may rely on a reasonable, good faith interpretation in determining whether its relationship to any other person, group, organization, or entity is exempt from the affiliation rules under this provision, and SBA will not assess, and will not require participating lenders to assess, the reasonableness of the faith-based organization's determination.

*d. Do the SBA affiliation rules prohibit a portfolio company of a private equity fund from being eligible for a PPP loan?*[45]

Borrowers must apply the affiliation rules that appear in 13 CFR 121.301(f), as set forth in the Second PPP Interim Final Rule (85 FR 20817). The affiliation rules apply to private equity-owned businesses in the same manner as any other business subject to outside ownership or control.[46] However, in addition to applying any applicable affiliation rules, all borrowers should carefully review the required certification on the Paycheck Protection Program Borrower Application Form (SBA Form 2483) stating that ''[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.''

*e. Does participation in an employee stock ownership plan (ESOP) trigger application of the affiliation rules?*[47]

No. For purposes of the PPP, a business's participation in an ESOP (as defined in 15 U.S.C. 632(q)(6)) does not result in an affiliation between the business and the ESOP.

*4. I Have Determined That I Am Eligible. How much can I borrow?*[48]

Under the PPP, the maximum loan amount for First Draw PPP Loans is the lesser of $10 million or an amount that you will calculate using a payroll-based formula authorized by the Act, as explained below.[49] PPP loans approved in 2020 used 2019 or the 1-year before the date on which the loan is made to calculate payroll costs for purposes of calculating the maximum loan amount. Borrowers who apply for PPP loans 2021 and who are not self-employed (including sole proprietorships and independent contractors) are also permitted to use the precise 1-year period before the date on which the loan is made to calculate payroll costs if they choose not to use 2019 or 2020. Since most borrowers will use 2019 or 2020 the rule text refers only to 2019 or 2020 for simplicity and readability.

North American Industry Classification System code beginning with 511110 or 5151; or (b) any nonprofit organization that is assigned a North American Industry Classification System code beginning with 5151. This interim final rule has no effect on these statutory waivers, which remain in full force and effect. As a result, the affiliation rules contained in section 121.301 also do not apply to these types of entities. In addition, paragraph 7(a)(36)(D) of the Small Business Act (15 U.S.C. 636(a)(36)(D)), as amended by section 342 of the Economic Aid Act states that, with respect to a business concern made eligible under paragraph 7(a)(36)(D)(iii)(II) or (iv)(IV) (certain news organizations), the Administrator shall not consider whether any affiliated entity, which for purposes of this subclause shall include any entity that owns or controls such business concern, is an issuer.

[41] In order to help potential borrowers identify other businesses with which they may be deemed to be affiliated under the common management standard, the Borrower Application Form, SBA Form 2483, released on April 2, 2020, requires applicants to list other businesses with which they have common management (including under a management agreement). The information supplied by the applicant in response to that information request should be used by applicants as they assess whether they have affiliates that should be included in their number of employees reported on SBA Form 2483.

[42] The text of this subsection was originally published at 85 FR 20817 (April 15, 2020) and has been modified to conform to the Economic Aid Act.

[43] For housing cooperatives, section 501(c)(6) organizations, and destination marketing organizations, the applicable size standard is not more than 300 employees.

[44] The text of this subsection was originally published at 85 FR 20817 (April 15, 2020) and has been modified for readability.

[45] This subsection was originally published at 85 FR 23450, subsection III.2.b. (April 28, 2020).

[46] However, the CARES Act waives the affiliation rules if the borrower receives financial assistance from an SBA-licensed Small Business Investment Company (SBIC) in any amount. This includes any type of financing listed in 13 CFR 107.50, such as loans, debt with equity features, equity, and guarantees. Affiliation is waived even if the borrower has investment from other non-SBIC investors.

[47] This subsection was originally published at 85 FR 23450, section III.3. (April 28, 2020) and has been modified for readability.

[48] This subsection was originally published at 85 FR 20811, subsection III.2.d. (April 15, 2020) and has been modified to conform to additional interim final rules or guidance and the Economic Aid Act.

[49] *See* subsection 4.d. for maximum loan amount applicable to certain farmers and ranchers. For the maximum loan amount for Second Draw PPP Loans, *see* the the interim final rule on Second Draw PPP Loans that is being published separately.

*a. How do I calculate the maximum amount I can borrow?* [50]

The following methodology, which is one of the methodologies authorized by the Act, will be most useful for many applicants.

i. *Step 1:* Aggregate payroll costs (defined in detail below in subsections 4.g. and 4.h.) from 2019 or 2020 for employees whose principal place of residence is the United States.

ii. *Step 2:* Subtract any compensation paid to an employee in excess of $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred.[51]

iii. *Step 3:* Calculate average monthly payroll costs (divide the amount from Step 2 by 12).

iv. *Step 4:* Multiply the average monthly payroll costs from Step 3 by 2.5.

v. *Step 5:* Add the outstanding amount of an Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020 that you seek to refinance. Do not include the amount of any "advance" under an EIDL COVID–19 loan (because it does not have to be repaid).

The examples below illustrate this methodology.

i. Example 1—No employees make more than $100,000
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Maximum loan amount is $25,000

ii. Example 2—Some employees make more than $100,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Maximum loan amount is $250,000

iii. Example 3—No employees make more than $100,000, outstanding EIDL loan of $10,000.
Annual payroll: $120,000
Average monthly payroll: $10,000
Multiply by 2.5 = $25,000
Add EIDL loan of $10,000 = $35,000
Maximum loan amount is $35,000

iv. Example 4—Some employees make more than $100,000, outstanding EIDL loan of $10,000
Annual payroll: $1,500,000
Subtract compensation amounts in excess of an annual salary of $100,000: $1,200,000
Average monthly qualifying payroll: $100,000
Multiply by 2.5 = $250,000
Add EIDL loan of $10,000 = $260,000
Maximum loan amount is $260,000

You must provide your Form 941 (or other tax forms containing similar information) and state quarterly wage unemployment insurance tax reporting forms from each quarter in 2019 or 2020 (whichever you used to calculate loan amount), or equivalent payroll processor records, along with evidence of any retirement and health insurance contributions. A payroll statement or similar documentation from the pay period that covered February 15, 2020 must be provided to establish you were in operation on February 15, 2020.[52]

b. I have income from self-employment and file a Form 1040, Schedule C, how do I calculate the maximum amount I can borrow and what documentation is required?[53]

How you calculate your maximum loan amount depends upon whether or not you employ other individuals. If you have no employees, the following methodology should be used to calculate your maximum loan amount:

i. *Step 1:* Find your 2019 or 2020 IRS Form 1040 Schedule C line 31 net profit amount (if you are using 2020 to calculate payroll costs and have not yet filed a 2020 return, fill it out and compute the value). If this amount is over $100,000, reduce it to $100,000. If this amount is zero or less, you are not eligible for a PPP loan.

ii. *Step 2:* Calculate the average monthly net profit amount (divide the amount from Step 1 by 12).

iii. *Step 3:* Multiply the average monthly net profit amount from Step 2 by 2.5.

iv. *Step 4:* Add the outstanding amount of any Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and April 3, 2020 that you seek to refinance. Do not include the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must provide the 2019 or 2020 (whichever you used to calculate loan amount) Form 1040 Schedule C with your PPP loan application to substantiate the applied-for PPP loan amount and a 2019 or 2020 (whichever you used to calculate loan amount) IRS Form 1099–MISC detailing nonemployee compensation received (box 7), invoice, bank statement, or book of record that establishes you are self-employed. If using 2020 to calculate loan amount, this is required regardless of whether you have filed a 2020 tax return with the IRS. You must provide a 2020 invoice, bank statement, or book of record to establish you were in operation on or around February 15, 2020.

If you have employees, the following methodology should be used to calculate your maximum loan amount:

i. *Step 1:* Compute 2019 or 2020 payroll (using the same year for all items) by adding the following:

a. Your 2019 or 2020 Form 1040 Schedule C line 31 net profit amount (if you are using 2020 and have not yet filed a 2020 return, fill it out and compute the value), up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred, if this amount is over $100,000, reduce it to $100,000, if this amount is less than zero, set this amount at zero;

b. 2019 or 2020 gross wages and tips paid to your employees whose principal place of residence is in the United States computed using 2019 or 2020 IRS Form 941 Taxable Medicare wages & tips (line 5c—column 1) from each quarter plus any pre-tax employee contributions for health insurance or other fringe benefits excluded from Taxable Medicare wages & tips; subtract any amounts paid to any individual employee in excess of $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred and any amounts paid to any employee whose principal place of residence is outside the United States; and

c. 2019 or 2020 employer contributions to employee group health, life, disability, vision and dental insurance (portion of IRS Form 1040 Schedule C line 14 attributable to those contributions); retirement contributions (Form 1040 Schedule C line 19), and state and local taxes assessed on employee compensation (primarily under state laws commonly referred to as the State Unemployment Tax Act or SUTA from state quarterly wage reporting forms).

ii. *Step 2:* Calculate the average monthly amount (divide the amount from Step 1 by 12).

[50] This subsection was originally published at 85 FR 20811, subsection III.2.d. (April 15, 2020) and has been modified to conform to additional rules or guidance and the Economic Aid Act.

[51] *See* subsection 4.j for treatment of amounts paid to independent contractors.

[52] This subsection clarifies the documentation that must be submitted with an applicant's loan application to substantiate the borrower's payroll costs. This requirement applies to loans made after December 27, 2020. For documentation requirements for PPP loans made before December 27, 2020, *see* 85 FR 20811, subsection III.1.e. (April 15, 2020).

[53] This subsection was originally published at 85 FR 21747, subsection III.1.b. (April 20, 2020) and has been modified to conform to additional rules or guidance and the Economic Aid Act.

iii. *Step 3:* Multiply the average monthly amount from Step 2 by 2.5.

iv. *Step 4:* Add the outstanding amount of any EIDL made between January 31, 2020 and April 3, 2020 that you seek to refinance. Do not include the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must supply your 2019 or 2020 (whichever you used to calculate loan amount) Form 1040 Schedule C, Form 941 (or other tax forms or equivalent payroll processor records containing similar information) and state quarterly wage unemployment insurance tax reporting forms from each quarter in 2019 or 2020 (whichever you used to calculate loan amount) or equivalent payroll processor records, along with evidence of any retirement and health insurance contributions, if applicable. A payroll statement or similar documentation from the pay period that covered February 15, 2020 must be provided to establish you were in operation on February 15, 2020.

*c. How does a seasonal employer calculate the maximum PPP loan amount?* [54]

As defined by section 315 of the Economic Aid Act, a borrower is a seasonal employer if it does not operate for more than 7 months in any calendar year or, during the preceding calendar year, it had gross receipts for any 6 months of that year that were not more than 33.33 percent of the gross receipts for the other 6 months of that year. Under section 336 of the Economic Aid Act, a seasonal employer must determine its maximum loan amount for purposes of the PPP by using the employer's average total monthly payments for payroll for any 12-week period selected by the seasonal employer beginning February 15, 2019, and ending February 15, 2020.

*d. How do farmers and ranchers calculate the maximum PPP loan amount?* [55]

How you calculate your maximum loan amount depends upon whether you employ other individuals. If you have no employees, the following methodology should be used to calculate your maximum loan amount:

i. *Step 1:* Find your 2019 or 2020 IRS Form 1040 Schedule F line 9 gross income (if you are using 2020 and you have not yet filed a 2020 return, fill it out and compute the value). If this amount is over $100,000, reduce it to $100,000. If this amount is zero or less, you are not eligible for a PPP loan.

ii. *Step 2:* Divide the amount from Step 1 by 12.

iii. *Step 3:* Multiply the average monthly gross income amount from Step 2 by 2.5.

iv. *Step 4:* Add the outstanding amount of any Economic Injury Disaster Loan (EIDL) made between January 31, 2020 and ending on April 3, 2020 that you seek to refinance. Do not include the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must provide the 2019 or 2020 (whichever you used to calculate loan amount) Form 1040 Schedule F with your PPP loan application to substantiate the applied-for PPP loan amount and a 2019 or 2020 (whichever you used to calculate loan amount) IRS Form 1099–MISC detailing nonemployee compensation received (box 7), invoice, bank statement, or book of record that establishes you are self-employed. You must provide a 2020 invoice, bank statement, or book of record to establish you were in operation on or around February 15, 2020.

If you have employees, the following methodology should be used to calculate your maximum loan amount:

i. *Step 1:* Compute 2019 or 2020 payroll (using the same year for all items) by adding the following:

a. The difference between your 2019 or 2020 Form 1040 Schedule F line 9 gross income amount (if you are using 2020 and you have not yet filed a 2020 return, fill it out and compute the value), and the sum of Schedule F lines 15, 22 and 23, up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred, if this amount is over $100,000, reduce it to $100,000, if this amount is less than zero, set this amount at zero; [56]

b. 2019 or 2020 gross wages and tips paid to your employees whose principal place of residence is in the United States computed using 2019 or 2020 IRS Form 941 Taxable Medicare wages & tips (line 5c—column 1) from each quarter plus any pre-tax employee contributions for health insurance or other fringe benefits excluded from Taxable Medicare wages & tips; subtract any amounts paid to any individual employee in excess of $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred and any amounts paid to any employee whose principal place of residence is outside the United States; and

c. 2019 or 2020 employer contributions for employee group health, life, disability, vision and dental insurance (portion of IRS Form 1040 Schedule F line 15 attributable to those contributions), employer contributions for employee retirement contributions (Form 1040 Schedule F line 23, and state and local taxes assessed on employers for employee compensation (primarily under state laws commonly referred to as the State Unemployment Tax Act or SUTA from state quarterly wage reporting forms).

ii. *Step 2:* Calculate the average monthly amount (divide the amount from Step 1 by 12).

iii. *Step 3:* Multiply the average monthly amount from Step 2 by 2.5.

iv. *Step 4:* Add the outstanding amount of any EIDL made between January 31, 2020 and April 3, 2020 that you seek to refinance. Do not include the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must supply your 2019 or 2020 (whichever you used to calculate loan amount) Form 1040 Schedule F, Form 941 (or other tax forms or equivalent payroll processor records containing similar information) and state quarterly wage unemployment insurance tax reporting forms from each quarter in 2019 or 2020 (whichever you used to calculate loan amount) or equivalent

---

[54] This subsection has been added to conform to section 336 of the Economic Aid Act. Except for loans made pursuant to section 7(a)(36) of the Small Business Act for which SBA has remitted a loan forgiveness payment to the lender before December 27, 2020, it is effective as if included in the CARES Act and applies to any loan made before, on, or after December 27, 2020, including forgiveness of such a loan. Previous guidance issued for seasonal employers stated as follows: ''Under section 1102 of the CARES Act, a seasonal employer may determine its maximum loan amount for purposes of the PPP by reference to the employer' average total monthly payments for payroll 'the 12-week period beginning February 15, 2019, or at the election of the eligible [borrower], March 1, 2019, and ending June 30, 2019.' Under this interim final rule issued pursuant to section 1109 of the Act, a seasonal employer may alternatively elect to determine its maximum loan amount as the average total monthly payments for payroll during any consecutive 12-week period between May 1, 2019 and September 15, 2019.'' 85 FR 23917 (April 30, 2020).

[55] This subsection has been added to conform to section 313 of the Economic Aid Act. This provision applies to a farmer or rancher who (1) operates as a sole proprietorship, an independent contractor, or is an eligible self-employed individual; (2) reports farm income or expenses on a Schedule F (or any equivalent successor schedule); and (3) was in business as of February 15, 2020. This provision is effective as if included in the CARES Act and applies to any loan made before, on, or after December 27, 2020, unless SBA has remitted a loan forgiveness payment to the lender on the PPP loan.

[56] Any employee payroll costs should be subtracted from the farmer's or rancher's gross income to avoid double-counting amounts that represent pay to the employees of the farmer or rancher.

payroll processor records, along with evidence of any retirement and health insurance contributions, if applicable. A payroll statement or similar documentation from the pay period that covered February 15, 2020 must be provided to establish you were in operation on February 15, 2020.

A farmer or rancher who received a PPP loan before December 27, 2020 may request a recalculation of the maximum loan amount based on the formula described above regarding gross income, if doing so would result in a larger covered loan amount and may receive an increase in its PPP loan based on the recalculation.

*e. How do partnerships calculate the maximum loan amount?*

The following methodology should be used to calculate the maximum amount that partnerships can borrow:

(i) *Step 1:* Compute 2019 or 2020 payroll (using the same year for all items) by adding (1) net earnings from self-employment of individual general partners in 2019 or 2020, as reported on IRS Form 1065 K–1, reduced by section 179 expense deduction claimed, unreimbursed partnership expenses claimed, and depletion claimed on oil and gas properties, multiplied by 0.9235,[57] that is not more than $100,000 per partner; (2) 2019 or 2020 gross wages and tips paid to your employees whose principal place of residence is in the United States, if any, which can be computed using 2019 or 2020 IRS Form 941 Taxable Medicare wages and tips (line 5c—column 1) from each quarter plus any pre-tax employee contributions for health insurance or other fringe benefits excluded from Taxable Medicare wages and tips, subtracting any amounts paid to any individual employee in excess of $100,000 and any amounts paid to any employee whose principal place of residence is outside the U.S.; (3) 2019 or 2020 employer contributions for employee group health, life, disability, vision and dental insurance, if any (portion of IRS Form 1065 line 19 attributable to those contributions); (4) 2019 or 2020 employer contributions to employee retirement plans, if any (IRS Form 1065 line 18); and (5) 2019 or 2020 employer state and local taxes assessed on employee compensation, primarily state unemployment insurance tax (from state quarterly wage reporting forms), if any.

(ii) *Step 2:* Calculate the average monthly payroll costs (divide the amount from Step 1 by 12).

(iii) *Step 3:* Multiply the average monthly payroll costs from Step 2 by 2.5.

(iv) *Step 4:* Add any outstanding amount of any EIDL made between January 31, 2020 and April 3, 2020 that you seek to refinance. Do not include the amount of any advance under an EIDL COVID–19 loan (because it does not have to be repaid).

You must supply 2019 or 2020 (whichever you used to calculate loan amount) IRS Form 1065 (including K–1s) and other relevant supporting documentation if the partnership has employees, including the 2019 or 2020 (whichever you used to calculate loan amount) IRS Form 941 and state quarterly wage unemployment insurance tax reporting form from each quarter (or equivalent payroll processor records or IRS Wage and Tax Statements) along with records of any retirement or health insurance contributions. If the partnership has employees, a payroll statement or similar documentation from the pay period that covered February 15, 2020 must be provided to establish the partnership was in operation and had employees on that date. If the partnership has no employees, an invoice, bank statement, or book of record establishing the partnership was in operation on February 15, 2020 must instead be provided.

*f. Can a single corporate group receive unlimited PPP loans?*[58]

No. To preserve the limited resources available to the PPP program, and in light of the previous lapse of PPP appropriations and the high demand for PPP loans, businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate.[59] For purposes of this limit, businesses are part of a single corporate group if they are majority owned, directly or indirectly, by a common parent.

It is the responsibility of an applicant for a PPP loan to notify the lender if the applicant has applied for or received PPP loans in excess of the amount permitted by this interim final rule and withdraw or request cancellation of any pending PPP loan application or approved PPP loan not in compliance with the limitation set forth in this rule. Failure by the applicant to do so will be regarded as a use of PPP funds for unauthorized purposes, and the loan will not be eligible for forgiveness. A lender may rely on an applicant's representation concerning the applicant's compliance with this limitation.

The Administrator, in consultation with the Secretary, determined that limiting the amount of PPP loans that a single corporate group may receive will promote the availability of PPP loans to the largest possible number of borrowers, consistent with the CARES Act. The Administrator has concluded that a limitation of $20,000,000 strikes an appropriate balance between broad availability of PPP loans and program resource constraints.

SBA's affiliation rules, which relate to an applicant's eligibility for PPP loans, and any waiver of those rules under the CARES Act, continue to apply independent of this limitation. Businesses are subject to this limitation even if the businesses are eligible for the waiver-of-affiliation provision under the CARES Act or are otherwise not considered to be affiliates under SBA's affiliation rules.[60]

This rule has no effect on lender obligations required to obtain an SBA guarantee for PPP loans.

*g. What qualifies as ''payroll costs?''*[61]

Payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care or group life, disability, vision, or dental

[57] This treatment follows the computation of self-employment tax from IRS Form 1040 Schedule SE Section A line 4 and removes the ''employer'' share of self-employment tax, consistent with how payroll costs for employees in the partnership are determined.

[58] This subsection was originally published at 85 FR 26324, subsection III.1. (May 4, 2020).

[59] The Administrator has authority to issue ''such rules and regulations as [the Administrator] deems necessary to carry out the authority vested in [her] by or pursuant to'' 15 U.S.C. Chapter 14A, including authorities established under section 1102 of the CARES Act. Section 1102 provides that the Administrator ''may'' guarantee loans under the terms and conditions set forth in section 7(a) of the Small Business Act, and those conditions specify a ''maximum''—but not a minimum—loan amount. *See* 15 U.S.C. 636(a)(36)(B), (E); *see also* CARES Act section 1106(k) (authorizing SBA to issue regulations to govern loan forgiveness). To preserve finite appropriations for PPP loans and ensure broad access for eligible borrowers, the Administrator, in consultation with the Secretary, has determined that an aggregate limitation on loans to a single corporate group is necessary and appropriate.

[60] *See* Section 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv), as added by the CARES Act; 13 CFR 121.103(b).

[61] This subsection was originally published at 85 FR 20811, subsection III.2.f. (April 15, 2020) and has been modified to conform to the Economic Aid Act.

insurance,[62] including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wages, commissions, income, or net earnings from self-employment, or similar compensation.

*h. Is there anything that is expressly excluded from the definition of payroll costs?* [63]

Yes. The Act expressly excludes the following:

i. Any compensation of an employee whose principal place of residence is outside of the United States;

ii. The compensation of an individual employee in excess of $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred;

iii. Federal employment taxes imposed or withheld during the applicable period, including the employee's and employer's share of FICA (Federal Insurance Contributions Act) and Railroad Retirement Act taxes, and income taxes required to be withheld from employees; and

iv. Qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Pub. L. 116–127).

*i. May fishing boat owners include payroll costs in their PPP loan applications that are attributable to crewmembers described in section 3121(b)(20) of the Internal Revenue Code?* [64]

Yes. A fishing boat owner may include compensation reported on Box 5 of IRS Form 1099–MISC and paid to a crewmember described in section 3121(b)(20) of the Code, up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred, as a payroll cost in its PPP loan application.

*j. Do independent contractors count as employees for purposes of PPP loan calculations?* [65]

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan calculation.[66]

*k. Do student workers count when determining the number of employees for PPP loan eligibility?* [67]

Yes. Student workers generally count as employees, unless (a) the applicant is an institution of higher education, as defined in the Department of Education's Federal Work-Study regulations, 34 CFR 675.2, and (b) the student worker's services are performed as part of a Federal Work-Study Program (as defined in those regulations [68]) or a substantially similar program of a State or political subdivision thereof. Institutions of higher education must exclude work study students when determining the number of employees for PPP loan eligibility, and must also exclude payroll costs for work study students from the calculation of payroll costs used to determine their PPP loan amount.

*5. What is the interest rate on a PPP loan?* [69]

The interest rate will be 100 basis points or one percent, calculated on a non-compounding, non-adjustable basis.[70]

*6. What will be the maturity date on a PPP loan?* [71]

The maturity is five years.

*7. Can I apply for more than one First Draw PPP Loan?* [72]

No. Except as set forth in subsection D.8, the Administrator, in consultation with the Secretary, determined that no eligible borrower may receive more than one First Draw PPP Loan. This means that if you apply for a PPP loan you should consider applying for the maximum amount. Any borrower who received a PPP loan in 2020 received a First Draw PPP Loan and is not eligible to receive another First Draw PPP Loan, but may be eligible for a second draw PPP loan.[73]

*8. Can I use e-signatures or e-consents if a borrower has multiple owners?* [74]

Yes, e-signature or e-consents can be used regardless of the number of owners.

*9. When will I have to begin paying principal and interest on my PPP loan?* [75]

If you submit to your lender a loan forgiveness application within 10 months after the end of your loan forgiveness covered period, you will not have to make any payments of principal or interest on your loan before the date on which SBA remits the loan forgiveness amount on your loan to your lender (or notifies your lender that no loan forgiveness is allowed).

Your ''loan forgiveness covered period'' is the period beginning on the date the lender disburses the PPP loan and ending on any date selected by the borrower that occurs during the period (i) beginning on the date that is 8 weeks after the date of disbursement and (ii) ending on the date that is 24 weeks after the date of disbursement. Your lender must notify you of remittance by SBA of the loan forgiveness amount (or notify you that SBA determined that no loan forgiveness is allowed) and the date your first payment is due. Interest continues to accrue during the deferment period.

If you do not submit to your lender a loan forgiveness application within 10

[62] This provision has been modified to conform to section 308 of the Economic Aid Act. This revision is effective as if included in the CARES Act and applies to any loan made before, on, or after December 27, 2020, including forgiveness of such a loan.

[63] This subsection was originally published at 85 FR 20811, subsection III.2.g. (April 15, 2020) and has been modified to conform to section 344 the Economic Aid Act.

[64] This subsection was originally published at 85 FR 39066, subsection III.1. (June 30, 2020) and has been modified to conform to section 344 the Economic Aid Act and for readability.

[65] This subsection was originally published at 85 FR 20811, subsection III.2.h. (April 15, 2020).

[66] *See* subsection 4.i. regarding fishing boat owners including payroll costs for their crewmembers in the calculation of the PPP loan amount.

[67] This subsection was originally published at 85 FR 27287, section III.2. (May 8, 2020) and has been modified for readability.

[68] The Department of Education's Federal Work-Study Programs described at 34 CFR part 675 are (1) the Federal Work-Study Program, (2) the Job Location and Development Program, and (3) Work Colleges Program.

[69] This subsection was originally published at 85 FR 20811, subsection III.2.i. (April 15, 2020) and has been modified to conform to additional interim final rules or guidance and the Economic Aid Act.

[70] Revised to conform to section 339 of the Economic Aid Act. The revision applies to PPP loans made on or after December 27, 2020, but may apply with respect to a PPP loan made before that date upon the mutual agreement of the lender and the borrower. A one percent interest rate provides low cost funds to borrowers to meet eligible payroll costs and other eligible expenses during this temporary period of economic dislocation caused by the coronavirus. Second, for lenders, the 100 basis points offers an attractive interest rate relative to the cost of funding for comparable maturities.

[71] This subsection was originally published at 85 FR 36308, subsection III.1.b. (June 16, 2020) and has been modified for readability.

[72] This subsection was originally published at 85 FR 20811, subsection III.2.i. (''*Can I apply for more than one PPP loan?*'') (April 15, 2020) and has been modified to conform to the Economic Aid Act and for readability. PPP borrowers may be eligible for a loan under section 7(a)(37) of the Small Business Act, ''Paycheck Protection Program Second Draw Loans,'' *see* interim final rule on Second Draw PPP Loans that is being published separately.

[73] *See* interim final rule on Second Draw PPP Loans for eligibility criteria for Second Draw PPP Loans, which is being published separately.

[74] This subsection was originally published at 85 FR 20811, subsection III.2.l. (April 15, 2020).

[75] This subsection was originally published at 85 FR 20811, subsection III.2.n. (April 15, 2020), as amended by 85 FR 36038 (June 16, 2020), and has been modified to conform to the Economic Aid Act.

months after the end of your loan forgiveness covered period, you must begin paying principal and interest after that period. For example, if a borrower's PPP loan is disbursed on January 25, 2021, the 24-week period ends on July 12, 2021. If the borrower does not submit a loan forgiveness application to its lender by May 12, 2022, the borrower must begin making payments on or after May 12, 2022.

*10. What forms do I need and how do I submit an application for a PPP loan?*[76]

The applicant must submit Paycheck Protection Program Borrower Application Form (SBA Form 2483), or lender's equivalent form, and payroll documentation, as described above. The lender must submit SBA Form 2484, Paycheck Protection Program Lender's Application for 7(a) Loan Guaranty, electronically in accordance with program requirements and maintain the forms and supporting documentation in its files.

*11. How can PPP loans be used?*[77]

a. The proceeds of a PPP loan are to be used for:

i. Payroll costs (as defined in the CARES Act, Economic Aid Act and this interim final rule);

ii. costs related to the continuation of group health care, life, disability, vision, or dental benefits during periods of paid sick, medical, or family leave, and group health care, life, disability, vision, or dental insurance premiums;

iii. mortgage interest payments (but not mortgage prepayments or principal payments);

iv. rent payments;

v. utility payments;

vi. interest payments on any other debt obligations that were incurred before February 15, 2020;

vii. refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020;[78]

viii. covered operations expenditures (payments for any business software or cloud computing service that facilitates business operations, product or service delivery, the processing, payment, or tracking of payroll expenses, human resources, sales and billing functions, or accounting or tracking of supplies, inventory, records and expenses);[79]

ix. covered property damage costs (costs related to property damage and vandalism or looting due to public disturbances that occurred during 2020 that was not covered by insurance or other compensation);

x. covered supplier costs (expenditures made by a borrower to a supplier of goods for the supply of goods that—(A) are essential to the operations of the borrower at the time at which the expenditure is made; and (B) is made pursuant to a contract, order, or purchase order—(i) in effect at any time before the covered period with respect to the applicable covered loan; or (ii) with respect to perishable goods, in effect before or at any time during the covered period with respect to the applicable covered loan); and

xi. covered worker protection expenditures ((A) operating or a capital expenditures to facilitate the adaptation of the business activities of an entity to comply with requirements established or guidance issued by the Department of Health and Human Services, the Centers for Disease Control, or the Occupational Safety and Health Administration, or any equivalent requirements established or guidance issued by a State or local government, during the period beginning on March 1, 2020 and ending the date on which the national emergency with respect to the COVID–19 expires related to the maintenance of standards for sanitation, social distancing, or any other worker or customer safety requirement related to COVID–19; (B) such expenditures may include—(i) the purchase, maintenance, or renovation of assets that create or expand—(I) a drive-through window facility; (II) an indoor, outdoor, or combined air or air pressure ventilation or filtration system; (III) a physical barrier such as a sneeze guard; (IV) an expansion of additional indoor, outdoor, or combined business space; (V) an onsite or offsite health screening capability; or (VI) other assets relating to the compliance with the requirements or guidance described in subparagraph (A), as determined by the Administrator in consultation with the Secretary of Health and Human Services and the Secretary of Labor; and (ii) the purchase of—(I) covered materials described in section 328.103(a) of title 44, Code of Federal Regulations, or any successor regulation; (II) particulate filtering facepiece respirators approved by the National Institute for Occupational Safety and Health, including those approved only for emergency use authorization; or (III) other kinds of personal protective equipment, as determined by the Administrator in consultation with the Secretary of Health and Human Services and the Secretary of Labor; and (C) such expenditures do not include residential real property or intangible property).

At least 60 percent of the PPP loan proceeds shall be used for payroll costs. For purposes of determining the percentage of use of proceeds for payroll costs, the amount of any EIDL refinanced will be included. For purposes of loan forgiveness, however, the borrower will have to document the proceeds used for payroll costs in order to determine the amount of forgiveness. While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a requirement that borrowers use a substantial portion of the loan proceeds for payroll costs, consistent with Congress' overarching goal of keeping workers paid and employed. This percentage is consistent with the limitation on the forgiveness amount set forth in the Flexibility Act. This limitation on use of the loan funds will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

*b. How can PPP loans be used by individuals with income from self-employment who file a Form 1040, Schedule C?*[80]

The proceeds of a PPP loan are to be used for the following.

i. Owner compensation replacement, calculated based on 2019 or 2020 (using the same year that was used to calculate the loan amount) net profit as described in subsection 4.b.

ii. Employee payroll costs (as defined in this interim final rule) for employees whose principal place of residence is in

[76] This subsection was originally published at 85 FR 20811, subsection III.2.q. (April 15, 2020).

[77] This subsection was originally published at 85 FR 20811, subsection III.2.r. (April 15, 2020), as amended by 85 FR 36308 (June 16, 2020) and has been modified to conform to the Economic Aid Act.

[78] Under paragraph 7(a)(36)(Q) of the Small Business Act, as amended by section 341 of the Economic Aid Act, an EIDL loan used for purposes other than paying payroll costs and other eligible PPP expenditures is not considered a duplication of the assistance available under the PPP.

[79] Items viii. through xi. were added to conform to section 304 of the Economic Aid Act. These provisions are effective as if included in the CARES Act and apply to any loan made before, on, or after December 27, 2020, including forgiveness of such loan, unless SBA has remitted a loan forgiveness payment to the lender on the PPP loan. Section 1106 of the CARES Act (15 U.S.C. 9005) was redesignated as section 7A, transferred to the Small Business Act (15 U.S.C. 631 *et seq.*), and inserted so as to appear after section 7 of the Small Business Act (15 U.S.C. 636) in section 304(b) of the Economic Aid Act.

[80] This subsection was originally published at 85 FR 21747, subsection III.1.d. (April 20, 2020) and has been modified to conform to the Economic Aid Act.

the United States, if you have employees.

iii. Mortgage interest payments (but not mortgage prepayments or principal payments) on any business mortgage obligation on real or personal property (*e.g.,* the interest on your mortgage for the warehouse you purchased to store business equipment or the interest on an auto loan for a vehicle you use to perform your business), business rent payments (*e.g.,* the warehouse where you store business equipment or the vehicle you use to perform your business), and business utility payments (*e.g.,* the cost of electricity in the warehouse you rent or gas you use driving your business vehicle). You must have claimed or be entitled to claim a deduction for such expenses on your 2019 or 2020 (whichever you used to calculate loan amount) Form 1040 Schedule C for them to be a permissible use. For example, if you did not claim or are not entitled to claim utilities expenses on your 2019 or 2020 Form 1040 Schedule C, you cannot use the proceeds for utilities.

iv. Interest payments on any other debt obligations that were incurred before February 15, 2020 (such amounts are not eligible for PPP loan forgiveness).

v. Refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020 (maturity will be reset to PPP's maturity of two years for PPP loans made before June 5, 2020 unless the borrower and lender mutually agree to extend the maturity of such loans to five years, or PPP's maturity of five years for PPP loans made on or after June 5).[81]

vi. Covered operations expenditures, as defined in section 7A(a) of the Small Business Act, to the extent they is deductible on Form 1040 Schedule C.

vii. Covered property damage costs, as defined in section 7A(a) of the Small Business Act, to the extent they is deductible on Form 1040 Schedule C.

viii. Covered supplier costs, as defined in section 7A(a) of the Small Business Act, to the extent they is deductible on Form 1040 Schedule C.

ix. Covered worker protection expenditures, as defined in section 7A(a) of the Small Business Act, to the extent they is deductible on Form 1040 Schedule C.[82]

The Administrator, in consultation with the Secretary, determined that it is appropriate to limit self-employed individuals' (who file a Form 1040 Schedule C) use of loan proceeds to those types of allowable uses for which the borrower made expenditures in 2019 or 2020 or that were used on covered property damage, as defined in section 7A(a). The Administrator has determined that this limitation on self-employed individuals who file a Form 1040 Schedule C is consistent with the borrower certification required by the Act; specifically, that the PPP loan is necessary ''to support the ongoing operations'' of the borrower. The Administrator and the Secretary thus believe that this limitation is consistent with the structure of the Act to maintain existing operations and payroll and not for business expansion. This limitation on the use of PPP loan proceeds will also help to ensure that the finite appropriations available for these loans are directed toward maintaining existing operations and payroll, as each loan that is made depletes the appropriation.

*c. Can PPP proceeds be used for lobbying activities or expenditures?*[83]

No. None of the proceeds of a PPP loan may be used for (1) lobbying activities, as defined in section 3 of the Lobbying Disclosure Act of 1995 (2 U.S.C. 1602); (2) lobbying expenditures related to a State or local election; or (3) expenditures designed to influence the enactment of legislation, appropriations, regulation, administrative action, or Executive order proposed or pending before Congress or any State government, State legislature, or local legislature or legislative body.

*d. What happens if PPP loan funds are misused?*[84]

If you use PPP funds for unauthorized purposes, SBA will direct you to repay those amounts. If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability such as charges for fraud. If one of your shareholders, members, or partners uses PPP funds for unauthorized purposes, SBA will have recourse against the shareholder, member, or partner for the unauthorized use.

*12. What certifications need to be made?*[85]

On the PPP borrower application, an authorized representative of the applicant must certify in good faith to all of the below:[86]

i. The Applicant was in operation on February 15, 2020, has not permanently closed, and was either an eligible self-employed individual, independent contractor, or sole proprietorship with no employees, or had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC.

ii. Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant.

iii. The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable such as for charges of fraud. (As explained above, not more than 40 percent of loan proceeds may be used for nonpayroll costs.)

iv. I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, covered utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures, and not more than 40% of the forgiven amount may be for non-payroll costs. If required, the Applicant will provide to the Lender and/or SBA documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of eligible expenses for the covered period following this loan.

v. The Applicant has not and will not receive another loan under the Paycheck Protection Program, section 7(a)(36) of the Small Business Act (15 U.S.C.

[81] Under section 7(a)(36)(Q) of the Small Business Act, as amended by section 341 of the Economic Aid Act, an EIDL loan used for purposes other than paying payroll costs and other eligible PPP expenditures is not considered a duplication of the assistance available under the PPP.

[82] Items vi. through ix. were added to conform to section 304 of the Economic Aid Act. These provisions are effective as if included in the CARES Act and apply to any loan made before, on, or after December 27, 2020, including forgiveness of such loan, unless SBA has remitted a loan forgiveness payment to the lender on the PPP loan.

[83] This subsection has been added to conform to section 319 of the Economic Aid Act.

[84] This subsection was originally published at 85 FR 20811, subsection III.2.s. (April 15, 2020).

[85] This subsection was originally published at 85 FR 20811, subsection III.2.s. (April 15, 2020), as amended by 85 FR 36308 (June 16, 2020) and has been modified to conform to the Economic Aid Act and the revised PPP Borrower Application Form (SBA Form 2483).

[86] A representative of the applicant can certify for the business as a whole if the representative is legally authorized to do so. The certifications have been revised to conform to the Economic Aid Act and the revised PPP Borrower Application Form (SBA Form 2483).

636(a)(36)) (this does not include Paycheck Protection Program second draw loans, section 7(a)(37) of the Small Business Act (15 U.S.C. 636(a)(37)).

vi. The Applicant has not and will not receive a Shuttered Venue Operator grant from SBA.

vii. The President, the Vice President, the head of an Executive department, or a Member of Congress, or the spouse of such person as determined under applicable common law, does not directly or indirectly hold a controlling interest in the Applicant, with such terms having the meanings provided in section 322 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act.

viii. The Applicant is not an issuer, the securities of which are listed on an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f).

ix. I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

x. I acknowledge that the Lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge, and agree that the Lender can share the tax information with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

*13. Limited Safe Harbor With Respect to Certification Concerning Need for PPP Loan Request* [87]

The CARES Act requires each applicant applying for a PPP loan to certify in good faith ''that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing obligations'' of the applicant. SBA, in consultation with the Department of the Treasury, issued additional guidance on May 13, 2020 concerning how SBA will review the required good-faith certification. *See* FAQ 46 (posted May 13, 2020). This guidance included a safe harbor providing that any PPP borrower, together with its affiliates, that received PPP loans with an original principal amount of less than $2 million will be deemed to have made the required certification concerning the necessity of the loan request in good faith.

*14. Can my PPP loan be forgiven in whole or in part?* [88]

Yes. The amount of loan forgiveness can be up to the full principal amount of the loan and any accrued interest. An eligible borrower will not be responsible for any loan payment if the borrower uses all of the loan proceeds for forgivable purposes and employee and compensation levels are maintained or, if not, an applicable safe harbor or exemption applies. The actual amount of loan forgiveness will depend, in part, on the total amount of payroll costs (including employer contributions for group health, life, disability, vision and dental insurance), payments of interest on mortgage obligations incurred before February 15, 2020, rent payments on leases dated before February 15, 2020, utility payments for service that began before February 15, 2020, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures over the loan forgiveness covered period.[89] Payroll costs that are qualified wages taken into account in determining the Employer Retention Credit are not eligible for loan forgiveness. The ''loan forgiveness covered period'' is the period beginning on the date the lender disburses the PPP loan and ending on any date selected by the borrower that occurs during the period (i) beginning on the date that is 8 weeks after the date of disbursement and (ii) ending on the date that is 24 weeks after the date of disbursement.

To receive full loan forgiveness, a borrower must use at least 60 percent of the PPP loan for payroll costs, and not more than 40 percent of the loan forgiveness amount may be attributable to nonpayroll costs. For example, if a borrower uses 59 percent of its PPP loan for payroll costs, it will not receive the full amount of loan forgiveness it might otherwise be eligible to receive. Instead, the borrower will receive partial loan forgiveness, based on the requirement that 60 percent of the forgiveness amount must be attributable to payroll costs. For example, if a borrower receives a $100,000 PPP loan, and during the covered period the borrower spends $54,000 (or 54 percent) of its loan on payroll costs, then because the borrower used less than 60 percent of its loan on payroll costs, the maximum amount of loan forgiveness the borrower may receive is $90,000 (with $54,000 in payroll costs constituting 60 percent of the forgiveness amount and $36,000 in nonpayroll costs constituting 40 percent of the forgiveness amount). Because the Economic Aid Act changed the loan forgiveness covered period from either an 8- or 24-week period to a covered period between 8 and 24 weeks at the election of the borrower, SBA is eliminating the ''alternative covered period'' as defined in the interim final rule published at 85 FR 33004, 33006 (June 1, 2020), as amended.

Additionally, an eligible borrower that received a loan of $150,000 or less shall not, at the time of its application for loan forgiveness, be required to submit any application or documentation in addition to the certification and information required by paragraph 7A(l)(1)(A) of the Small Business Act. Such borrowers must retain records relevant to the form that prove compliance with the PPP requirements—with respect to employment records, for the 4-year period following submission of the loan forgiveness application, and with respect to other records, for the 3-year period following submission of the loan forgiveness application. All other borrowers must follow the existing requirements for loan forgiveness applications and records retention. SBA may review and audit PPP loans of $150,000 or less and access any records the borrower is required to retain. All borrowers with loans of any size must provide documentation independently to a lender to satisfy relevant Federal, State, local or other statutory or regulatory requirements or in connection with an SBA loan review.

The Economic Aid Act repealed the CARES Act provision requiring SBA to deduct EIDL Advance Amounts received by borrowers from the forgiveness payment amounts remitted

[87] This subsection has been added to codify the safe harbor contained in FAQ 46 (posted May 13, 2020).

[88] This subsection replaces the rule originally published at 85 FR 20811, subsection III.2.o (April 15, 2020), as amended by 85 FR 36308 (June 16, 2020) and has been modified to conform to the Economic Aid Act.

[89] Covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures were added as eligible expenses in section 304 of the Economic Aid Act. Except for loans made pursuant to section 7(a)(36) of the Small Business Act for which SBA has remitted a loan forgiveness payment to the lender before December 27, 2020, these eligible expenses apply to any loan made before, on, or after December 27, 2020, including forgiveness of such a loan.

by SBA to the lender. The EIDL Advance Amount received by the borrower will not reduce the amount of forgiveness to which the borrower is entitled and will not be deducted from the forgiveness payment amount that SBA remits to the lender. Any EIDL Advance Amounts previously deducted from a borrower's forgiveness amount will be remitted to the lender, together with interest to the remittance date.

*15. Do independent contractors count as employees for purposes of PPP loan forgiveness?* [90]

No, independent contractors have the ability to apply for a PPP loan on their own so they do not count for purposes of a borrower's PPP loan forgiveness.

*16. For loans made prior to December 27, 2020, what additional documentation must a borrower submit when the President of the United States, Vice President of the United States, the head of an Executive department, or a Member of Congress, or the spouse of any of the preceding, directly or indirectly holds a controlling interest in the borrower?*

For PPP loans made before December 27, 2020, if the President of the United States, Vice President of the United States, the head of an Executive department, or a Member of Congress, or the spouse of such person as determined under applicable common law, directly or indirectly holds a controlling interest in the borrower, the principal executive officer, or individual performing a similar function, of the borrower must disclose that information to SBA. Such disclosure must be made not later than January 26, 2021, if the borrower submitted an application for forgiveness before December 27, 2020, or not later than 30 days after submitting an application for forgiveness.

**C. What do lenders need to know and do?**

*1. Who is eligible to make PPP loans?* [91]

a. All SBA 7(a) lenders are automatically approved to make PPP loans on a delegated basis.

b. The Act provides that the authority to make PPP loans can be extended to additional lenders determined by the Administrator and the Secretary to have the necessary qualifications to process, close, disburse, and service loans made with the SBA guarantee. Since SBA is authorized to make PPP loans (and loans under section 7(a)(37) of the Small Business Act) up to $806.45 billion by March 31, 2021, the Adminstrator and the Secretary have jointly determined that authorizing additional lenders is necessary to achieve the purpose of allowing as many eligible borrowers as possible to receive loans by the March 31, 2021 deadline.

c. The following types of lenders have been determined to meet the criteria and are eligible to make PPP loans unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action with their primary Federal regulator that addresses unsafe or unsound lending practices:

i. Any federally insured depository institution or any federally insured credit union;

ii. Any Farm Credit System institution [92] (other than the Federal Agricultural Mortgage Corporation) as defined in 12 U.S.C. 2002(a) that applies the requirements under the Bank Secrecy Act and its implementing regulations (collectively, BSA) as a federally regulated financial institution, or functionally equivalent requirements that are not altered by this rule; and

iii. Any depository or non-depository financing provider that originates, maintains, and services business loans or other commercial financial receivables and participation interests; has a formalized compliance program; applies the requirements under the BSA as a federally regulated financial institution, or the BSA requirements of an equivalent federally regulated financial institution; has been operating since at least February 15, 2019, and has originated, maintained, or serviced more than $50 million in business loans or other commercial financial receivables during a consecutive 12 month period in the past 36 months, or is a service provider to any insured depository institution that has a contract to support such institution's lending activities in accordance with 12 U.S.C. 1867(c) and is in good standing with the appropriate Federal banking agency.[93]

d. Qualified institutions described in 1.c.i. and ii. will be automatically qualified under delegated authority by the SBA upon transmission of CARES Act Section 1102 Lender Agreement (SBA Form 3506) unless they currently are designated in Troubled Condition by their primary Federal regulator or are subject to a formal enforcement action by their primary Federal regulator that addresses unsafe or unsound lending practices.

e. A non-bank lender may be approved to make PPP loans if it has originated, maintained, or serviced more than $10 million in business loans or other commercial financial receivables during a 12-month period in the past 36 months, if the non-bank lender is (1) a community development financial institution (other than a federally insured bank or federally insured credit union) or (2) a majority minority-, women-, or veteran/military-owned lender.[94]

*2. Do lenders have to register in SAM.gov to make PPP loans?* [95]

Yes. Given the exigent circumstances in which small businesses and lenders currently find themselves due to the COVID–19 pandemic, PPP lenders will have thirty (30) days from the date of the first PPP loan disbursement made by them after December 27, 2020 to complete SAM registration and provide SBA with the lender's unique entity identifier.

*3. What do lenders have to do in terms of loan underwriting?* [96]

Each lender shall:

a. Confirm receipt of borrower certifications contained in Paycheck Protection Program Borrower Application Form (SBA Form 2483) issued by the Administration or lender's equivalent form;

b. Confirm receipt of information demonstrating that a borrower was either an eligible self-employed individual, independent contractor, or

---

[90] This subsection was originally published at 85 FR 20811, subsection III.2.p. (April 15, 2020).

[91] This subsection was originally published at 85 FR 20811, subsection III.3.a. (April 15, 2020) and has been modified to conform to additional interim final rules or guidance and sections 323 and 343 of the Economic Aid Act.

[92] Section 314 of the Economic Aid Act contains the following information related to Farm Credit System Institutions: ''(1) APPLICABLE RULES.—Solely with respect to loans under paragraphs (36) and (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), Farm Credit Administration regulations and guidance issued as of July 14, 2020, and compliance with such regulations and guidance, shall be deemed functionally equivalent to requirements referenced in section 3(a)(iii)(II) of the interim final rule of the Administration entitled 'Business Loan Program Temporary Changes; Paycheck Protection Program' (85 FR 20811 (April 15, 2020)) or any similar requirement referenced in that interim final rule in implementing such paragraph (37).''

[93] This subsection c.iii. was modified to implement the rule originally published at 85 FR 26324, subsection III.2.a. (May 4, 2020).

[94] Lenders described in this subsection (e.) should follow the special instructions in footnote 1 of the 1102 Lender Agreement—Non-Bank and Non-Insured Depository Institution Lenders (SBA Form 3507). This subsection (e.) was adapted from the rule originally published at 85 FR 26324, subsection III.2.b. (May 4, 2020).

[95] This subsection adds a new requirement that all PPP lenders must register in *SAM.gov. See* 2 CFR 25.110(c)(2)(iii).

[96] This subsection was originally published at 85 FR 20811, subsection III.3.b. (April 15, 2020) and has been modified to conform to additional rules or guidance and the Economic Aid Act.

sole proprietorship with no employees or had employees for whom the borrower paid salaries and payroll taxes on or around February 15, 2020;

c. Confirm the dollar amount of average monthly payroll costs for 2019 or 2020 by reviewing the payroll documentation submitted with the borrower's application;[97] and

d. Follow applicable BSA requirements:

i. Federally insured depository institutions and federally insured credit unions should continue to follow their existing BSA protocols when making PPP loans to either new or existing customers who are eligible borrowers under the PPP. PPP loans for existing customers will not require re-verification under applicable BSA requirements, unless otherwise indicated by the institution's risk-based approach to BSA compliance.

ii. Entities that are not presently subject to the requirements of the BSA, should, prior to engaging in PPP lending activities, including making PPP loans to either new or existing customers who are eligible borrowers under the PPP, establish an anti-money laundering (AML) compliance program equivalent to that of a comparable federally regulated institution. Depending upon the comparable federally regulated institution, such a program may include a customer identification program (CIP), which includes identifying and verifying their PPP borrowers' identities (including *e.g.,* date of birth, address, and taxpayer identification number), and, if that PPP borrower is a company, following any applicable beneficial ownership information collection requirements. Alternatively, if available, entities may rely on the CIP of a federally insured depository institution or federally insured credit union with an established CIP as part of its AML program. In either instance, entities should also understand the nature and purpose of their PPP customer relationships to develop customer risk profiles. Such entities will also generally have to identify and report certain suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN). If such entities have questions with regard to meeting these requirements, they should contact the FinCEN Regulatory Support Section at *FRC@fincen.gov.* In addition, FinCEN has created a COVID–19-specific contact channel, via a specific drop-down category, for entities to communicate to FinCEN COVID–19-related concerns while adhering to their BSA obligations. Entities that wish to communicate such COVID–19-related concerns to FinCEN should go to *www.FinCEN.gov,* click on ''Need Assistance,'' and select ''COVID19'' in the subject drop-down list.

Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the ''Paycheck Protection Borrower Application Form.'' Borrowers must submit such documentation as is necessary to establish eligibility such as payroll records, payroll tax filings, or Form 1099–MISC, Schedule C or F, income and expenses from a sole proprietorship, or bank records. For borrowers that do not have any such documentation, the borrower must provide other supporting documentation, such as bank records, sufficient to demonstrate the qualifying payroll amount.

A lender may rely on any certification or documentation submitted by an applicant for a PPP loan or an eligible recipient or eligible entity that (A) is submitted pursuant to all applicable statutory requirements, regulations, and guidance related to a PPP loan, including under paragraph 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)); and (B) attests that the applicant, eligible recipient, or eligible entity, as applicable, has accurately provided the certification or documentation to the lender in accordance with the statutory requirements, regulations, and guidance related to PPP loans. With respect to a lender that relies on such a certification or documentation related to a PPP loan, an enforcement action may not be taken against the lender, and the lender shall not be subject to any penalties relating to loan origination or forgiveness of the PPP loan, if—(A) the lender acts in good faith relating to loan origination or forgiveness of the PPP loan based on that reliance; and (B) all other relevant Federal, State, local, and other statutory and regulatory requirements applicable to the lender are satisfied with respect to the PPP loan.[98]

*4. Can lenders rely on borrower documentation for loan forgiveness?*[99]

Yes. The lender does not need to independently verify the borrower's reported information if the borrower submits documentation supporting its request for loan forgiveness and attests that it accurately verified the payments for eligible costs.

*5. What fees will lenders be paid?*[100]

For PPP loans made on or after December 27, 2020, SBA will pay lenders fees, based on the balance of the financing outstanding at the time of disbursement of the loan, for processing PPP loans in the following amounts:

i. For loans of not more than $50,000, an amount equal to the lesser of fifty (50) percent or $2,500;

ii. Five (5) percent for loans of more than $50,000 and not more than $350,000;

iii. Three (3) percent for loans of more than $350,000 and less than $2,000,000; and

iv. One (1) percent for loans of at least $2,000,000.

SBA will pay the fee not later than 5 days after the reported disbursement of the PPP loan and, as required by the Economic Aid Act, may not require the fee to be repaid by the lender unless the lender is found guilty of an act of fraud in connection with the PPP loan.

*6. Can PPP loans be sold into the secondary market?*[101]

Yes. A PPP loan may be sold on the secondary market after the loan is fully disbursed. A PPP loan may be sold on the secondary market at a premium or a discount to par value.

*7. Do the requirements for loan pledges under 13 CFR 120.434 apply to PPP loans pledged for borrowings from a Federal Reserve Bank (FRB) or advances by a Federal Home Loan Bank (FHLB)?*[102]

No. Pursuant to SBA regulations at 13 CFR 120.435(d) and (e), a pledge of 7(a) loans to a FRB or FHLB does not require SBA's prior written consent or notice to SBA. SBA, in consultation with Treasury, has determined that for purposes of loans made under the PPP, the additional requirements set forth in 120.434 shall also not apply. This would mean, for example, that SBA would not have to approve loan

[97] *See* PPP FAQ 1 (April 3, 2020) for further information on this step.

[98] This paragraph was added to conform to section 305 of the Economic Aid Act. This shall be effective as if included in the CARES Act and shall apply to any loan made before, on, or after December 27, 2020, including forgiveness of such a loan.

[99] This subsection was originally published at 85 FR 20811, subsection III.3.c. (April 15, 2020) and has been modified for readability. SBA also intends to issue a consolidated interim final rule governing all aspects of loan forgiveness and the loan review process.

[100] This subsection was originally published at 85 FR 20811, subsection III.3.d. (April 15, 2020) and has been modified to conform to section 340 of the Economic Aid Act.

[101] This subsection was originally published at 85 FR 20811, subsection III.4.d (April 15, 2020) and modified to reflect that advance purchases are not available.

[102] This subsection was originally published at 85 FR 21747, subsection III.3. (April 20, 2020).

documents or require a multi-party agreement among SBA, the lender, and others.

*8. Are lenders required to use a promissory note provided by SBA or may they use their own?* [103]

Lenders may use their own promissory note or an SBA form of promissory note.

*9. Are lenders required to use a separate SBA Authorization document to issue PPP loans?* [104]

No. A lender does not need a separate SBA Authorization for SBA to guarantee a PPP loan. However, lenders must have executed SBA Form 2484 (the Lender Application Form—Paycheck Protection Program Loan Guaranty) [105] to issue PPP loans and receive a loan number for each originated PPP loan. Lenders may include in their promissory notes for PPP loans any terms and conditions, including relating to amortization and disclosure, that are not inconsistent with section 1102 of the CARES Act and section 7A of the Small Business Act, the PPP Interim Final Rules and guidance, and SBA Form 2484. *See* FAQ 21 (posted April 13, 2020). The decision not to require a separate SBA Authorization in order to ensure that critical PPP loans are disbursed as efficiently as practicable.

*10. By when must a lender electronically submit an SBA Form 1502 indicating that PPP loan funds have been disbursed?* [106]

SBA has made available a specific SBA Form 1502 reporting process through which PPP lenders report on PPP loans and collect the processing fee on fully disbursed loans to which they are entitled. Lenders must electronically upload SBA Form 1502 information within 20 calendar days after a PPP loan is approved. The lender must report on SBA Form 1502 whether it has fully disbursed PPP loan proceeds. A lender will not receive a processing fee: (1) Prior to full disbursement of the PPP loan; (2) if the PPP loan is cancelled before disbursement; or (3) if the PPP loan is cancelled or voluntarily terminated and repaid after disbursement (including if a borrower repays the PPP loan proceeds to conform to the borrower's certification regarding the necessity of the PPP loan request). If the lender has received a processing fee on a loan that was cancelled or voluntarily terminated and repaid after disbursement (including if a borrower repaid the PPP loan proceeds to conform to the borrower's certification regarding the necessity of the PPP loan request), SBA will not require the lender to repay the processing fee unless the lender is found guilty of an act of fraud in connection with the PPP loan. In addition to providing ACH credit information to direct payment of the requested processing fee, lenders will be required to confirm that all PPP loans for which the lender is requesting a processing fee have been fully disbursed on the disbursement dates and in the loan amounts reported. A lender must report through either E-Tran Servicing or the SBA Form 1502 report any PPP loans that have been cancelled before disbursement or that have been cancelled or voluntarily terminated and repaid after disbursement.

*11. How do lenders report disbursements on PPP loans that are approved for loan increases due to the Economic Aid Act?* [107]

Lenders must submit the SBA Form 1502 information within 20 calendar days after a PPP loan increase is approved following the SBA Form 1502 reporting process. See subsection C.10. for more information.

**D. What do both borrowers and lenders need to know and do?**

*1. What are the loan terms and conditions?* [108]

Loans will be guaranteed under the PPP under the same terms, conditions and processes as other 7(a) loans, with certain changes including but not limited to:

a. The guarantee percentage is 100 percent.

b. No collateral will be required.

c. No personal guarantees will be required.

d. The interest rate will be 100 basis points or one percent, calculated on a non-compounding, non-adjustable basis.[109]

e. All loans will be processed by all lenders under delegated authority and lenders will be permitted to rely on certifications of the borrower in order to determine eligibility of the borrower and the use of loan proceeds.

*2. Do lenders have to apply the ''credit elsewhere test''?* [110]

No. When evaluating an applicant's eligibility lenders will not be required to apply the ''credit elsewhere test'' (as set forth in section 7(a)(1)(A) of the Small Business Act (15 U.S.C. 636) and SBA regulations at 13 CFR 120.101).

*3. Are there any fee waivers?* [111]

a. There will be no up-front guarantee fee payable to SBA by the borrower;

b. There will be no lender's annual service fee (''on-going guaranty fee'') payable to SBA;

c. There will be no subsidy recoupment fee; and

d. There will be no fee payable to SBA for any guarantee sold into the secondary market.

*4. Who pays the fee to an agent who provides assistance in connection with a PPP loan?* [112]

Agent fees may not be paid out of the proceeds of a PPP loan. If a borrower has knowingly retained an agent, such fees will be paid by the borrower. A lender is only responsible for paying fees to an agent for services for which the lender directly contracts with the agent. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:

a. One (1) percent for loans of not more than $350,000;

b. 0.50 percent for loans of more than $350,000 and less than $2 million; and

c. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application

---

[103] This subsection was originally published at 85 FR 23450, subsection III.1.a. (April 28, 2020).

[104] This subsection was originally published at 85 FR 23450, subsection III.1.b. (April 28, 2020) and has been modified to conform to the Economic Aid Act.

[105] This requirement is satisfied by a lender when the lender completes the process of submitting a loan through the E-Tran system; no transmission or retention of a physical copy of Form 2484 is required.

[106] This subsection was originally published at 85 FR 26321, subsection III.1.b. (May 4, 2020) and has been modified to conform to the Economic Aid Act and for readability.

[107] This subsection was added to conform to the Economic Aid Act.

[108] This subsection was originally published at 85 FR 20811, subsection III.4.a. (April 15, 2020) and modified to conform to the Economic Aid Act.

[109] This subsection (d) was revised to conform to section 339 of the Economic Aid Act. The revision applies to PPP loans made on or after December 27, 2020, but may apply with respect to a PPP loan made before that date upon the mutual agreement of the lender and the borrower.

[110] This subsection was originally published at 85 FR 20811, subsection III.3.e. (April 15, 2020).

[111] This subsection was originally published at 85 FR 20811, subsection III.4.a. (April 15, 2020).

[112] This subsection was originally published at 85 FR 20811, subsection III.4.c. (April 15, 2020) and modified to conform to section 340 of the Economic Aid Act. This revision is effective as if included in the CARES Act and applies to PPP loans made before, on, or after December 27, 2020, including forgiveness of such a loan.

requirements and the fees that lenders receive for making PPP loans.

*5. Can a borrower take multiple draws from a PPP loan and thereby delay the start of the covered period?* [113]

No. The lender must make a one-time, full disbursement of the PPP loan within ten calendar days of loan approval; for the purposes of this rule, a loan is considered approved when the loan is assigned a loan number by SBA.[114]

Notwithstanding this limitation, lenders are not responsible for delays in disbursement attributable to a borrower's failure to timely provide required loan documentation, including a signed promissory note. Loans for which funds have not been disbursed because a borrower has not submitted required loan documentation within 20 calendar days of loan approval shall be cancelled by the lender. When disbursing loans, lenders must send any amount of loan proceeds designated for the refinance of an EIDL loan directly to SBA and not to the borrower.

*6. If a partnership received a PPP loan that did not include any compensation for its partners, can the loan amount be increased to include partner compensation?* [115]

Yes. If a partnership received a PPP loan that only included amounts necessary for payroll costs of the partnership's employees and other eligible operating expenses, but did not include any amount for partner compensation,[116] the lender may electronically submit a request through SBA's E-Tran Servicing site to increase the PPP loan amount to include appropriate partner compensation, even if the loan has been fully disbursed and even if the lender's first SBA Form 1502 report to SBA on the PPP loan has already been submitted. In no event can the increased loan amount exceed the maximum loan amount allowed under the PPP Program, which is $10 million for an individual borrower or $20 million for a corporate group. Additionally, the borrower must provide the lender with required documentation to support the calculation of the increase. Any request for an increase must be submitted electronically in E-Tran on or before March 31, 2021, and is subject to the availability of funds.

As described in subsection B.1.c., partnerships, rather than individual partners, are eligible for a PPP loan. As described in subsection B.4.e., self-employment income of general active partners could be reported as a payroll cost, up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred, on a PPP loan application filed by or on behalf of the partnership. For guidance describing how to calculate partnership PPP loan amounts and defining the self-employment income of partners, *see* How to Calculate Maximum Loan Amounts, Question 4 at *https://www.sba.gov/sites/default/files/2020-04/How-to-Calculate-Loan-Amounts.pdf* (April 20, 2020).

*7. If a seasonal employer received a PPP loan before December 27, 2020, can the loan amount be increased based on a revised calculation of the maximum loan amount?* [117]

Yes. If a seasonal employer received a PPP loan before December 27, 2020, and such employer would be eligible for a higher maximum loan amount under section 336 of the Economic Aid Act, as described in subsection B.4.c., the lender may electronically submit a request through SBA's E-Tran Servicing site to increase the PPP loan amount, even if the loan has been fully disbursed and even if the lender's first SBA Form 1502 report to SBA on the PPP loan has already been submitted. In no event can the increased loan amount exceed the maximum PPP loan amount ($10 million for an individual borrower or $20 million for a corporate group). Additionally, the borrower must provide the lender with required documentation to support the calculation of the increase. Any request for an increase must be submitted electronically in E-Tran on or before March 31, 2021, and is subject to the availability of funds.

*8. Which other PPP borrowers can reapply or request an increase in their PPP loan amount?* [118]

The following borrowers can reapply or request an increase in their PPP loan amount:

a. If a borrower returned all of a PPP loan, the borrower may reapply for a PPP loan in an amount the borrower is eligible for under current PPP rules.

b. If a borrower returned part of a PPP loan, the borrower may reapply for an amount equal to the difference between the amount retained and the amount previously approved.

c. If a borrower did not accept the full amount of a PPP loan for which it was approved, the borrower may request an increase in the amount of the PPP loan up to the amount previously approved.

Any request for an increase must be submitted electronically in E-Tran on or before March 31, 2021, and is subject to the availability of funds. SBA will issue additional guidance on the process to reapply or request a loan increase under subsections D.6, D.7, and D.8.

*9. If a borrower's PPP loan has already been fully disbursed, can the lender make an additional disbursement for the increased loan proceeds?* [119]

Yes. Notwithstanding the requirement set forth in paragraph 1.a. of the interim final rule on disbursements posted on April 28, 2020, *i.e.,* that lenders make a one-time, full disbursement of the PPP loan within ten calendar days of loan approval, if a PPP loan is increased under subsections D.6., D.7., or D.8., the lender may make a single additional disbursement of the increased loan proceeds.

*10. Are recipients of PPP loans entitled to exemptions on the grounds provided in Federal nondiscrimination laws for sex-specific admissions practices, sex-specific domestic violence shelters, coreligionist housing, or Indian tribal preferences in connection with adoption or foster care practices?* [120]

Yes. With respect to any loan or loan forgiveness under the PPP, the nondiscrimination provisions in the applicable SBA regulations incorporate the limitations and exemptions provided in corresponding Federal statutory or regulatory

[113] This subsection was originally published at 85 FR 26321, subsection III.1.a. (May 4, 2020), as amended by 85 FR 26321 (June 19, 2020), and has been modified for readability.

[114] If the tenth calendar day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next business day.

[115] This subsection was originally published at 85 FR 29842, subsection III.1.a. (May 19, 2020) and has been revised to conform to sections 312 and 344 of the Economic Aid Act.

[116] A partner in a partnership may not submit a separate PPP loan application as a self-employed individual. Instead, the self-employment income of general active partners may be reported as a payroll cost, up to $100,000 on an annualized basis, as prorated for the period during which the payments are made or the obligation to make the payments is incurred, on a PPP loan application filed by or on behalf of the partnership.

[117] This subsection was originally published at 85 FR 29842, subsection III.1.b. (May 19, 2020) and has been revised to conform to sections 312 and 336 of the Economic Aid Act.

[118] This subsection was added to conform to section 312 of the Economic Aid Act. *See also* recalculation available under subsection B.4.d. above for farmers and ranchers.

[119] This subsection was originally published at 85 FR 29842, subsection III.2.a. (May 19, 2020) and revised to conform to section 312 of the Economic Aid Act.

[120] This subsection was originally published at 85 FR 27287, section III.1. (May 8, 2020).

nondiscrimination provisions for sex-specific admissions practices at preschools, non-vocational elementary or secondary schools, and private undergraduate higher education institutions under Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), for sex-specific emergency shelters and coreligionist housing under the Fair Housing Act of 1968 (42 U.S.C. 3601 *et seq.*), and for adoption or foster care practices giving child placement preferences to Indian tribes under the Indian Child Welfare Act of 1978 (25 U.S.C. 1901 *et seq.*).

In addition, for purposes of the PPP, SBA regulations do not bar a religious nonprofit entity from making decisions with respect to the membership or the employment of individuals of a particular religion to perform work connected with the carrying on by such nonprofit of its activities.

**E. Additional Information**

All loans guaranteed by the SBA pursuant to the CARES Act and the Economic Aid Act will be made consistent with constitutional, statutory, and regulatory protections for religious liberty, including the First Amendment to the Constitution, the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 and bb–3, and SBA regulation at 13 CFR 113.3–1h, which provides that nothing in SBA nondiscrimination regulations shall apply to a religious corporation, association, educational institution or society with respect to the membership or the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its religious activities.

SBA may provide further guidance, if needed, through SBA notices and a program guide which will be posted on SBA's website at *www.sba.gov.*

Questions on the Paycheck Protection Program 7(a) Loans may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**Compliance With Executive Orders 12866, 12988, 13132, 13563, and 13771, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612)**

*Executive Orders 12866, 13563, and 13771*

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563, and the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) has determined that this is a major rule under the Congressional Review Act (5 U.S.C. 804(2)). SBA, however, is proceeding under the emergency provision at Executive Order 12866 section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency. This rule's designation under Executive Order 13771 will be informed by public comment.

This rule is necessary to implement the Economic Aid Act in order to provide economic relief to small businesses nationwide adversely impacted under the COVID–19 Emergency Declaration. We anticipate that this rule will result in substantial benefits to small businesses, their employees, and the communities they serve. However, we lack data to estimate the effects of this rule.

The Administrator of OIRA has determined that this is a major rule for purposes of the Congressional Review Act (5 U.S.C. 801 *et seq.*) (CRA). Under section 801(3) of the CRA, a major rule takes effect 60 days after the rule is published in the **Federal Register**.

Notwithstanding this requirement, section 808(2) of the CRA allows agencies to dispense with the requirements of section 801 when the agency for good cause finds that such procedure would be impracticable, unnecessary, or contrary to the public interest and the rule shall take effect at such time as the agency promulgating the rule determines. Pursuant to section 808(2) of the CRA, SBA finds, for good cause, that a 60-day delay in the effective date is unnecessary and contrary to the public interest.

As discussed elsewhere in this interim final rule, the last day to apply for and receive a PPP loan is March 31, 2021. Given the short duration of this program, and the urgent need to issue loans quickly, the Administrator in consultation with the Secretary has determined that it is impractical and not in the public interest to provide a delayed effective date. An immediate effective date will give small businesses the maximum amount of time to apply for loans and lenders the maximum amount of time to process applications before the program ends.

*Executive Order 12988*

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive effect but does have some retroactive effect consistent with specific applicability provisions of the Economic Aid Act (such provisions are identified in the footnotes).

*Executive Order 13132*

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

*Paperwork Reduction Act, 44 U.S.C. Chapter 35*

SBA has determined that this rule requires revisions to existing recordkeeping or reporting requirements of the Paycheck Protection Program (PPP) information collection (OMB Control Number 3245–0407) as a result of amendments made to the PPP by the Economic Aid Act and implemented in this interim final rule. The revisions will affect the PPP Borrower Application Form (SBA Form 2483), the PPP Lender Application Form (SBA Form 2484), the Lender Application Form for Federally Insured Depository Institutions, Federally Insured Credit Unions, and Farm Credit System Institutions (SBA Form 3506), and the Lender Application Form for Non-Bank and Non-Insured Depository Institution Lenders (SBA Form 3507).

SBA Form 2483 has been revised to add housing cooperatives, section 501(c)(6) organizations, destination marketing organizations, and certain news organizations to the categories of eligible entities; to collect the NAICS code of the applicant; to add additional eligible use of proceeds; and to add or revise the certifications to incorporate the Economic Aid Act amendments. Changes were made to SBA Form 2484 to conform to the changes made to SBA Form 2483. SBA Forms 3506 and 3507 were revised to extend the term through March 31, 2021; restate the way interest rate is calculated; and make clarifying changes for consistency with program requirements.

SBA is developing a process to collect the information necessary for eligible borrowers to reapply or request an increase in their PPP loan amount as described in this interim final rule.

SBA has requested emergency approval of the revisions to this PPP information collection to enable the Agency to resume the reauthorized PPP as quickly as possible. Without such emergency approval, the authority for

the program would expire before the procedural steps, including the comment periods generally required by the Paperwork Reduction Act, could be completed.

*Regulatory Flexibility Act (RFA)*

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the APA or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604. Specifically, the RFA normally requires agencies to describe the impact of a rulemaking on small entities by providing a regulatory impact analysis. Such analysis must address the consideration of regulatory options that would lessen the economic effect of the rule on small entities. The RFA defines a ''small entity'' as (1) a proprietary firm meeting the size standards of the Small Business Administration (SBA); (2) a nonprofit organization that is not dominant in its field; or (3) a small government jurisdiction with a population of less than 50,000. 5 U.S.C. 601(3)–(6). Except for small government jurisdictions with a population of less than 50,000, neither State nor local governments are ''small entities.''

The requirement to conduct a regulatory impact analysis does not apply if the head of the agency ''certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities.'' 5 U.S.C. 605(b). The agency must, however, publish the certification in the **Federal Register** at the time of publication of the rule, ''along with a statement providing the factual basis for such certification.'' If the agency head has not waived the requirements for a regulatory flexibility analysis in accordance with the RFA's waiver provision, and no other RFA exception applies, the agency must prepare the regulatory flexibility analysis and publish it in the **Federal Register** at the time of promulgation or, if the rule is promulgated in response to an emergency that makes timely compliance impracticable, within 180 days of publication of the final rule. 5 U.S.C. 604(a), 608(b).

Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. Small Business Administration's Office of Advocacy guide: *How to Comply with the Regulatory Flexibility Ac. Ch.1. p.9.* Since this rule is exempt from notice and comment, SBA is not required to conduct a regulatory flexibility analysis.

**Authority:** 15 U.S.C. 636(a)(36); Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, section 1114 and Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116–260), section 303.

**Jovita Carranza, Michael Faulkender,**

*Assistant Secretary for Economic Policy.*

[FR Doc. 2021–00451 Filed 1–12–21; 4:15 pm]

BILLING CODE 8026–03–P

---

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Parts 120 and 121

[Docket No. SBA–2021–0002]

RIN 3245–AH63

## Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** This interim final rule announces the implementation of section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Economic Aid Act). The Economic Aid Act authorizes the U.S. Small Business Administration to guarantee additional loans under the temporary Paycheck Protection Program, which was originally established under the Coronavirus Aid, Relief, and Economic Security Act to provide economic relief to small businesses nationwide adversely impacted under the Coronavirus Disease 2019 (COVID–19) Emergency Declaration (COVID–19 Emergency Declaration) issued by President Trump on March 13, 2020. Section 311 of the Economic Aid Act adds a second temporary program to SBA's 7(a) Loan Program titled, ''Paycheck Protection Program Second Draw Loans.'' This interim final rule implements the key provisions of section 311 of the Economic Aid Act and requests public comment.

**DATES:**

*Effective Date:* This interim final rule is effective January 12, 2021.

*Applicability Date:* This interim final rule applies to loan applications and applications for loan forgiveness submitted for Paycheck Protection Program Second Draw Loans.

*Comment Date:* Comments must be received on or before February 16, 2021.

**ADDRESSES:** You may submit comments, identified by number SBA–2021–0002 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.* All other comments must be submitted through the Federal eRulemaking Portal described above. Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**SUPPLEMENTARY INFORMATION:**

### I. Background Information

On December 27, 2020, President Trump signed the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (the Economic Aid Act) (Pub. L. 116–260) into law to provide continued assistance to individuals and businesses that have been financially impacted by the ongoing coronavirus pandemic. Section 311 of the Economic Aid Act added a new temporary section 7(a)(37) to the Small Business Act (15 U.S.C. 636(a)(37)). This new section authorizes the U.S. Small Business Administration (SBA or the Administration) to guarantee Paycheck Protection Program Second Draw Loans (PPP Second Draw Program), under generally the same terms and conditions available under the Paycheck Protection Program (PPP) established under section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)). Under section 311, SBA may guarantee loans under the PPP Second Draw Program through March 31, 2021 (''Second Draw PPP Loans'') to borrowers that previously received a PPP loan under section 7(a)(36) of the Small Business Act (''First Draw PPP Loans'') and have used or will use the full amount of the initial PPP loan for authorized purposes on or before the expected date of disbursement of the Second Draw PPP Loan.

Like First Draw PPP Loans, Second Draw PPP Loans are intended to provide expeditious relief to America's small

subsequent rulemaking. We may also engage in a rulemaking that implements section 5.61C(h) of the Act, which governs the chartering, termination, and dissolution of System bridge banks that enable FCSIC to handle the resolution of one or more distressed FCS institutions.

## IV. Direct Final Rule

For the reasons discussed above, we are rescinding the above-referenced sections of part 627 subparts B (Receivers and Receiverships) and C (Conservators and Conservatorships) by direct final rulemaking. The Administrative Conference of the United States recommends direct final rulemakings for Federal agencies to enact noncontroversial regulations on an expedited basis, without the usual notice and comment period.[5] This process enables us to reduce the time and resources we need to develop, review, and publish a final rule while still affording the public an adequate opportunity to comment or object to the rule.

In a direct final rulemaking, we notify the public that the rule will become effective on a specified date unless we receive a significant adverse comment during the comment period. A significant adverse comment is one where the commenter explains why the rule would be inappropriate (including challenges to its underlying premise or approach), ineffective, or unacceptable without a change. In general, a significant adverse comment would raise an issue serious enough to warrant a substantive response from the FCA in a notice-and-comment proceeding.

We believe that a direct final rulemaking is the appropriate method for rescinding above-referenced sections in subparts B and C of part 627 that are superseded by the 2018 Farm Bill. We do not anticipate there will be significant adverse comments because this direct final rule implements recent statutory amendments governing FCSIC's numerous powers and duties as the conservator or receiver of System institutions. If, however, we receive a significant adverse comment during the comment period, we will publish in the **Federal Register** a notice of withdrawal of the relevant provisions of this rule that will also indicate how the agency plans to proceed. If we receive no significant adverse comments, we will publish notice of the effective date of the rule following the required congressional waiting period under section 5.17(c)(1) of the Act.

[5] Recommendation 95–4, referencing the Administrative Procedure Act ''good cause'' exemption at 5 U.S.C. 553(b)(B), adopted June 15, 1995.

## V. Regulatory Flexibility Act Analysis and Major Rule Conclusion

Pursuant to section 605(b) of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*), FCA hereby certifies that the direct final rule would not have a significant economic impact on a substantial number of small entities. Each of the banks in the Farm Credit System, considered together with its affiliated associations, has assets and annual income in excess of the amounts that would qualify them as small entities. Therefore, Farm Credit System institutions are not ''small entities'' as defined in the Regulatory Flexibility Act.

Under the provisions of the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Management and Budget's Office of Information and Regulatory Affairs has determined that this direct final rule is not a ''major rule,'' as the term is defined at 5 U.S.C. 804(2).

### List of Subjects in 12 CFR Part 627

Agriculture, Banks, Banking, Claims, Rural areas.

For the reasons stated in the preamble, part 627 of chapter VI, title 12 of the Code of Federal Regulations are amended as follows:

## PART 627— TITLE IV CONSERVATORS, RECEIVERS, AND VOLUNTARY LIQUIDATIONS

■ 1. The authority citation for part 627 continues to read as follows:

**Authority:** Secs. 4.2, 5.9, 5.10, 5.17, 5.51, 5.58, 5.61 of the Farm Credit Act (12 U.S.C. 2183, 2243, 2244, 2252, 2277a, 2277a–7, 2277a–10).

**§§ 627.2725, 627.2726, 627.2730, 627.2740, 627.2745, 627.2750, 627.2752, 627.2755, 627.2760, and 627.2780 [Removed and Reserved]**

■ 2. Sections 627.2725, 627.2726, 627.2730, 627.2740, 627.2745, 627.2750, 627.2752, 627.2755, 627.2760, and 627.2780 are removed and reserved.

Dated: March 17, 2021.

**Dale Aultman,**

*Secretary, Farm Credit Administration Board.*

[FR Doc. 2021–05860 Filed 3–19–21; 8:45 am]

BILLING CODE 6705–01–P

## SMALL BUSINESS ADMINISTRATION

### 13 CFR Parts 120 and 121

**[Docket Number SBA–2021–0013]**

**RIN 3245–AH77**

## Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by American Rescue Plan Act

**AGENCY:** U.S. Small Business Administration.

**ACTION:** Interim final rule.

**SUMMARY:** This interim final rule implements changes related to loans made under the Paycheck Protection Program (PPP), which was originally established under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) to provide economic relief to small businesses nationwide adversely impacted by the Coronavirus Disease 2019 (COVID–19). On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Economic Aid Act) was enacted, extending the authority to make PPP loans through March 31, 2021, revising certain PPP requirements, and permitting second draw PPP loans. On January 14, 2021, SBA published an interim final rule that incorporated the Economic Aid Act amendments to the PPP and consolidated the interim final rules (and important guidance) that had been issued governing borrower eligibility, lender eligibility, and PPP application and origination requirements for PPP loans. On March 11, 2021, the American Rescue Plan Act of 2021 (American Rescue Plan Act) was enacted expanding eligibility for first and second draw PPP loans, revising the exclusions from payroll costs for purposes of loan forgiveness, and providing that a PPP borrower that receives a PPP loan after December 27, 2020 can be approved for a Shuttered Venue Operator Grant under certain conditions. This interim final rule revises the PPP rules to incorporate the American Rescue Plan Act's amendments to the PPP. Additionally, this interim final rule clarifies the eligibility for first draw PPP loans for applicants that are assigned a North American Industry Classification System (NAICS) code beginning with 72 and have more than one physical location and clarifies certain payroll cost exclusions included in the Economic Aid Act.

**DATES:**

*Effective date:* The provisions of this interim final rule are effective March 18, 2021.

*Applicability date:* The provisions of this interim final rule incorporating the American Rescue Plan Act changes to the PPP apply to PPP loans approved, and loan forgiveness applications submitted, on or after March 11, 2021.

*Comment date:* Comments must be received on or before April 21, 2021.

**ADDRESSES:** You may submit comments, identified by number SBA–2021–0013 through the Federal eRulemaking Portal: *http://www.regulations.gov.* Follow the instructions for submitting comments.

SBA will post all comments on *www.regulations.gov.* If you wish to submit confidential business information (CBI) as defined in the User Notice at *www.regulations.gov,* please send an email to *ppp-ifr@sba.gov.* All other comments must be submitted through the Federal eRulemaking Portal described above. Highlight the information that you consider to be CBI and explain why you believe SBA should hold this information as confidential. SBA will review the information and make the final determination whether it will publish the information.

**FOR FURTHER INFORMATION CONTACT:** A Call Center Representative at 833–572–0502, or the local SBA Field Office; the list of offices can be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

**SUPPLEMENTARY INFORMATION:**

## I. Background Information

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) (Pub. L. 116–136) was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the coronavirus disease 2019 (COVID–19) pandemic. Section 1102 of the CARES Act temporarily permitted the Small Business Administration (SBA) to guarantee 100 percent of 7(a) loans under a new program titled the ''Paycheck Protection Program,'' pursuant to section 7(a)(36) of the Small Business Act (15 U.S.C. 636(a)(36)) (First Draw PPP Loans). Section 1106 of the CARES Act provided for forgiveness of up to the full principal amount of qualifying loans guaranteed under the Paycheck Protection Program (PPP).

On December 27, 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act (Economic Aid Act) (Pub. L. 116–260) was enacted. The Economic Aid Act reauthorized lending under the PPP through March 31, 2021. The Economic Aid Act added a new temporary section 7(a)(37) to the Small Business Act, which authorizes SBA to guarantee additional PPP loans (Second Draw PPP Loans) to eligible borrowers under generally the same terms and conditions available under section 7(a)(36) of the Small Business Act through March 31, 2021. The Economic Aid Act also redesignated section 1106 of the CARES Act as section 7A of the Small Business Act, to appear after section 7 of the Small Business Act.

SBA initially published an interim final rule implementing the PPP on April 15, 2020 and subsequently issued additional interim final rules. On January 14, 2021, SBA published interim final rules implementing the Economic Aid Act amendments to the PPP.[1] On February 5, 2021, SBA published an additional interim final rule implementing Economic Aid Act changes related to the forgiveness and review of PPP loans.[2] Following the publication of the interim final rules implementing the Economic Aid Act, SBA published another interim final rule revising certain loan amount calculation and eligibility provisions of those rules.[3] As described below, this interim final rule further revises the consolidated interim final rule implementing updates to the PPP, the interim final rule on second draw PPP loans, and the consolidated interim final rule on loan forgiveness requirements and loan review procedures, by incorporating the expanded eligibility for First Draw and Second Draw PPP Loans and the exclusions from payroll costs that may be forgiven enacted in the American Rescue Plan Act (Pub. L. 117–2); confirming that First Draw PPP Loan applicants that are assigned a NAICS code beginning with 72 and that employ no more than 500 employees per physical location are eligible; and clarifying certain forgiveness payroll cost exclusions in the Economic Aid Act.

## II. Comments and Immediate Effective Date

This interim final rule is being issued without advance notice and public comment because section 1114 of the CARES Act and section 303 of the Economic Aid Act authorize SBA to issue regulations to implement the Paycheck Protection Program without regard to notice requirements. In addition, this rule is being issued to allow for immediate implementation of these changes. The intent of the CARES Act, the Economic Aid Act, and the American Rescue Plan Act is that SBA provide relief to America's small businesses and nonprofit organizations expeditiously. Given the urgent need to provide borrowers with timely relief and the short period of time before the program ends on March 31, 2021, SBA has determined that it is impractical and not in the public interest to provide a 30-day delayed effective date. An immediate effective date will allow SBA to give small businesses and nonprofit organizations affected by this interim final rule the maximum amount of time to apply for loans and lenders the maximum amount of time to process applications before the program ends. This good cause justification also supports waiver of the 60-day delayed effective date for major rules under the Congressional Review Act at 5 U.S.C. 808(2). Although this interim final rule is effective immediately, comments are solicited from interested members of the public on all aspects of the interim final rule.

These comments must be submitted on or before April 21, 2021. SBA will consider these comments and the need for making any revisions as a result of these comments.

## III. Paycheck Protection Program as Amended by the American Rescue Plan Act

### *1. Eligibility, Size, Affiliation Waivers, and Certifications*

Part III.B.1. of the consolidated interim final rule implementing updates to the PPP identifies the businesses, organizations, and individuals that are eligible for First Draw PPP Loans, including the applicable size standards. Part III.B.3. of that rule sets forth the affiliation rules generally applicable to PPP loans, including the affiliation waivers available to certain businesses and organizations. The American Rescue Plan Act expands eligibility to additional businesses and organizations and revises size standards and adds affiliation waivers for certain eligible businesses and organizations.

The American Rescue Plan Act also revises section 324 of the Economic Aid Act to provide that businesses that receive a PPP loan after December 27, 2020 are no longer ineligible for a Shuttered Venue Operator (SVO) Grant under certain conditions. Specifically, if a PPP borrower receives a First Draw or Second Draw PPP Loan after December 27, 2020, the amount of any subsequently-approved SVO grant will

[1] 86 FR 3692 (Jan. 14, 2021) (which we refer to as the ''consolidated interim final rule implementing updates to the PPP''); 86 FR 3712 (Jan. 14, 2021) (which we refer to as the ''interim final rule on second draw PPP loans'').

[2] 86 FR 8283 (Feb. 5, 2021) (which we refer to as the ''consolidated interim final rule on loan forgiveness requirements and loan review procedures'').

[3] 86 FR 13149 (March 8, 2021).

be reduced by the amount of the First Draw or Second Draw PPP Loan. (If a PPP borrower receives both a First Draw and a Second Draw PPP Loan after December 27, 2020, the amount of any subsequently-approved SVO grant will be reduced by the combined amount of both PPP loans.) However, because sections 7(a)(36)(U) and 7(a)(37)(A)(iv)(III)(ee) of the Small Business Act were not amended by the American Rescue Plan Act, if a PPP applicant is approved for an SVO grant before SBA issues a loan number for the PPP loan, the applicant is ineligible for the PPP loan and acceptance of any PPP loan proceeds will be considered an unauthorized use.

In addition, SBA is making a clarifying change to the list of eligible entities for First Draw PPP Loans by adding businesses with a NAICS code beginning with 72 that employ no more than 500 employees per physical location. These entities are included in section 7(a)(36)(D)(iii) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iii)), as amended by the CARES Act, and are addressed in section B.3. of the consolidated interim final rule implementing updates to the PPP. Because the omission of these entities from the list of eligible entities could cause borrower confusion, SBA is revising subsection B.1.a. to add these entities.

Therefore, Part III.B.1.a. (86 FR 3692, 3695) of the consolidated interim final rule implementing updates to the PPP is revised to read as follows:

*1. What businesses, organizations, and individuals are eligible?*

*a. Am I eligible?* [2] [3]

You are eligible for a PPP loan if:

i. You, together with any affiliates (if applicable),[4] are:

- A small business concern under the applicable revenue-based size standard established by SBA in 13 CFR 121.201 for your industry or under the SBA alternative size standard; [5]
- an independent contractor, eligible self-employed individual, or sole proprietor;
- a business concern, a tax-exempt nonprofit organization described in section 501(c)(3) of the Internal Revenue Code (IRC), a tax-exempt veterans organization described in section 501(c)(19) of the IRC, a Tribal business concern described in section 31(b)(2)(C) of the Small Business Act, and you employ no more than the greater of 500 employees or, if applicable, the size standard in number of employees established by SBA in 13 CFR 121.201;
- a housing cooperative that employs no more than 300 employees and meets the criteria described in subsection B.1.g.v. of the consolidated interim final rule implementing updates to the PPP, as amended by this interim final rule;
- a business concern that is assigned a North American Industry Classification System (NAICS) code beginning with 72 that employs no more than 500 employees per physical location;
- an eligible section 501(c)(6) organization or an eligible destination marketing organization,[6] that employs no more than 300 employees per physical location;
- a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS 511110 or 5151, that employs no more than 500 employees (or, if applicable, the size standard in number of employees established by SBA in 13 CFR 121.201 for your industry) per location;
- a tax-exempt non-profit organization described in section 501(c)(3) of the Internal Revenue Code that employs not more than 500 employees per physical location of the organization;
- a tax-exempt nonprofit organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19) that employs not more than 300 employees per physical location and meets the criteria described in subsection B.1.g.iii. of the consolidated interim final rule implementing updates to the PPP, as amended by this interim final rule;
- a business concern or other organization that is assigned a NAICS code of 519130, certifies in good faith as an internet-only news publisher or internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information, that employs not more than 500 employees (or the size standard in number of employees established by SBA in 13 CFR 121.201 for NAICS code 519130) per physical location, and meets the criteria described in subsection B.1.g.iv. of the consolidated interim final rule implementing updates to the PPP, as amended by this interim final rule*;* or
- another type of entity specifically provided for by PPP rules (as described below); and

ii. you were in operation on February 15, 2020, and either had employees for whom you paid salaries and payroll taxes or paid independent contractors, as reported on a Form 1099–MISC or you were an eligible self-employed individual, independent contractor, or sole proprietorship with no employees.

You must submit documentation sufficient to establish eligibility and to demonstrate the qualifying payroll amount, which may include, as applicable, payroll records, payroll tax filings, Form 1099–MISC, Schedule C or F, income and expenses from a sole proprietorship, or bank records.

* * * * *

The American Rescue Plan Act expands eligibility for PPP loans to tax-exempt organizations described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, except for section 501(c)(4). Thus, subsections III.B.1.g.iii. and iv. of the consolidated interim final rule implementing updates to the PPP, which describe the eligibility of electric cooperatives and telephone cooperatives that are exempt from Federal income taxation under section 501(c)(12) of the Internal Revenue Code, are no longer necessary. For PPP loans made after the effective date of this interim final rule, such organizations will be eligible as set forth in a new subsection for tax-exempt organizations under any paragraph of section 501(c) of the Internal Revenue Code (other than paragraph (3), (4), (6), or (19)) discussed immediately below. With the new statutory change, the size eligibility requirements for electric and telephone cooperatives have changed as well. Previously, these entities were eligible if they had no more than 500 employees, met the employee-based SBA size standard for their industry (if higher), or met SBA's alternative size standard. For PPP loans made after the effective date of this interim final rule, these entities are eligible if they have no more than 300 employees per physical location, and these entities are no longer permitted to use the employee-based SBA size standard for their industry or SBA's alternative size standard to determine size.

Therefore, Part III.B.1.g. of the consolidated interim final rule implementing updates to the PPP (86 FR 3692, 3696–3697) is revised by replacing subsections B.1.g.iii. and iv. of the industry-specific eligibility issues with two new subsections to read as follows:

*g. Industry-Specific Eligibility Issues*

* * * * *

*iii. Are tax-exempt nonprofit organizations described in any paragraph of section 501(c)*

[2] *See* interim final rule on Second Draw PPP Loans for eligibility criteria for Second Draw PPP Loans, which was published separately. 86 FR 3712 (January 14, 2021).

[3] This subsection was originally published at 85 FR 20811, subsection III.2.a. (April 15, 2020), as amended by 85 FR 36308 (June 16, 2020), 85 FR 36717 (June 18, 2020), and 85 FR 38301 (June 26, 2020), and has been modified to reflect subsequent rules or guidance, the Economic Aid Act, and the American Rescue Plan Act.

[4] *See* subsection B.3 of the consolidated interim final rule implementing updates to the PPP regarding the applicability of affiliation rules at 13 CFR 121.103 and 121.301 to PPP loans.

[5] Under SBA's alternative size standard, a business concern may qualify as a small business concern if it, together with any affiliates: (1) Has a maximum tangible net worth of not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of application is not more than $5 million.

[6] See subsections B.1.g.vii. and B.1.g.viii for additional information on the eligibility of section 501(c)(6) organizations, and destination marketing organizations. As amended by the American Rescue Plan Act, the applicable size standard for section 501(c)(6) organizations and destination marketing organizations is not more than 300 employees *per physical location.*

*of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19), eligible for PPP loans?* [17]

Yes. An organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19) and exempt from tax under section 501(a) of such Code, is eligible for a PPP loan if: (1) The organization does not receive more than 15 percent of its receipts from lobbying activities; (2) the lobbying activities of the organization do not comprise more than 15 percent of the total activities of the organization; (3) the cost of the lobbying activities of the organization did not exceed $1,000,000 during the most recent tax year of the organization that ended prior to February 15, 2020; and (4) the organization employs not more than 300 employees.[18] However, this does not include any organization that, if the organization were a business concern, would be described in 13 CFR 120.110 (or any successor regulation or other related guidance or rule that may be issued by SBA) other than a business concern described in paragraph (a) or (k) of such section. Tax-exempt organizations described in section 501(c)(3), 501(c)(6) and 501(c)(19) of the Internal Revenue Code of 1986 have separate eligibility requirements described elsewhere in this rule. Tax-exempt organizations described in section 501(c)(4) of the Internal Revenue Code of 1986 are ineligible for a PPP loan.

*iv. Are internet publishing organizations eligible for PPP loans?* [19]

Yes. A business concern or other organization that was not eligible to receive a PPP loan before March 11, 2021, is eligible for a PPP loan if it: (1) Is assigned a NAICS code of 519130; (2) certifies in good faith that it is an internet-only news publisher or internet-only periodical publisher; (3) is engaged in the collection and distribution of local or regional and national news and information; (4) employs not more than 500 employees (or the size standard in number of employees established by SBA in 13 CFR 121.201 for NAICS code 519130) per physical location; and (5) certifies in good faith that proceeds of the loan will be used to support expenses at the component of the business concern or organization that supports local or regional news.[20]

* * * * *

To implement the American Rescue Plan Act provision that allows businesses to receive both a Shuttered Venue Operator (SVO) Grant and a PPP loan under certain conditions, Part III.B.2.a.vi. of the consolidated interim final rule implementing updates to the PPP (86 FR 3692, 3698) is revised to read as follows:

*2. What businesses, organizations, and individuals are ineligible?*

*a. Could I be ineligible even if I meet the eligibility requirements in section 1?* [28]

You are ineligible for a PPP loan if, for example:

* * * * *

vi. You or your business have been approved for a grant under the Shuttered Venue Operator (SVO) Grant Program under section 324 of the Economic Aid Act. (If you receive a PPP loan after December 27, 2020 and you are subsequently approved for an SVO grant, the amount of the SVO grant received will be reduced by the amount of a First Draw or Second Draw PPP Loan. If you receive both a First Draw and Second Draw PPP Loan after December 27, 2020 and you are subsequently approved for an SVO grant, the SVO grant will be reduced by the combined amounts of both PPP loans. A PPP loan received before December 27, 2020 will not reduce the amount of the SVO grant.) [30]

As noted above, the American Rescue Plan Act added affiliation waivers for certain eligible organizations with respect to PPP loans. To implement the additional affiliation waiver applicable to eligible internet publishing organizations, the parenthetical at the end of Part III.B.2.a.viii. of the consolidated interim final rule implementing updates to the PPP (86 FR 3692, 3698) is revised to include a reference to B.1.g.iv, which describes the conditions under which such internet publishing companies are eligible. Therefore, Part III.B.2.a.viii of the consolidated interim final rule implementing updates to the PPP, as amended by this interim final rule, is revised to read as follows:

* * * * *

viii. Your business is an issuer, the securities of which are listed on an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f) [32] (SBA will not consider whether a news organization that is eligible under the conditions described in subsection 1.f. and 1.g.vi. or an internet publishing organization that is eligible under the conditions described in subsection 1.g.iv. is affiliated with an entity, which includes any entity that owns or controls such news organization or internet publishing organization, that is an issuer [33]);

* * * * *

Also, Part III.B.12.vi. of the consolidated interim final rule implementing updates to the PPP (86 FR 3692, 3706) is revised to read as follows:

*12. What certifications need to be made?*

On the PPP borrower application, an authorized representative of the applicant must certify in good faith to all of the below:

* * * * *

vi. The Applicant has not been approved for a Shuttered Venue Operator (SVO) grant from SBA as of the date of this loan application, and the Applicant acknowledges that if the Applicant is approved for an SVO grant before SBA issues a loan number for this loan, the Applicant is ineligible for the loan and acceptance of any loan proceeds will be considered an unauthorized use.

Part III.B.3. of the consolidated interim final rule implementing updates to the PPP describes the affiliation rules generally applicable to PPP loans (86 FR 3692, 3698–3699). The American Rescue Plan Act adds affiliation waivers for certain businesses and organizations. Therefore, footnote 40 in part III.B.3.a. is revised to read as follows:

Paragraph 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv)), as added by the CARES Act and amended by the Economic Aid Act and the American Rescue Plan Act, waives the affiliation rules contained in § 121.103 for (1) any business concern with not more than 500 employees that, as of the date on which the loan is disbursed, is assigned a North American Industry Classification System code beginning with 72; (2) any business concern operating as a franchise that is assigned a franchise identifier code by the Administration; (3) any business concern that receives financial assistance from a company

[17] This subsection was originally published at 85 FR 29847, subsection III.1. (May 19, 2020) and has been revised to conform to the American Rescue Plan Act. Section 7(a)(36)(D)(ix) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(ix)) as amended by the American Rescue Plan Act adds ‘‘additional covered nonprofit entities’’ to the eligible entities for First Draw PPP Loans. The term ‘‘additional covered nonprofit entities’’ is defined in section 7(a)(36)(A)(xvii) as ‘‘an organization described in any paragraph of section 501(c) of the Internal Revenue Code of 1986, other than paragraph (3), (4), (6), or (19), and exempt from tax under section 501(a) of such Code; and does not include any entity that, if the entity were a business concern, would be described in section 120.110 of title 13, Code of Federal Regulations (or in any successor regulation or other related guidance that may be issued by the Administrator) other than a business concern described in paragraph (a) or (k) of such section.’’

[18] For such entities with more than one physical location, section 7(a)(36)(D)(iii)(III) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iii)(III)), as amended by section 5001 of the American Rescue Plan Act, provides that such entities with more than one physical location are eligible if they employ not more than 300 employees *per physical location*.

[19] This subsection was originally published at 85 FR 35550, subsection III.1. (June 11, 2020) and has been revised to conform with the American Rescue Plan Act.

[20] *See* section 7(a)(36)(D)(iii)(IV) of the Small Business Act as amended by the American Rescue Plan Act.

[28] This subsection was originally published at 85 FR 20811, subsection III.2.a. (April 15, 2020), and amended by 85 FR 36308 (June 16, 2020), 85 FR 36717 (June 18, 2020), 85 FR 38301 (June 26, 2020), and 86 FR 13149 (March 8, 2021), and has been modified to conform to subsequent interim final rules or guidance, the Economic Aid Act, the American Rescue Plan Act and for readability.

[30] This subsection has been revised to conform to section 5005 of the American Rescue Plan Act.

[32] Added to conform to section 342 of the Economic Aid Act, which also added the following definitions to paragraph 7(a)(36)(A) of the Small Business Act (15 U.S.C. 636(a)(36)(A)): ‘‘(xvi) the terms ‘exchange’, ‘issuer’, and ‘security’ have the meanings given those terms in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)).’’ This provision applies to loans made on or after December 27, 2020.

[33] *See* section 317 of the Economic Aid Act, as amended by section 5001 of the American Rescue Plan Act.

licensed under section 301 of the Small Business Investment Act of 1958 (15 U.S.C. 681); (4)(a) any business concern (including any station which broadcasts pursuant to a license granted by the Federal Communications Commission under title III of the Communications Act of 1934 (47 U.S.C. 301 *et seq.*) without regard for whether such a station is a concern as defined in § 121.105 of title 13, Code of Federal Regulations, or any successor thereto) that employs not more than 500 employees, or the size standard established by the Administrator for the North American Industry Classification System code applicable to the business concern, per physical location of such business concern and is majority owned or controlled by a business concern that is assigned a North American Industry Classification System code beginning with 511110 or 5151; or (b) any nonprofit organization that is assigned a North American Industry Classification System code beginning with 5151; and (5) any business concern or organization that is assigned a NAICS code of 519130, certifies in good faith as an internet-only news publisher or internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information, if the business concern or organization employs not more than 500 employees (or the size standard in number of employees established by SBA in 13 CFR 121.201 for NAICS code 519130) per physical location, and is majority owned or controlled by a business concern or organization that is assigned NAICS 519130. This interim final rule has no effect on these statutory waivers, which remain in full force and effect. As a result, the affiliation rules contained in § 121.301 also do not apply to these types of entities. In addition, paragraph 7(a)(36)(D) of the Small Business Act (15 U.S.C. 636(a)(36)(D)), as amended by section 342 of the Economic Aid Act and section 5001 of the American Rescue Plan Act states that, with respect to a business concern made eligible under paragraph 7(a)(36)(D)(iii)(II) or (IV) or 7(a)(36)(D)(iv)(IV) or (V) (certain news organizations and internet publishing organizations), the Administrator shall not consider whether any affiliated entity, which for purposes of this subclause shall include any entity that owns or controls such business concern or organization, is an issuer as defined in subsection III.B.2.a.viii.

Part IV.(c) of the interim final rule on second draw PPP loans sets forth who is eligible for a Second Draw PPP Loan. The American Rescue Plan Act amended the eligibility criteria for a Second Draw PPP Loan similarly to the amendments discussed above for First Draw PPP Loans. Therefore, part IV.(c)(1) of the interim final rule on second draw PPP loans (86 FR 3712, 3717) is revised to read as follows:

*(c) Who is eligible for a Second Draw PPP Loan?*

Subject to subsection (e) of this section, below, the following applicants are eligible for Second Draw PPP Loans:

(1) An applicant is eligible for a Second Draw PPP Loan if it is a business concern, independent contractor, eligible self-employed individual, sole proprietor, nonprofit organization eligible for a First Draw PPP Loan, veterans organization, Tribal business concern, housing cooperative, small agricultural cooperative, eligible 501(c)(6) organization or destination marketing organization, an eligible nonprofit news organization, additional covered nonprofit entity, or eligible internet publishing company[33] that:

(i) Previously received a First Draw PPP loan in accordance with the eligibility criteria in the Consolidated First Draw PPP IFR (as amended);

(ii) has used, or will use, the full amount of its First Draw PPP Loan (including the amount of any increase on such First Draw PPP Loan) on authorized uses under subsection B.11. of the Consolidated First Draw PPP IFR on or before the expected date on which the Second Draw PPP Loan will be disbursed;

(iii) employs not more than 300 employees, unless it satisfies the alternative criteria for businesses with a North American Industry Classification System (''NAICS'') code beginning with 72, eligible news organizations, (501)(c)(3) nonprofit organizations, additional covered nonprofit entities, 501(c)(6) organizations, eligible destination marketing organizations, and eligible internet publishing organizations with more than one physical location described in subsection (c)(3), (c)(4), (c)(5), or (c)(6) of this section; and

(iv) (A) experienced a reduction in revenue in calendar year 2020, measured as follows:

* * * * *

Part IV.(c) of the interim final rule on second draw PPP loans (86 FR 3712, 3718) also is revised by adding two new subsections at the end to read as follows:

(5) An entity is eligible for a Second Draw PPP Loan if it is a 501(c)(3) nonprofit organization, an additional covered nonprofit entity, an eligible 501(c)(6) organization, or an eligible destination marketing organization and it employs not more than 300 employees per physical location of the entity or organization.

(6) A business concern or other organization that was not eligible to receive a covered loan before March 11, 2021, is eligible to receive a Second Draw PPP Loan for the continued provision of news, information, content, or emergency information if it is assigned a NAICS code of 519130, certifies in good faith as an internet-only news publisher or internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information, and:

(i) The business concern or organization employs not more than 300 employees per physical location of the business concern or organization; and

(ii) the business concern or organization makes a good faith certification that proceeds of the loan will be used to support expenses at the component of the business concern or organization that supports local or regional news.

Part IV.(d) of the interim final rule on second draw PPP loans states that eligibility for Second Draw PPP Loans is governed by the same affiliation rules (and waivers) as First Draw PPP Loans, except as described in subsection (d)(2). The American Rescue Plan Act revised the affiliation waivers for First Draw and Second Draw PPP Loans. Although the American Rescue Plan Act did not amend section 7(a)(37)(E)(ii) of the Small Business Act (15 U.S.C. 636(a)(37)(E)(ii)) to substitute ''not more than 300 employees'' for ''not more than 500 employees'' in subclause (V) of section 7(a)(36)(D)(iv) of the Small Business Act (15 U.S.C. 636(a)(36)(D)(iv)), as section 7(a)(37)(E)(ii) does for eligible news organizations, SBA is doing so here to harmonize the affiliation waiver for internet publishing organizations with the 300 employees per location size standard for Second Draw PPP Loans to internet publishing organizations.

Therefore, Part IV.(d)(2) of the interim final rule on second draw PPP loans (86 FR 3712, 3718) is revised by adding a new subsection (iii) to read as follows:

*(d) How do SBA's affiliation rules affect an applicant's eligibility for a Second Draw PPP Loan?*

* * * * *

(iii) Any business concern or other organization that was not eligible to receive a covered loan before March 11, 2021, is assigned a NAICS code of 519130, certifies in good faith as an internet-only news publisher or internet-only periodical publisher, and is engaged in the collection and distribution of local or regional and national news and information, if the business concern or organization:

(A) Employs not more than 300 employees, per physical location of the business concern or organization; and

(B) is majority owned or controlled by a busines concern or organization that is assigned a NAICS code of 519130.

In order to implement the American Rescue Plan Act provision that allows businesses to receive both a Shuttered Venue Operator (SVO) Grant and a PPP loan, part IV.(e)(5) of the interim final rule on second draw PPP loans (86 FR 3712, 3719) is revised to read as follows:

*(e) Who is not eligible for a Second Draw PPP Loan?*

An applicant is not eligible for a Second Draw PPP Loan, even if it meets the eligibility requirements of subsection (c) of this section, if the applicant is:

* * * * *

(5) any person or entity that has been approved for a grant under the Shuttered Venue Operator (SVO) Grant Program under

[33] All terms in this subsection have the same definitions as in sections 7(a)(36) and (37) of the Small Business Act and the Consolidated First Draw PPP IFR, as applicable.

section 324 of the Economic Aid Act. (If you receive a PPP loan after December 27, 2020 and you are subsequently approved for an SVO grant, the amount of the SVO grant received will be reduced by the amount of a First Draw or Second Draw PPP Loan. If you receive both a First Draw and Second Draw PPP Loan after December 27, 2020 and you are subsequently approved for an SVO grant, the SVO grant will be reduced by the combined amounts of both PPP loans. A PPP loan received prior to December 27, 2020 will not reduce the amount of the SVO grant.)

As noted above, the American Rescue Plan Act added affiliation waivers for certain eligible organizations with respect to PPP loans. To implement the additional affiliation waiver applicable to eligible internet publishing organizations, the parenthetical at the end of Part IV.(e)(7) of the interim final rule on second draw loans (86 FR 3712, 3719) is revised to include a reference to Part IV.(c)(6), which describes the conditions under which such internet publishing companies are eligible. Therefore, Part IV.(e)(7) of the interim final rule on second draw loans, as amended by this interim final rule, is revised to read as follows:

* * * * *

(7) Any issuer, the securities of which are listed on an exchange registered as a national securities exchange under section 6 of the Securities Exchange Act of 1934 (15 U.S.C. 78f), where the terms ''exchange,'' ''issuer,'' and ''security'' have the meanings given those terms in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)) (except that SBA will not consider whether a news organization that is eligible under subsection (c)(4) or an internet publishing organization that is eligible under subsection (c)(6) is affiliated with an entity, which includes any entity that owns or controls such news organization or internet publishing organization, that is an issuer);

* * * * *

*2. Forgiveness of First Draw and Second Draw PPP Loans*

Part III.B.14 of the consolidated interim final rule implementing updates to the PPP provides general information to borrowers on loan forgiveness. The consolidated interim final rule implementing updates to the PPP requires a revision to clarify certain forgiveness payroll cost exclusions included in the Economic Aid Act and to incorporate section 3134 of the Internal Revenue Code of 1986 (Internal Revenue Code) as added by section 9651 of the American Rescue Plan Act. Additionally, section 5001(c) of the American Rescue Plan Act revised the forgiveness payroll cost exclusions to include premiums taken into account in determining the credit allowed under section 6432 of the Internal Revenue Code. Therefore, the fourth full sentence in part III.B.14 of the consolidated interim final rule implementing updates to the PPP (86 FR 3692, 3706) reading ''[p]ayroll costs that are qualified wages taken into account in determining the Employer Retention Credit are not eligible for loan forgiveness,'' is revised to read ''The following payroll costs are not eligible for loan forgiveness: (a) Qualified wages taken into account in determining (i) the Employee Retention Credit under section 2301 of the CARES Act, as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act), (ii) the Employee Retention Credit under section 3134 of the Internal Revenue Code, or (iii) the disaster credit under section 303 of the Relief Act, and (b) premiums for COBRA continuation coverage taken into account in determining the credit under section 6432 of the Internal Revenue Code.''

Part IV.1 of the consolidated interim final rule on loan forgiveness requirements and loan review procedures sets forth general information about loan forgiveness for First Draw and Second Draw PPP Loans. The consolidated interim final rule on loan forgiveness requirements and loan review procedures requires revisions to clarify certain forgiveness payroll cost exclusions under the Economic Aid Act and revisions to incorporate the forgiveness payroll cost exclusions required by the American Rescue Plan Act. Part IV.1.a.(1) describes the payroll costs that are eligible for loan forgiveness and identifies those costs that are to be excluded. The second full sentence of part IV.1.a.(1), Payroll Costs (86 FR 8283, 8286), reading ''[p]ayroll costs that are qualified wages taken into account in determining the Employer Retention Credit are not eligible for loan forgiveness,'' is revised to read ''The following payroll costs are not eligible for loan forgiveness: (a) Qualified wages taken into account in determining (i) the Employee Retention Credit under section 2301 of the CARES Act, as amended by section 206 of the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (Relief Act) (CARES Act Employee Retention Credit), (ii) the Employee Retention Credit under section 3134 of the Internal Revenue Code of 1986 (ARP Employee Retention Credit), or (iii) the disaster credit under section 303 of the Relief Act (Disaster Credit), and (b) premiums for COBRA continuation coverage taken into account in determining the credit under section 6432 of the Internal Revenue Code of 1986 (COBRA Continuation Coverage).''

Part IV.1.b. of the consolidated interim final rule on loan forgiveness requirements and loan review procedures describes the amount eligible for loan forgiveness for individuals with self-employment income who file an IRS Form 1040, Schedule C or F. The last clause of part IV.1.b.i (86 FR 8283, 8287) is revised to read ''but excluding any qualified wages taken into account in determining the CARES Act Employee Retention Credit, ARP Employee Retention Credit, or the Disaster Credit or premiums for COBRA Continuation Coverage.''

*3. Additional Information*

SBA may provide further guidance, if needed, through SBA notices that will be posted on SBA's website at *www.sba.gov.* Questions on the Paycheck Protection Program may be directed to the Lender Relations Specialist in the local SBA Field Office. The local SBA Field Office may be found at *https://www.sba.gov/tools/local-assistance/districtoffices.*

*Compliance with Executive Orders 12866, 12988, 13132 and 13563 the Congressional Review Act, the Administrative Procedure Act, the Paperwork Reduction Act (44 U.S.C. Ch. 35), and the Regulatory Flexibility Act (5 U.S.C. 601–612).*

Executive Orders 12866 and 13563

This interim final rule is economically significant for the purposes of Executive Orders 12866 and 13563. SBA, however, is proceeding under the emergency provision at Executive Order 12866 section 6(a)(3)(D) based on the need to move expeditiously to mitigate the current economic conditions arising from the COVID–19 emergency.

This rule is necessary to provide economic relief to small businesses and nonprofit organizations nationwide adversely impacted under the COVID–19 Emergency Declaration. We anticipate that this rule will result in substantial benefits to small businesses, nonprofit organizations, their employees, and the communities they serve. However, we lack data to estimate the effects of this rule.

The Administrator of the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) has determined that this is a major rule for purposes of Subtitle E of the Small Business Regulatory Enforcement and Fairness Act of 1996 (also known as the Congressional Review Act or CRA) (5 U.S.C. 804(2) *et seq.*). Under the CRA, a major rule takes effect 60 days after the rule is published in the **Federal Register**. 5 U.S.C. 801(a)(3).

Notwithstanding this requirement, the CRA allows agencies to dispense with

the requirements of section 801 when the agency for good cause finds that such procedure would be impracticable, unnecessary, or contrary to the public interest and the rule shall take effect at such time as the agency promulgating the rule determines. 5 U.S.C. 808(2). Pursuant to section 808(2), SBA for good cause finds that a 60-day delay to provide public notice is impracticable and contrary to the public interest. Likewise, for the same reasons, SBA for good cause finds that there are grounds to waive the 30-day effective date delay under the Administrative Procedure Act. 5 U.S.C. 553(d)(3).

The last day to apply for and receive a PPP loan is March 31, 2021. Given the short duration of this program, and the urgent need to issue loans quickly, SBA has determined that it is impractical and not in the public interest to provide a delayed effective date. An immediate effective date will give small businesses and nonprofit organizations affected by this interim final rule the maximum amount of time to apply for loans and lenders the maximum amount of time to process applications before the program ends.

Executive Order 12988

SBA has drafted this rule, to the extent practicable, in accordance with the standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, to minimize litigation, eliminate ambiguity, and reduce burden. The rule has no preemptive or retroactive effect.

Executive Order 13132

SBA has determined that this rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various layers of government. Therefore, SBA has determined that this rule has no federalism implications warranting preparation of a federalism assessment.

Paperwork Reduction Act, 44 U.S.C. Chapter 35

SBA has determined that this rule will require revisions to existing recordkeeping or reporting requirements of the Paycheck Protection Program (PPP) information collections (OMB Control Numbers 3245–0407 and 3245–0417. The revisions will affect SBA Form 2483, Borrower Application Form Revised March 3, 2021, SBA Form 2483–C, Borrower Application Form for Schedule C Filers Using Gross Income March 3, 2021, SBA Form 2483–SD, Second Draw Borrower Application Form Revised March 3, 2021, SBA Form 2483–SD–C, Second Draw Borrower Application Form for Schedule C Filers Using Gross Income March 3, 2021, SBA Form 2484, Lender's Application—Paycheck Protection Program Loan Guaranty Revised March 3, 2021, SBA Form 2484–SD, Lender's Application—Second Draw Loan Guaranty Revised March 3, 2021,. SBA Forms 2483, 2483–C, 2483–SD, and 2483–SD–C were amended to include the additional eligible entities (where applicable) and revise the Shuttered Venue Operator Grant Program certification due to the changes made by the American Rescue Plan Act. Other clarifying changes were also made to the forms. Additionally, conforming changes were made to SBA Forms 2484 and 2484–SD.

SBA has requested Office of Management and Budget (OMB) emergency approval of the revisions to the information collections to give small businesses and nonprofits affected by this interim final rule the maximum amount of time to apply for loans and lenders the maximum amount of time to process applications before the program ends.

Regulatory Flexibility Act (RFA)

The Regulatory Flexibility Act (RFA) generally requires that when an agency issues a proposed rule, or a final rule pursuant to section 553(b) of the Administrative Procedure Act or another law, the agency must prepare a regulatory flexibility analysis that meets the requirements of the RFA and publish such analysis in the **Federal Register**. 5 U.S.C. 603, 604.

Rules that are exempt from notice and comment are also exempt from the RFA requirements, including conducting a regulatory flexibility analysis, when among other things the agency for good cause finds that notice and public procedure are impracticable, unnecessary, or contrary to the public interest. SBA Office of Advocacy guide: How to Comply with the Regulatory Flexibility Act, Ch.1. p.9. Since this rule is exempt from notice and comment, SBA is not required to conduct a regulatory flexibility analysis.

**Authority:** 15 U.S.C. 636(a)(36); 15 U.S.C. 636(a)(37); 15 U.S.C. 636m; Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116–136, section 1114, Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116–260), section 303, and American Rescue Plan Act of 2021, sections 5001 and 5005.

**James Rivera,**

*Acting Administrator, Small Business Administration.*

[FR Doc. 2021–05930 Filed 3–18–21; 4:15 pm]

BILLING CODE P

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2020–0971; Product Identifier 2020–NM–083–AD; Amendment 39–21453; AD 2021–05–10]**

**RIN 2120–AA64**

## Airworthiness Directives; Airbus Canada Limited Partnership (Type Certificate Previously Held by C Series Aircraft Limited Partnership (CSALP); Bombardier, Inc.) Airplanes

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** The FAA is adopting a new airworthiness directive (AD) for certain Airbus Canada Limited Partnership Model BD–500–1A10 and BD–500–1A11 airplanes. This AD was prompted by a report that threaded fuel couplings were incorrectly installed at final assembly and in service. This AD requires repetitive functional tests of the auxiliary power unit (APU) fuel feed line shroud, a general visual inspection of the APU fuel feed line shroud for any loose couplings; and tightening any loose couplings, which would terminate the repetitive functional tests. The FAA is issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective April 26, 2021.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of April 26, 2021.

**ADDRESSES:** For service information identified in this final rule, contact Airbus Canada Limited Partnership, 13100 Henri-Fabre Boulevard, Mirabel, Québec J7N 3C6, Canada; telephone 450–476–7676; email *a220_crc@abc.airbus;* internet *http://a220world.airbus.com.* You may view this service information at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available on the internet at *https://www.regulations.gov* by searching for and locating Docket No. FAA–2020–0971.

### Examining the AD Docket

You may examine the AD docket on the internet at *https://www.regulations.gov* by searching for and locating Docket No. FAA–2020–

# Paycheck Protection Program
## Borrower Application Form

OMB Control No.: 3245-0407
Expiration Date: 09/30/2020

| Check One: ❑ Sole proprietor ❑ Partnership ❑ C-Corp ❑ S-Corp ❑ LLC ❑ Independent contractor ❑ Eligible self-employed individual ❑ 501(c)(3) nonprofit ❑ 501(c)(19) veterans organization ❑ Tribal business (sec. 31(b)(2)(C) of Small Business Act) ❑ Other | | DBA or Tradename if Applicable | |
|---|---|---|---|
| **Business Legal Name** | | | |
| | | | |
| **Business Address** | | **Business TIN (EIN, SSN)** | **Business Phone** |
| | | | ( ) - |
| | | **Primary Contact** | **Email Address** |
| | | | |

| Average Monthly Payroll: | $ | x 2.5 + EIDL, Net of Advance (if Applicable) Equals Loan Request: | $ | Number of Employees: | |
|---|---|---|---|---|---|
| Purpose of the loan (select more than one): | ☐Payroll ☐Lease / Mortgage Interest ☐Utilities ☐Other (explain):_________________ | | | | |

### Applicant Ownership

List all owners of 20% or more of the equity of the Applicant. Attach a separate sheet if necessary.

| Owner Name | Title | Ownership % | TIN (EIN, SSN) | Address |
|---|---|---|---|---|
| | | | | |
| | | | | |

*If questions (1) or (2) below are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 1. Is the Applicant or any owner of the Applicant presently suspended, debarred, proposed for debarment, declared ineligible, voluntarily excluded from participation in this transaction by any Federal department or agency, or presently involved in any bankruptcy? | ☐ | ☐ |
| 2. Has the Applicant, any owner of the Applicant, or any business owned or controlled by any of them, ever obtained a direct or guaranteed loan from SBA or any other Federal agency that is currently delinquent or has defaulted in the last 7 years and caused a loss to the government? | ☐ | ☐ |
| 3. Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A. | ☐ | ☐ |
| 4. Has the Applicant received an SBA Economic Injury Disaster Loan between January 31, 2020 and April 3, 2020? If yes, provide details on a separate sheet identified as addendum B. | ☐ | ☐ |

*If questions (5) or (6) are answered "Yes," the loan will not be approved.*

| Question | Yes | No |
|---|---|---|
| 5. Is the Applicant (if an individual) or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction, or presently incarcerated, or on probation or parole? Initial here to confirm your response to question 5 → _______________ | ☐ | ☐ |
| 6. Within the last 5 years, for any felony, has the Applicant (if an individual) or any owner of the Applicant 1) been convicted; 2) pleaded guilty; 3) pleaded nolo contendere; 4) been placed on pretrial diversion; or 5) been placed on any form of parole or probation (including probation before judgment)? Initial here to confirm your response to question 6 → _______________ | ☐ | ☐ |
| 7. Is the United States the principal place of residence for all employees of the Applicant included in the Applicant's payroll calculation above? | ☐ | ☐ |
| 8. Is the Applicant a franchise that is listed in the SBA's Franchise Directory? | ☐ | ☐ |

# Paycheck Protection Program
## Borrower Application Form

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

CERTIFICATIONS AND AUTHORIZATIONS

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

For Applicants who are individuals: I authorize the SBA to request criminal record information about me from criminal justice agencies for the purpose of determining my eligibility for programs authorized by the Small Business Act, as amended.

CERTIFICATIONS

The authorized representative of the Applicant must certify in good faith to all of the below by **initialing** next to each one:

_____ The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____ Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

_____ The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

_____ The Applicant will provide to the Lender documentation verifying the number of full-time equivalent employees on the Applicant's payroll as well as the dollar amounts of payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities for the eight-week period following this loan.

_____ I understand that loan forgiveness will be provided for the sum of documented payroll costs, covered mortgage interest payments, covered rent payments, and covered utilities, and not more than 25% of the forgiven amount may be for non-payroll costs.

_____ During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program.

_____ I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

_____ I acknowledge that the lender will confirm the eligible loan amount using required documents submitted. I understand, acknowledge and agree that the Lender can share any tax information that I have provided with SBA's authorized representatives, including authorized representatives of the SBA Office of Inspector General, for the purpose of compliance with SBA Loan Program Requirements and all SBA reviews.

________________________________________ ____________________
Signature of Authorized Representative of Applicant Date

________________________________________ ____________________
Print Name Title

**Paycheck Protection Program**
**Borrower Application Form**

**Purpose of this form:**

This form is to be completed by the authorized representative of the Applicant and ***submitted to your SBA Participating Lender***. Submission of the requested information is required to make a determination regarding eligibility for financial assistance. Failure to submit the information would affect thatdetermination.

**Instructions for completing this form:**

With respect to "purpose of the loan," payroll costs consist of compensation to employees (whose principal place of residence is the United States) in the form of salary, wages, commissions, or similar compensation; cash tips or the equivalent (based on employer records of past tips or, in the absence of such records, a reasonable, good-faith employer estimate of such tips); payment for vacation, parental, family, medical, or sick leave; allowance for separation or dismissal; payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums, and retirement; payment of state and local taxes assessed on compensation of employees; and for an independent contractor or sole proprietor, wage, commissions, income, or net earnings from self-employment or similar compensation.

For purposes of calculating "Average Monthly Payroll," most Applicants will use the average monthly payroll for 2019, excluding costs over $100,000 on an annualized basis for each employee. For seasonal businesses, the Applicant may elect to instead use average monthly payroll for the time period between February 15, 2019 and June 30, 2019, excluding costs over $100,000 on an annualized basis for each employee. For new businesses, average monthly payroll may be calculated using the time period from January 1, 2020 to February 29, 2020, excluding costs over $100,000 on an annualized basis for each employee.

If Applicant is refinancing an Economic Injury Disaster Loan (EIDL): Add the outstanding amount of an EIDL made between January 31, 2020 and April 3, 2020, less the amount of any "advance" under an EIDL COVID-19 loan, to Loan Request as indicated on the form.

All parties listed below are considered owners of the Applicant as defined in 13 CFR § 120.10, as well as "principals":

- For a sole proprietorship, the sole proprietor;
- For a partnership, all general partners, and all limited partners owning 20% or more of the equity of the firm;
- For a corporation, all owners of 20% or more of the corporation;
- For limited liability companies, all members owning 20% or more of the company; and
- Any Trustor (if the Applicant is owned by a trust).

**Paperwork Reduction Act** – You are not required to respond to this collection of information unless it displays a currently valid OMB Control Number. The estimated time for completing this application, including gathering data needed, is 8 minutes. Comments about this time or the information requested should be sent to : Small Business Administration, Director, Records Management Division, 409 3rd St., SW, Washington DC 20416., and/or SBA Desk Officer, Office of Management and Budget, New Executive Office Building, Washington DC 20503.

**Privacy Act (5 U.S.C. 552a)** – Under the provisions of the Privacy Act, you are not required to provide your social security number. Failure to provide your social security number may not affect any right, benefit or privilege to which you are entitled. (But see Debt Collection Notice regarding taxpayer identification number below.) Disclosures of name and other personal identifiers are required to provide SBA with sufficient information to make a character determination. When evaluating character, SBA considers the person's integrity, candor, and disposition toward criminal actions. Additionally, SBA is specifically authorized to verify your criminal history, or lack thereof, pursuant to section 7(a)(1)(B), 15 USC Section 636(a)(1)(B) of the Small Business Act (the Act).

**Disclosure of Information** – Requests for information about another party may be denied unless SBA has the written permission of the individual to release the information to the requestor or unless the information is subject to disclosure under the Freedom of Information Act. The Privacy Act authorizes SBA to make certain "routine uses" of information protected by that Act. One such routine use is the disclosure of information maintained in SBA's system of records when this information indicates a violation or potential violation of law, whether civil, criminal, or administrative in nature. Specifically, SBA may refer the information to the appropriate agency, whether Federal, State, local or foreign, charged with responsibility for, or otherwise involved in investigation, prosecution, enforcement or prevention of such violations. Another routine use is disclosure to other Federal agencies conducting background checks but only to the extent the information is relevant to the requesting agencies' function. See, 74 F.R. 14890 (2009), and as amended from time to time for additional background and other routine uses. In addition, the CARES Act, requires SBA to register every loan made under the Paycheck Protection Act using the Taxpayer Identification Number (TIN) assigned to the borrower.

**Debt Collection Act of 1982, Deficit Reduction Act of 1984 (31 U.S.C. 3701 et seq. and other titles)** – SBA must obtain your taxpayer identification number when you apply for a loan. If you receive a loan, and do not make payments as they come due, SBA may: (1) report the status of your loan(s) to credit bureaus, (2) hire a collection agency to collect your loan, (3) offset your income tax refund or other amounts due to you from the Federal Government, (4) suspend or debar you or your company from doing business with the Federal Government, (5) refer your loan to the Department of Justice, or (6) foreclose on collateral or take other action permitted in the loan instruments.

**Right to Financial Privacy Act of 1978 (12 U.S.C. 3401)** – The Right to Financial Privacy Act of 1978, grants SBA access rights to financial records held by financial institutions that are or have been doing business with you or your business including any financial

institutions participating in a loan or loan guaranty. SBA is only required provide a certificate of its compliance with the Act to a financial institution in connection with its first request for access to your financial records. SBA's access rights continue for the term of any approved loan guaranty agreement. SBA is also authorized to transfer to another Government authority any financial records concerning an approved loan or loan guarantee, as necessary to process, service or foreclose on a loan guaranty or collect on a defaulted loan guaranty.

**Freedom of Information Act (5 U.S.C. 552)** – Subject to certain exceptions, SBA must supply information reflected in agency files and records to a person requesting it. Information about approved loans that will be automatically released includes, among other things, statistics on our loan programs (individual borrowers are not identified in the statistics) and other information such as the names of the borrowers (and their officers, directors, stockholders or partners), the collateral pledged to secure the loan, the amount of the loan, its purpose in general terms and the maturity. Proprietary data on a borrower would not routinely be made available to third parties. All requests under this Act are to be addressed to the nearest SBA office and be identified as a Freedom of Information request.

**Occupational Safety and Health Act (15 U.S.C. 651 et seq.)** – The Occupational Safety and Health Administration (OSHA) can require businesses to modify facilities and procedures to protect employees. Businesses that do not comply may be fined, forced to cease operations, or prevented from starting operations. Signing this form is certification that the applicant, to the best of its knowledge, is in compliance with the applicable OSHA requirements, and will remain in compliance during the life of the loan.

**Civil Rights (13 C.F.R. 112, 113, 117)** – All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations. All borrowers must display the "Equal Employment Opportunity Poster" prescribed by SBA.

**Equal Credit Opportunity Act (15 U.S.C. 1691)** – Creditors are prohibited from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status or age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

**Debarment and Suspension Executive Order 12549; (2 CFR Part 180 and Part 2700)** – By submitting this loan application, you certify that neither the Applicant or any owner of the Applicant have within the past three years been: (a) debarred, suspended, declared ineligible or voluntarily excluded from participation in a transaction by any Federal Agency; (b) formally proposed for debarment, with a final determination still pending; (c) indicted, convicted, or had a civil judgment rendered against you for any of the offenses listed in the regulations or (d) delinquent on any amounts owed to the U.S. Government or its instrumentalities as of the date of execution of this certification.

ProPublica TRACKING PPP Donate

# Tracking PPP

## Search Every Company Approved for Federal Loans

As part of the Paycheck Protection Program, the federal government has provided hundreds of billions in financial support to banks to make low-interest loans to companies and nonprofit organizations in response to the economic devastation caused by the coronavirus pandemic. Search more than 11 million loans approved by lenders and disclosed by the Small Business Administration. | Frequently Asked Questions →

by Moiz Syed and Derek Willis, July 7, 2020. Updated Oct. 27, 2024

**Search for PPP loan applications by organization, lender, zip code and business type.**

Search

For example: trucking, hospice, television, Kasowitz Benson Torres, 90210, Sole Proprietorship

**11.5M**
Loans Approved

**968,524**
Organizations approved for loans between $150,000 and $10 million

**$793B**
Amount Approved

**$763B**
Amount Forgiven
*Includes any accrued interest*

## Number of loans by state

| State | Total | $150k or less | $150k - $350k | $350k - $1m | $1m - 2m | $2m - 5m | $5m - 10m |
|---|---|---|---|---|---|---|---|
| Alabama | 169,554 | 158,642 | 6,558 | 3,199 | 794 | 308 | 42 |
| Alaska | 23,693 | 21,031 | 1,620 | 774 | 186 | 67 | 15 |
| American Samoa | 314 | 294 | 15 | 5 | 0 | 0 | 0 |

Commonwealth of Virginia
State Corporation Commission
Office of the Clerk
Entity ID: 11698697
Filing Number: 2405177230328
Filing Date/Time: 05/17/2024 09:25 AM
Effective Date/Time: 05/17/2024 09:25 AM

## Limited Liability Company - Articles of Organization

### Entity Information

Entity Name: The Tarbell Group, LLC

Entity Type: Limited Liability Company

### Business Type

Industry Code: 0 - General

### Duration

Perpetual(forever)

### Registered Agent Information

RA Type: Entity

Locality: VIRGINIA BEACH CITY

RA Qualification: BUSINESS ENTITY THAT IS AUTHORIZED TO TRANSACT BUSINESS IN VIRGINIA

Name: Northwest Registered Agent LLC

Email Address: virginia@northwestregisteredagent.com

The company's registered office address, including the street and number, if any, which is identical to the business office of the registered agent, is:

Registered Office Address: 4445 Corporation Ln Ste 264, Virginia Beach, VA, 23462 - 3671, USA

Contact Number: N/A

### Principal Office Address

Address: 4445 Corporation Ln Ste 264, Virginia Beach, VA, 23462, USA

### Principal Information

Management Structure: Member-Managed

### Signature Information

Date Signed: 05/17/2024

Executed in the name of the limited liability company by:

| Printed Name | Signature | Title |
|---|---|---|
| Nat Smith | Nat Smith | Organizer |